UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BYRON SIGCHO LOPEZ, | ) | |
| JOSE GUERRA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 26-cv-9156 |
| v. | ) | |
| | ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, | ) | |
| and its members, in their official capacities, | ) | |
| LAURA K. DONAHUE, Chair, RICK S. | ) | |
| TERVEN, SR., Vice Chair, JENNIFER M. | ) | |
| BALLARD CROFT, CRISTINA D. CRAY, | ) | |
| TONYA L. GENOVESE, CATHERINE S. | ) | |
| McCRORY, JACK VRETT, and CASSANDRA | ) | |
| B. WATSON, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

Plaintiffs, Byron Sigcho Lopez and Jose Guerra, through their attorneys, file their verified complaint against the Defendants, Illinois State Board of Elections and its members, in their official capacities ("Defendants") and state as follows.

## Nature of the Case

1. There is a growing majority of voters who are disenfranchised with the established political parties, and identify as being independent, or non-partisan, yet the Illinois Election Code has not been modernized in the last century, and its many requirements governing independent and new political party candidates deny First amendment ballot access rights to independent candidates and the growing majority of Illinois residents who do not affiliate with a political party.

2. Data from Gallup polling confirms the trend since the 1990s that more people consider themselves to be politically independent, or non-partisan. Gallup

1

polling wrote[1]: "A record-high 45% of U.S. adults identified as political independents in 2025, surpassing the 43% measured in 2014, 2023 and 2024. Meanwhile, equal shares of U.S. adults — 27% each — identified as either Democrats or Republicans." See Gallup polling report attached as **Exhibit A**.

3.      Among younger voters, Gallup polling wrote[2] in 2022 that 44% of Generation X (born 1965-1980) and 52% of Millennials (born 1981-1996) identified as politically independent. See Gallup polling report attached as **Exhibit B**.

4.      This is an action to declare unconstitutional and to enjoin enforcement of a provision in Section 10-3 of the Illinois Election Code, 10 ILCS 5/10-3, requiring petitions "signed in the aggregate for each candidate by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district."

5.      Plaintiffs seek a declaratory order as follows:  (a) finding that the provision of 10 ILCS 5/10-3 requiring not less than 5%, nor more than 8% * * * of the number of persons, who voted at the next preceding regular election in such district" or 10,816 signatures for the 4th Congressional Dist. is an excessive, an unnecessary,  and an unconstitutional restraint upon Candidate's and his petition signers' First and Fourteenth Amendment rights, and (b) that the name of Byron Sigcho Lopez should be certified to and printed upon the November 3, 2026 general election ballot as an independent candidate for US Representative in

---

1  https://news.gallup.com/poll/700499/new-high-identify-political-independents.aspx  [last visited 7/26/2026]

2  https://news.gallup.com/poll/397241/millennials-gen-clinging-independent-party.aspx   [last visited 7/26/2026]

Congress for the 4th Congressional Dist.

6.     There is "no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 11 (1968). Article 10 of the Illinois Election Code governing independent and new political party candidates is not the least restrictive ballot access scheme that addresses legitimate state interests to maintain the integrity of the election.

## Jurisdiction & Venue

7.     This Complaint is brought pursuant to 42 U.S.C.§§ 1983 and 1988 and the First and Fourteenth Amendments to the United States Constitution.

8.      Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) and the aforementioned statutory and constitutional provisions.

9.     Venue in this Court exists and is proper pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(2), in that the Defendants maintain offices in Chicago, IL and Springfield, IL and simultaneously hold meetings via video conference equipment at both locations, and a substantial part of the events giving rise to the Plaintiffs' claims occurred within the Northern District of Illinois.

10.     Declaratory relief and further relief requested is authorized by 28 U.S.C. §§ 2201 and 2202.

## Parties

11.     Plaintiff, Byron Sigcho Lopez, is a US Citizen, a resident of Chicago, Illinois, a registered voter in the 4th Congressional Dist. of Illinois, and an independent candidate for US Representative for the 4th Congressional Dist. in

3

Illinois seeking ballot placement at the November 3, 2026 general election.

12. Plaintiff, Byron Sigcho Lopez, exerted considerable time, effort, and expense to diligently gather over 17,000 signatures from the 4th Congressional Dist. and timely filed these signature petition with his statement of candidacy with the Defendant, ISBE, on May 26, 2026, confirming that he had a considerable showing of supported for his candidacy from voters who exercised their First amendment right to support the candidate of their choice and to see Candidate Byron Sigcho Lopez's name printed upon the November 3, 2026 general election ballot as an independent candidate for US Representative.

13. Plaintiff, Jose Guerra, is a US Citizen, a resident of Chicago, Illinois, a registered voter in the 4th Congressional Dist. of Illinois, and a voter who signed, supported, and circulated ballot access petitions for Byron Sigcho Lopez as an independent candidate for US Representative for the 4th Congressional Dist. seeking ballot placement at the November 3, 2026 general election.

14. Defendant, Illinois State Board of Elections ("ISBE"), is an Illinois executive branch agency created by the General Assembly in 1973 to supervise the administration of elections throughout the State, with statutory authority defined in the Election Code, 10 ILCS 5/1A-1, et seq. Since its creation, the ISBE has been granted greater authority by the General Assembly beyond coordinating and overseeing election authorities throughout the State, 10 ILCS 5/1A-1, et seq., and the ISBE maintains its own copy of every election authority's electronic voter registration database. Incidental to its statutory authority, the ISBE regularly gathers information and offers recommendations to promulgate new laws and procedures to the General Assembly and the Election Laws Commission.

15. On August 21, 2026, Defendant ISBE will certify all candidates for the general election ballot for the November 3, 2026 general election.

16. Defendant, ISBE, through its same eight appointed members, is also named in its capacity as the State Officers Electoral Board ("SOEB"), which is a quasi-judicial governmental entity that is constituted and convened after an objection petition is filed against a candidate's ballot access petitions, pursuant to 10 ILCS 5/10-8; 10-9. The Election Code authorizes the SOEB to determine the sufficiency of a candidate's ballot access petition, including holding evidentiary hearings, reviewing candidate's petition sheets signed by voters, and determining whether a candidate's name should appear on the general election ballot.

17. The ISBE and SOEB are compromised of four members who are affiliated with the Democratic Party and four of whom are affiliated with the Republican Party; all members of the ISBE are appointed by the State Governor pursuant to 10 ILCS 5/1A-3. Where the state executive officers Attorney General, Secretary of State, Comptroller, and Treasurer are all affiliated with the same political party, the Governor selects and appoints all members. 10 ILCS 5/1A-3(4)

18. Defendants, Casandra B. Watson, Rick Terven Sr., Tonya Genovese, and Jennifer Ballard Croft are named in their official capacities as members of the ISBE and the SOEB that were selected and appointed by the State Governor as the ISBE members of and affiliated with the Democratic Party pursuant to 10 ILCS 5/1A-2, 1A-3.

19. Defendants, Jack Vrett, Catherine McCrory, Laura Kent Donohue, and Cristina Cray are named in their official capacities as members of the ISBE and the SOEB that were selected and appointed by the State Governor as the ISBE members

of and affiliated with the Republican Party pursuant to 10 ILCS 5/1A-2, 1A-3.

20.     The Election Code does not authorize or allow any members of the ISBE or its members sitting as the SOEB to be non-partisan or independent, nor does it allow members who are not affiliated with one of the top two vote receiving established political parties.

<u>**Relevant Facts and Law Allegations**</u>

21.     "Illinois classifies general-election candidates into three groups: those affiliated with an 'established' political party, those affiliated with a 'new' political party, and those running as independents. If a candidate is affiliated with a party, whether established or new, the party name appears alongside the candidate's name on the ballot." *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 521 (7th Cir. 2017).

22.     Independent candidates are those individuals who are not candidates of any political party, and are not nominated at a primary, but rather are candidates at the general election competing for election against the nominated established political party candidates, and are listed on the ballot with the designation "Independent" as defined in 10 ILCS 5/10-3.

23.     Established party candidates benefit from a much lower signature requirement than independent candidates; independent candidates who are able to overcome the Election Code requirements, would not receive any benefits, even from electoral success, and would be required to meet the same heightened signature requirements each election.

24.     Independent candidates, however, gain no benefit of reduced ballot access requirements in subsequent elections by either winning an election or attaining more than 5% of the vote, and are still required to meet the same

6

heightened ballot access requirements defined in Article 10 of the Election Code at each subsequent election.

25. Illinois' signature collection requirement for ballot access for new party and independent candidates originated in 1891, when the requirement was 2% of the last vote in the relevant district. See ALL THE LAWS OF THE STATE OF ILLINOIS, THIRTY-SEVENTH GENERAL ASSEMBLY, § 291, at 93 (1891)[3]. In the 135 years since Illinois adopted this requirement, this signature gathering approach for independent candidates has not been modernized or improved, despite the availability of less burdensome alternatives enabled by modern technology, which many other states have adopted. Yet the number of signatures required under Illinois law has substantially increased, along with a restrictive 90 day time allowed to gather all signatures added in 1985, the "dual circulator" restriction that limits available potential circulators for independent and new party candidates, notarization of each petition, an objector-biased challenge process for controlling the ballot, and other restrictions that have been added to the Election Code.

26. "[V]oting is of the most fundamental significance under our constitutional structure." *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 990 (1979). The rights of candidates and the rights of voters are inescapably intertwined. Citizens have a fundamental right to associate in order to advance political beliefs, and voters have the right to be given the means to vote effectively. *Id.*

27. The First Amendment right to associate, support, and vote for the candidate of the voters' choice was denied in the 4th Congressional Dist. when Rep.

---

3   https://archive.org/details/lawsofstateofill1891illi/page/92/mode/2up
    [last visited 7/26/2026]

Chuy Garcia and his chief of staff Patty Garcia rigged the Democratic primary, and also when Patty Garcia's operatives challenged the ballot access petitions of Plaintiff, Byron Sigcho Lopez.

28.     Nomination papers for a primary and ballot access petitions for a general election that are received by the ISBE are subjected to an apparent conformity review.

29.     All legitimate state interests are satisfied and met, including the showing of a modicum of support from voters, when the Defendants complete an apparent conformity review as defined in the Preface of the ISBE's 2026 Candidate's Guide (Preface attached as **Exhibit C**) as follows:

### APPARENT CONFORMITY

The State Board of Elections conducts an "apparent conformity" review of all nominating petitions filed therewith. The review will take place after a petition is filed and will be limited to determining the following:

(1) whether a signed Statement of Candidacy has been filed, and (2) whether the filed nominating sheets contain gross signatures equal to or exceeding 10% of the minimum number of signatures required for the office sought.

All candidates whose petitions fail the apparent conformity review will be notified in writing and given the opportunity to appear before the State Board of Elections at its first meeting after the petition filing deadline to show good cause why the petition should not be rejected on the basis of non-conformity.

Please note, SBE employees are not available during filing periods to notarize documents.

30.     Defendants have many times in the past, and will continue in the future, to certify any candidate to the primary or to the general election ballot who submitted a Statement of Candidacy and at least 10% of the required signatures, when an objection either is not filed to that candidate's petitions, or where the objection is withdrawn despite direct knowledge by the Defendants that the candidate has fewer signatures than required by the Election Code.

31.     All legitimate state interests are satisfied and met, including the showing of a modicum of support from voters, when candidates for US

8

Representative submit 5,000 voter signatures from their congressional district, seeking ballot access for elections immediately following redistricting.

32. All legitimate state interests would have been satisfied and met including the showing of a modicum of support from voters, and the ISBE would have certified Plaintiff's name to the general election ballot if the objection to Plaintiff's ballot access petitions was withdrawn, and despite the SOEB finding that Plaintiff had submitted fewer signatures than required under the Election Code for an independent candidate.

33. By operation of 10 ILCS 5/7-10 and 8-8 all established party candidates seeking their party's nomination at their primary are allowed 90 days to gather the required number of voter signatures defined in the Election Code for nomination at a primary; by operation of 10 ILCS 5/10-4 all independent and new political party candidates seeking ballot access at a general election are allowed 90 days to gather the number of voter signatures defined in the Election Code.

34. For inclusion in the March 17, 2026 primary nomination, established party candidates' 90 day circulation time (10 ILCS 5/7-12; 8-9) was from **August 5, 2025 to November 3, 2025**; for inclusion upon the November 3, 2026 general election ballot, independent and new political party candidates' 90 day circulation time (10 ILCS 5/10-6) was from **February 25, 2026 to May 26, 2026**.

35. The Election Code mandates that signatures supporting a candidate's petitions be collected "in the presence of the petition circulator" and each circulator of a candidate's petition must then sign the required circulator's affidavit at the bottom of each petition sheet before a notary public affirming that all signatures were taken in their presence (10 ILCS 5/7-10, 8-8, 10-4).

9

36.     The Election Code expressly prohibits a circulator's sworn statement being signed pursuant to penalty of perjury as allowed by 735 ILCS 5/1-109 or 28 U.S.C. § 1746, without a notary public's notarial *jurat*.

37.     Independent and new political parties are disparately and severely burdened by the "dual circulator" prohibition in 10 ILCS 5/10-4, which prevents a person who previously circulated even one petition for a candidate seeking a political party's nomination at a primary from later circulating a petition for an independent or new political party candidate at the general election ballot. See *John W. Moore v. Bd. of Elec. Com'rs*, 794 F.2d 1254 (1986) and 845 F.2d 144 (1988).

38.     After candidates file their petitions, they are then subjected to one or more potential objection challenges (10 ILCS 5/10-8, 10-9) before an electoral board, such as the SOEB, and must overcome such an objection in order to reach the ballot.  This objection process allows a voter to lend their name to an objectors' petition that is advanced by an attorney at an accelerated pace with limited due process, even though the electoral board proceeding is the most important stage, and the only opportunity to present evidence and arguments, but not constitutional challenges.

39.     The SOEB writes its own Rules governing objection proceedings, and has largely adopted the same Rules with the same accelerated deadlines, that it has used for review of nomination petitions submitted by established party candidates with a 1/10th or smaller fraction of signatures than ballot access petitions submitted by independent and new political party candidates; the SOEB's use of the same Rules for independent candidates, who do not have political organizations, denies independent candidates their fundamental due process and equal protection, and

often results in the striking of thousands of voter signatures.

40. The ISBE summarized the requirements for US Representative in its 2026 Candidate's Guide at pgs. 27-28, attached as **Exhibit D**.

**A. Signature requirements for established party US Representative candidates nominated at a primary, with winner automatically moving to general election ballot.**

41. Established political party voters select their candidates for the general election through a publicly funded primary nomination process; a primary is not an election, but rather, a selection by voters who choose one established party and nominate that party's candidates for various offices, with the nominated candidates automatically being placed upon the general election ballot without any further signature gathering or other filings.

42. For the office of US Representative in Congress, candidates seeking nomination by an established political party have 90 days to gather and submit signatures from voters in the congressional district equal to 0.5% (one-half of one percent) of the votes cast only for the party's candidate that received the most votes at the last general election.

43. For the March 17, 2026 established party primary nominations the minimum signature requirement for all candidates, including candidates for US Representative for the 4th Congressional Dist. was defined in 10 ILCS 5/7-10 as follows:

> 10 ILCS 5/7-10(b) "the candidate's petition for nomination must contain at least the number of signatures equal to 0.5% of the qualified primary electors of his or her party in his or her congressional district."

> 10 ILCS 5/7-10(k) "For political subdivisions, the number of primary electors shall be determined by taking the total vote cast for the candidate for that political party who received the highest number of votes in the political subdivision at the last regular election at which an officer was regularly

scheduled to be elected from that subdivision."

44. The signature requirement for established party candidates was calculated based upon 0.5% (multiplied by 0.005) of the votes cast at the 2024 general election for each established party's highest-vote recipient that represented the district. See spreadsheet attached as **Exhibit E**.

45. For the March 17, 2026 established party primary, US Representative candidates for the 4th Congressional Dist. were required to submit 697 signatures to be eligible for the Democratic Party nomination, and 371 signatures to be eligible for the Republican Party nomination.

46. US Rep. Chuy Garcia publicly represented throughout the 90 day circulation period that he was seeking re-election and would seek the Democratic Party's nomination at the March 17, 2026 primary as its candidate for US Representative for the 4th Congressional Dist.; Rep. Chuy Garcia submitted his nomination papers on the first day of petition filing – October 27, 2025 at 8:00 AM.

47. Only one other candidate submitted nomination papers for the Democratic Party's nomination for US Representative for the 4th Congressional Dist., and that candidate was Rep. Chuy Garcia's chief of staff, Patty Garcia, who filed her nomination papers on the last day of filing – November 3, 2025 at 5:00 PM.

48. Rep. Chuy Garcia then withdrew his nomination papers so that his chief of staff, Patty Garcia, was the only Democratic party candidate that could be selected and nominated by Democratic party voters at the March 17, 2026 primary.

49. Rep. Chuy Garcia's misdirection of voters and the petition filing/withdrawal maneuver coordinated with his chief of staff, Patty Garcia, generated negative media with parallels to insider Democratic machine politics

12

which denied candidates and voters a meaningful choice of Democratic party candidates, and resulted in a reprimand being issued by the US House of Representatives. See **Exhibit F** attached.

50. A minimum signature requirement of 0.5% (or one half of one percent) of the votes for the party's candidate at the last general election meets all legitimate state interests in the electoral process.

51. There has never been ballot overcrowding, frivolous candidates, or voter confusion or any concerns about the integrity of the election at an established party primary nomination in Illinois because the 0.5% signature requirement for established political parties, alongside other provisions of the Election Code such as 90 days to gather signatures, with each sheet notarized, and subject to the objection challenge process allowed in 10 ILCS 5/10-8, addresses all legitimate state interests in the orderly administration of the primary.

52. Defendant ISBE knows of no facts to support any legitimate state interest for a higher signature requirement than the signature requirement stated in 10 ILCS 5/7-10 for established party US Representative candidate nominations.

B. **Ballot access requirements for independent US Representative candidates, excluding elections immediately after decennial redistricting.**

53. The Election Code, 10 ILCS 5/10-3, requires independent candidates to submit signature petitions "by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area."

13

54. The signature requirement for independent candidates was calculated based upon 5% to 8% of the total votes cast (for all candidates) at the 2024 general election in the district. See spreadsheet attached as **Exhibit E**.

55. For the 2026 general election, to field candidates in each of the 17 districts, the Democratic party needed to gather at least 15,642 signatures; the Republican party needed to gather at least 12,909 signatures to have a candidate in each of the 17 districts. If a group of independent candidates (or a new political party) wanted to have candidates in all 17 districts, that group of independent US Representative candidates would have been required by the Election Code to have gathered and submitted at least 285,234 signatures in total (**Exhibit E**).

56. For the November 2026 general election, independent candidates in the 4th Congressional Dist. were required to submit at least 10,816 signatures from voters in the district. However, independent candidates, unlike established political party and new political party candidates, are restricted to a maximum of 17,304 signatures; in practice, this means that a reviewing electoral board would not consider any signatures that are after the 17,304th signature in the petitions.

57. Candidate, Byron Sigcho Lopez, organized his campaign with staff and volunteers who started gathering signatures on the first day of petition gathering which continued throughout the 90 day period, which yielded almost 20,000 signatures from voters in the 4th Congressional Dist. Separately, Candidate also undertook fundraising that generated $182,247 in campaign contributions.

58. Candidate Byron Sigcho Lopez however was not able to circulate his own petition sheets and promote his own candidacy through circulation because he previously circulated a few petitions for a Democratic party candidate seeking

nomination at the March 17, 2026 primary; in addition, many of Candidate's volunteers and other paid professional circulators could not circulate petitions for Sigcho Lopez's independent candidacy because they had previously circulated petitions for established party candidates seeking their party's nomination at the March 17, 2026 primary.

59. An objection to Candidate, Byron Sigcho Lopez's petition sheets as an independent candidate for US Representative was filed by Democratic candidate Patty Garcia's supporters, alleging that (a) fewer than 10,816 signatures were submitted after removal of voters who were not registered at the address written, were not registered in the 4th Congressional Dist., and/or whose signatures did not match their voter registration card signatures; and (b) fewer than 10,816 signatures after removal of all sheets under the "dual circulator" restriction (10 ILCS 5/10-4) because two of Plaintiff's circulators had previously circulated petition sheets for a Democratic party committeeperson at the March 17, 2026 primary.

60. The ISBE sitting in its capacity as the SOEB scheduled a "records examination" or review of signatures as defined in its Rules to be located at the ISBE's Springfield location, and scheduled 13 computer stations being operated simultaneously for June 11-12, 2026, which required Candidate Byron Sigcho Lopez to coordinate and arrange for at least 13 campaign volunteers to travel from Chicago to Springfield to partake in the review as "watchers" to observe the review process. Thirteen computer stations is the ISBE's maximum number of stations, and this amount is scheduled for statewide petitions, and a lesser number has historically been scheduled for candidates in a political divisions or district less than the entire state.

61. The ISBE records examination on June 11-12, 2026 was also scheduled by ISBE Staff to proceed from 8:30AM – 8:30PM even though the ISBE's regular business hours are from 8:30AM – 5:00 PM, and SOEB Rules require attorneys to be available "by telephone (including cell phone) during the day and at least until 7:00 p.m." Deviating from the ISBE's procedure for records examinations in the past, for Candidate Sigcho Lopez's review the ISBE hired and paid the City of Springfield Police Dept. to provide armed municipal police officers to patrol inside of the room where the records examination was proceeding, with the threat of arrest and removal for anyone who disobeyed staff instructions announced regularly during the review; on information and belief, the Springfield police officers were privately hired and paid by the ISBE, and were not employed by the City of Springfield on June 11-12, 2026.

62. Adding further difficulty to the records examination in Springfield, ISBE Staff also announced at the start of the records examination that restrooms in the ISBE facility were for employees only, and that Staff had arranged for watchers to use of washrooms at the gas station located across the street from the ISBE's Springfield location, which Staff confirmed they had pre-arranged with the gas station management; to help Candidate they would allow watchers to use the ISBE facility's side-door in the records examination review room, rather than exiting the building through the front door, but would not stop the records examination except for lunch and dinner breaks.  At some point later in the day, the ISBE revised its bathroom policy, and allowed watchers to use the employee restrooms.

63.  At the completion of the records examination, the SOEB determined that Candidate Byron Sigcho Lopez had 9,594 signatures of petition signers that

were registered voters in the 4th Congressional Dist. at the address written, were located in the 4th Congressional Dist., and their handwritten ink signatures matched the digital signature "clip" or image shown on the ISBE's computer monitors.

64. On July 21, 2026 each member of the SOEB, individually and in their official capacities, willfully and intentionally voted "Yes" to adopt the recommendation of the SOEB's hearing officer, and issued their 8-0 decision that Candidate Byron Sigcho Lopez's name should not be certified to the ballot because his ballot access petitions did not include at least 10,816 signatures of voters from the 4th Congressional Dist. See decision attached as **Exhibit G**.

65. Historically, only a handful of independent candidates in Illinois have ever been able to attain ballot access due to the severe and burdensome signature requirement for independent candidates; the 5% signature requirement is enhanced due to additional provisions of the Election Code, including only 90 days to circulate starting in February, each sheet requiring a notarial *jurat*, the "dual circulator" restriction that drastically reduces the number of eligible and experienced circulators, and the objector-biased electoral board objection process governed by electoral board Rules written for much smaller established party petitions.

66. Mayra Macias was another candidate that gathered signatures as an independent candidate for US Representative for the 4th Congressional Dist. who submitted 17,458 signatures and as reported to the FEC her campaign committee received $306,144.40 to support her congressional campaign. A records examination for ballot access petitions filed by Candidate Macias was scheduled by

17

the ISBE for its Chicago office on June 11-12, 15-18, 2026 with 5 computer stations operating simultaneously from 9:00AM – 12:00PM and from 1:00PM – 4:00PM. The ISBE did not hire armed state, county, or municipal police officers to patrol inside of the location where the Macias records examination was being undertaken.

67.     At the conclusion of the Macias records examination, the SOEB determined that Macias had 10,330 signatures of petition signers that were registered voters in the 4th Congressional Dist. at the address written, were located in the 4th Congressional Dist., and their handwritten ink signatures matched the digital signature "clip" or image shown on the ISBE's computer monitors.

68.     On July 21, 2026 and each member of the SOEB, individually and in their official capacities, willfully and intentionally voted "Yes" to adopt the recommendation of the SOEB's hearing officer that Macias did not have sufficient signatures to warrant ballot placement, and issued their 8-0 decision that Candidate Mayra Macias' name should not be certified to the ballot because her ballot access petitions did not include at least 10,816 signatures of voters from the 4th Congressional Dist.

69.     One other candidate, Chris Getty, filed petitions as an independent candidate for US Representative for the 4th Congressional Dist. and his ballot access petitions were not challenged, and thus his signatures did not proceed through a records examination.  Candidate Getty's ballot access petitions were subject only to the ISBE's 10% apparent conformity review, which confirmed that Candidate Getty had filed a statement of candidacy and at least 1,082 signatures. Candidate Getty will appear on the Nov. 3, 2026 general election ballot.

70.     Only Plaintiff, Byron Sigcho Lopez, and Candidates Macias and Getty,

18

filed to be independent candidates in the 4th Congressional Dist. which has the lowest independent signature requirement of 10,816 through application of 10 ILCS 5/10-3 (for non-redistricting elections); **other than these three** independent candidates, _no other persons_ filed as independent candidates for US Representative in any of the other 16 districts in Illinois for the November 3, 2026 general election.

**C. Ballot access requirements for independent candidates in elections following redistricting**

71. District boundaries are changed through decennial redistricting after US Census data is updated, and since boundaries are changed, the ballots cast at the last election in the district have no relevance to the newly drawn district which would not include all parts of the old district; thus the State does not calculate the 5% minimum and 8% maximum signature requirement based upon the ballots cast in the district at the last general election for the election after redistricting.

72. For elections following the decennial redistricting, the Election Code 10 ILCS 5/10-3 imposes a requirement of 5,000 signatures for independent candidates, as follows:

> [ * * * ] For the first election following a redistricting of congressional districts, nomination papers for an independent candidate for congressperson shall be signed by at least 5,000 qualified voters of the congressional district. For the first election following a redistricting of legislative districts, nomination papers for an independent candidate for State Senator in the General Assembly shall be signed by at least 3,000 qualified voters of the legislative district. For the first election following a redistricting of representative districts, nomination papers for an independent candidate for State Representative in the General Assembly shall be signed by at least 1,500 qualified voters of the representative district. [ * * * ]

73. All legitimate state interests are satisfied and met, including the showing of a modicum of support from voters, when independent candidates for US Representative submit at least 5,000 voter signatures from their congressional

district seeking ballot access for elections immediately following redistricting.

74.     There has never been ballot overcrowding, frivolous candidates, or voter confusion or any concerns about the integrity of the election at a general election in Illinois during elections following redistricting with a 5,000 signature requirement for independent candidates, alongside other provisions of the Election Code such as 90 days to gather signatures, with each sheet notarized, "dual circulator" restriction that severely burdens independent candidates, and being subject to the objection challenge process (10 ILCS 5/10-8), which together addresses all state interests in the orderly administration of the general election.

**D.     Other state ballot access requirements for US Representative.**

75.     The US Census defines congressional districts based upon census population data as follows:

> Congressional districts are the 435 areas from which members are elected to the U.S. House of Representatives. After the apportionment of congressional seats among the states, which is based on decennial census population counts, each state with multiple seats is responsible for establishing congressional districts for the purpose of electing representatives. Each congressional district is to be as equal in population to all other congressional districts in a state as practicable. The boundaries and numbers shown for the congressional districts are those specified in the state laws or court orders establishing the districts within each state.

Source:  https://www.census.gov/programs-surveys/geography/guidance/geo-areas/congressional-dist.html [last visited July 26, 2026]

76.     On average each congressional district had a population of approximately 761,169 people based upon the 2020 US Census data; the largest are Delaware at-large (989,948) and Montana at-large (994,416) while the district with the fewest people is Rhode Island's 1st district with a population of 545,085 according to Wikipedia [last visited July 26, 202] summary:

20

https://en.wikipedia.org/wiki/List_of_United_States_congressional_districts

77.     The 4th Congressional Dist. in Illinois (map attached as **Exhibit H**) had a population of 653,647 at the 2020 US Census, and increased to an approximate population of 712,078 in 2024 based upon 2024 American Community Survey 1-Year Estimates[4]. The ethnic demographics of the 4th Congressional Dist.[5] is 66.5% Hispanic, 23.4% White, 4.5% Back, 3.9% Asian; the 4th Congressional Dist. was the hardest targeted ICE enforcement area in Illinois, and many residents have been living scared and traumatized.

78.     Nearly all other states yield to the US Constitution for the office of US Representative, and have lower ballot access requirements for independent candidates for US Representative than Illinois, and do just fine administering their elections for US Representative with lower and less burdensome ballot access requirements.

79.     Unaffiliated or independent candidates for US Representative in other states have lower signature requirements (see **Exhibit I**) including the following:

**Alaska** 3% of voters in district or 2,000 whichever is less;

**California** $1,740 fee or 2,000 signatures or partial fee plus signatures;

**Colorado** lesser of 2.5% votes in district at last election or 1,500 signature;

**Hawaii** 25 signatures and $75 filing fee;

**Idaho** 500 signatures in district and $300 filing fee;

**Indiana** 2% of votes cast in district at last election;

**Iowa** 1,726 signatures, at least 47 signatures in half the counties in the district;

---

4   https://www.census.gov/mycd/?st=17 [last visited July 26, 2026]
5   https://en.wikipedia.org/wiki/Illinois%27s_4th_congressional_district [last visited 7/26/26]

**Kansas** 4% of voters in district, at least 25 and no more 5,000 and $1,740;

**Kentucky** 400 signatures and $500 filing fee;

**Louisiana** 250 signatures from anywhere in the state or $1,500 filing fee;

**Maine** 2,000 to 2,500 signatures;

**Massachusetts** 2,000 signatures;

**Michigan** 3,000 to 6,000 signatures;

**Minnesota** 1,000 signatures and $300 filing fee;

**Mississippi** 1,000 signatures anywhere or 200 in district and $500 filing fee;

**Missouri** 2% of votes from last election;

**Nebraska** 20% of registered voters in district of 2,000 whichever is less;

**Nevada** 1% of ballots cast in district at last election and $300 filing fee;

**New Hampshire** 1,500 signatures and $50;

**New Jersey** 250 signatures or 50 signatures after redistricting;

**New Mexico** 2% of ballots cast in district (D1: 5,678; D2: 3,903 or D3:4,619)

**New York** 5% of votes for governor at last election or 3,500 whichever less

**North Carolina** 1.5% of registered voters in district and $1,740

**North Dakota** 2% of resident population or 300 whichever is less

**Oregon** 1% of votes for president in district at last election

**Pennsylvania** 2% of the highest votes at last election in district and $150

**Rhode Island** 500 signatures

**South Dakota** 1% of votes for governor at last election or 3,502 signatures

**Tennessee** 25 signatures

**Texas** lesser of 500 or 5% of votes for governor in district at last election

**Utah** lesser of 300 or 5% of voters in the district

**Vermont**  500 signatures

**Virginia**  1,000 signatures

**Washington**  $1,740 filing fee, or if unable to pay, gather 1,740 signatures

**West Virginia** 1% of votes in district at last election (D1: 2,072 and D2: 2,449)

**Wisconsin** at least 1,000 but not more than 2,000

**Wyoming** 2% of votes for same office in district at last election and $750

80.      California has a large population and handles its ballot access requirements through a filing fee of 1% of the US Representative salary of $1,740, but also allows candidates without the funds to pay the filing fee to gather and submit signatures, or a combination of partial fee and partial signatures.

81.      All legitimate state interests are satisfied and met, including the showing of a modicum of support from voters, preventing voter confusion, deterring frivolous candidates, preventing ballot overcrowding, and maintaining the integrity of elections, in each state that has a lower and less burdensome signature requirement than Illinois.

82.      On information and belief, only four states besides Illinois, impose a signature requirement of 10,000 or more for independent candidates for US Representative:  South Carolina, Maryland, Oklahoma and Georgia.

83.      Since each congressional district is similarly sized based upon US Census population data, the signature requirements for independent candidates from other states may be relied upon as legitimate, less restrictive, and feasible alternatives to Illinois' ballot access requirements for independent candidates.

84.      Illinois' Election Code signature requirement for independent candidates for US Representative, amplified by the many other requirements and

23

limitations governing independent ballot access petitions, is an outlier among the 50 states, and poses a severe burden to ballot access for independent candidates.

<u>Causes of Action</u>

**Count I**
**First & Fourteenth Amendments to the United States Constitution**

1-84. Plaintiffs reassert Paragraphs 1-84 as if fully stated herein.

85. The First and Fourteenth Amendments afford candidates vying for elected office, and their voting constituencies, the fundamental right to associate for political purposes and to participate in the electoral process. See *Clingman v. Beaver,* 544 U.S. 581, 586 (2005); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983); *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

86. The Election Code provisions governing independent and new party candidates serve to insulate the two-party system, as confirmed by historical record where few independent candidates have been able to meet the signature requirements, and those that made the ballot were not challenged so the total number of signatures submitted was never determined, other than through the Defendants' apparent conformity review which confirms that such candidates submitted at least 10% of the number stated in the Election Code.

87. Legislation that imposes greater burdens upon independent candidates to protect or insulate the two-party system is not permitted, explained by the Supreme Court as follows:"[o]ur U.S. Supreme Court has observed that interest in political stability 'does not permit a State to completely insulate the two-party system from minor parties' or 'independent candidates' competition and influence." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 366-87, 117 S. Ct. 1364 (1977); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 187, 99 S.Ct.

24

983 (1979).

88. "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S. Ct. 533 (1986).

89. The requirement for a modicum of voter support for US Representative is met through 0.5% of the votes for a party's candidate (rather than all ballots cast) at the last general election, or 697 signatures for Democratic party candidates and 371 for Republican party candidates.

90. The requirement for a modicum of voter support for US Representative, sufficient to satisfy the Defendants' interests and to certify a candidate to the ballot is met through Defendant ISBE's apparent conformity review, and confirmation by the ISBE of at least 70 signatures for Democratic party candidates and 37 for Republican party candidates, for US Representative.

91. The requirement for a modicum of voter support for US Representative, sufficient to satisfy the Defendants' interests and to certify a candidate to the ballot is met when an independent candidate for US Representative submits at least 5,000 signatures on elections following redistricting.

92. Application of the provisions in 10 ILCS 5/10-4 that requires an independent candidate petition to contain no less than 5% but not more than 8% of the *total* ballots cast at the last general election, gathered within 90 days, imposes a severe burden that restricts Plaintiffs' and their petition signers First and Fourteenth Amendment rights of the United States Constitution.

93. Application of the provisions in 10 ILCS 5/10-3 requiring an

25

independent candidate petition to contain no less than 5% but not more than 8% of the ballots cast at the last general election fails to narrowly advance any legitimate state interest or regulatory purpose.

94. Application of the provisions in 10 ILCS 5/10-3 requiring an independent candidate petition to contain no less than 5% but not more than 8% of the ballots cast at the last general election is not the least restrictive means for maintaining the integrity of the election, but rather, imposes as severe and unequal burden upon independent candidates, including Plaintiff, and such a requirement advances no legitimate and compelling state interest.

95. The least restrictive method for advancing legitimate state interests to protect the integrity of the election would be either (a) ISBE's apparent conforming review which determines if there is 10% of the required signatures (1,082-1,980 signatures), or (b) a three or four times multiple of the established party signature requirement; or (c) 5,000 signatures after redistricting which is the requirement that meets all legitimate state interests.

96. Defendants have no legitimate state interest or compelling justification for requiring more than 5,000 signatures for independent candidates for US Representative.

97. Illinois' ballot access requirements for independent candidates and new party candidates for US Representative violate rights guaranteed to the Plaintiffs – in their capacities as Candidate, voter, circulator, supporter, and/or petition signer – by the First and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

98. A real and actual controversy exists between the parties.

99. Plaintiffs have no adequate remedy at law other than this action for declaratory and equitable relief.

100. Plaintiffs are suffering irreparable harm as a result of the denial of First Amendment rights in their capacities of candidate, voter, supporter, and/or circulator, and that harm will continue unless declared unlawful and enjoined by this honorable Court.

101. Plaintiff, Byron Sigcho Lopez has suffered actual damages, which includes the loss of the expenditure of funds for his campaign staff, printing petition sheets, office expenses, payments for petition circulators, legal fees for representation at the SOEB proceeding, and other actual damages.

102. The higher than necessary 5% signature requirement separately and in conjunction with other requirements of the Election Code, both cause injury to and violate the rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT II
### As-Applied First Amendment to the United States Constitution

1-102. Plaintiffs reassert Paragraphs 1-102 as if fully stated herein.

103. The signature requirement of at least 5% but not more than 8% of the total votes cast in the district at the last general election, combined with the other ballot access requirements including 90 day circulation time, notarization for each sheet, "dual circulator" restriction, and electoral board objection process, poses a severe and burdensome requirement to Candidate, Byron Sigcho Lopez's, ballot access rights under the First Amendment.

104. As applied, the signature requirement of at least 5% but not more than 8% of the total votes cast in the district at the last general election, combined with

27

the other ballot access requirements including 90 day circulation time, notarization for each sheet, "dual circulator" restriction, and electoral board objection process, poses a severe and burdensome requirement to Plaintiff Jose Guerra's, rights under the First Amendment to support, see the candidate of his choice on the ballot, and to be able to vote for the candidate of his choice.

105.    As applied, the higher than necessary 5% signature requirement separately and in conjunction with other requirements of the Election Code, both cause injury to and violate rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

**COUNT III**
**Equal Protection First & Fourteenth Amendments**
**to the United States Constitution**

1-102.  Plaintiffs reassert Paragraphs 1-102 as if fully stated herein.

102     Ballot access requirements that place more burdensome restrictions on certain types of candidates than on others implicate rights under the Equal Protection Clause as confirmed by the US Supreme Court in *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968); *Bullock v. Carter*, 405 U.S. 134 (1972); *Lubin v. Panish*, 415 U.S. 709 (1974); *Illinois Elections Bd. v. Socialist Workers Party*, 440 U. S. 173, 183 (1979),

103.    The Election Code provisions governing ballot access by independent candidates insulate and protects the established party structure in Illinois, and freezes the statewide political status quo, as is confirmed by very few independent candidates reaching the ballot in the last half century.

104.    The many fold larger signature requirement governing independent and new political party candidates is neither necessary for the integrity of elections nor is it a minor difference from the signature requirement for established party

28

candidates, particularly since the other provisions of the Election Code have not been expanded or adjusted for the many times larger signature requirement.

105. The Election Code requires over 10,000 signatures for independent candidates for US Representative, yet the Election Code applies the same signature gathering procedures governing much smaller established party primary nomination papers – 90 days to gather signatures (but earlier February start), with each sheet requiring a notarial *jurat*, the "dual circulator" restriction, and the objector-biased objection process where a competing political interest can challenge and deny ballot access, and SOEB Rules that are the same accelerated schedule for established party candidates, without being adjusted to provide additional time, due process, and opportunities for Candidates to gather evidence and oppose the objectors' petition.

106. The impact of the dramatically larger signature requirement, yet restricted by the same provisions of the Election Code governing established party candidates and SOEB Rules written for established party candidate petitions results in an invidious and disparate discrimination against independent and new party candidates, in violation of the Equal Protection Clause of the US Constitution.

107. A considerable disparity in signature requirements for ballot access for independent candidates for US Representative exists as follows: (a) between established party candidates 0.5% and independent or new party candidates at 5%, and (b) 5,000 signatures for election after redistricting and over 10,000 signatures for in-between elections based on 5% of total votes in last general election in the district, and (c) Defendants' 10% apparent conformity review (1,081 to 1,980) and over 10,000 signatures for in-between elections based on 5% of total votes in last

general election in the district. Such disparities are overt and invidious discrimination against independent candidates that violate the Equal Protection Clause of the US Constitution.

108.   The Defendants have no legitimate state interest in enforcing a signature requirement of 5% to 8% of the total votes cast in the district at the last general election, when all legitimate state interests are satisfied through the lesser 5,000 signature requirement on elections following redistricting, and separately satisfied through the Defendant's 10% apparent conformity review (1,082-1,980 signatures).

109.   Plaintiffs' fundamental First amendment rights were confirmed by the U.S. Supreme Court in *Reynolds v. Sims* as follows: "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362 (1964).

110.   Protecting core political speech from improper denial by Defendants has historically warranted court intervention and the granting of preliminary injunctive relief since "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

111.   Plaintiffs, and all persons who supported Candidate Byron Sigcho Lopez are being denied their First amendment rights by Defendants through their application of the signature requirement of at least 5% but not more than 8% of the total votes cast in the district at the last general election; this denial is particularly egregious since there were over 17,000 petition signers that are being denied their

their First amendment right to see the candidate of their choice appear on the general election ballot.

112.    The Election Code 10 ILCS 5/10-3 that requires independent candidates for US Representative to file at least 5% but not more than 8% of the total votes cast in the district at the last general election, when 5,000 signatures is sufficient to meet any state interests in elections following redistricting constitutes a violation of Plaintiffs' right to Equal Protection under the US Constitution.

### Count IV
### Impermissible expansion of Qualifications Clause

1-102.  Plaintiffs reassert Paragraphs 1-102 as if fully stated herein.

103.    The qualifications for the office of US Representative[6] are defined in the US Constitution, Article I, section 2, clause 2, as follows:

> No Person shall be a Representative who shall not have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

104.    The Tenth Amendment confirms that states have no authority to expand or impose additional qualifications to the office of US Representative: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

105.    In *U.S. Term Limits*, the Supreme Court confirmed that states cannot add qualifications to federal candidacies by passing term limits. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 115 S.Ct. 1842, 1847, 1852, 1868, 1870 (1995). See also *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944 (1969); *Trump v. Anderson*, 601 U.S. 100, 144 S.Ct. 662 (2024).

---

6   See also, **Exhibit D**.

106. Illinois' signature requirement for independent candidates for US Representative are so excessive and burdensome, and beyond any legitimate state interests, that the signature requirement of at least 5% but not more than 8% of the total votes in the district at the last general election – without expanding or modifying other signature gathering provisions[7] – constitutes an additional qualification beyond the qualifications stated in the US Constitution.

107. The Election Code 10 ILCS 5/10-3 that requires independent candidates for US Representative to file at least 5% but not more than 8% of the total votes cast in the district at the last general election is an unconstitutional attempt to add qualifications for independent and new political party candidates for US Representative, and is unconstitutional because it violates the Tenth Amendment by imposing additional qualifications not stated in the US Constitution, Article I, section 2, clause 2.

**COUNT V**
**Cumulative effect of Illinois law creates an unconstitutional restriction of rights under the First & Fourteenth Amendments to the Constitution**

1-102. Plaintiffs reassert Paragraphs 1-102 as if fully stated herein.

103. Many of requirements of the Election Code in Article 10 of the Election Code governing independent and new party candidates are the same as those governing established party candidates that have a much smaller signature requirement.

---

7  Equal 90 days to gather signatures (but February start), with each sheet notarized creates a 10-15 times additional time/effort burden, the "dual circulator" restriction eliminates majority of experienced/paid circulators, and the objector-biased objection process where a competing political interest can challenge and deny ballot access, and SOEB Rules that are the same accelerated schedule and limited due process that were written for established party candidates, without expansion of time or due process for much larger petitions.

104.    Independent candidates are allowed the same 90 days to gather signatures (but have an earlier start in February), so independent candidates have to either hire circulators or enlist a considerably larger team of volunteers to gather 10 to 15 times as many signatures within 90 days; however, independent candidates, by virtue of being independent of a political organization, typically do not have the network of precinct captains, committeepersons, loyal supporters, and elected officials with their staffs, or the ability to run a "slate" petition with multiple candidates all gathering the same number of signatures as needed for one candidate.

105.    Each sheet must contain a notarial *jurat*, rather than a signature under penalty of perjury; each sheet being notarized creates a 10-15 times additional burden upon independent candidates who have to gather 10-15 times the number of signatures, where ink signed and notarized sheets require coordination of circulators and notaries.

106.    The "dual circulator" restriction in 10 ILCS 5/10-4, which locks-in any person who circulated even one petition sheet for an established party candidate's nomination at a primary (March 17, 2026) into being affiliated with that political party, and prevents such circulators from later circulating for an independent candidate at the general election (Nov. 3, 2026), which is actually a direct content-based restriction upon such circulators' right to First amendment speech.

107.    Circulation of ballot access petitions necessarily constitutes "core political speech" for which First Amendment protection is at its zenith.  *Meyer v. Grant*, 486 U.S. 414 (1988).

108.    The "dual circulator" restriction amplifies the signature requirement

because independent and new party candidates are restricted in who is authorized to circulate their petition sheets, with the penalty being the loss of all signatures upon sheets that were circulated by someone who previously circulated a party nomination petition for a primary. This restriction poses a major obstacle to independent and new party candidate ballot access both because of the huge number of signatures required, but also because virtually all experienced, regular, and professional circulators have already circulated for established party nominations. Independent and new party candidates have to enlist the help of persons who may not have experience circulating petitions, which is a less efficient method and risks errors in circulation.

109. After filing, independent and new party candidates face an objector-biased objection process where a competing political interest can challenge and deny ballot access to thousands of petition signers, by alleging signatures don't match voter card signatures, voters are not registered at the address or in the district, and other bases for striking petition signers, without notice or due process afforded to voters, or an additional time allotted to independent candidates to gather additional signatures.

110. The objection process before an electoral board, such as the SOEB, is governed by Rules written by the electoral board, and not otherwise defined in the Election Code. Electoral Board rules define an expedited schedule, with limited due process, no discovery, and subpoenas for witnesses/documents that are allowed or not at the discretion of the SOEB's general counsel. Though the electoral board process is the most important stage, akin to a trial court proceeding where all evidence, arguments, and claims must be made, the SOEB adopted and

used the same Rules that were written for established party candidates and their much smaller petitions for nomination, with an accelerated schedule to a decision. The SOEB Rules prioritize speed to resolution, rather than accuracy of the result or respect for First amendment rights of candidates and petition signers that are being adjudicated.

111. The cumulative effect of the higher than necessary 5% to 8% signature requirement, in conjunction with other requirements of the Election Code, both cause injury to and violate rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

112. The higher signature requirement is unnecessary and unconstitutional on its face, because the cumulative effect of ballot access provisions in Article 10 of the Election Code are so robust that any legitimate state interests are already satisfied when there is a 5,000 signature requirement for independent candidates for US Representative alongside the 90 day circulation time, notarization for each sheet, "dual circulator" restriction, objection challenge process, and harsh SOEB Rules that don't fit the larger sized independent and new party petitions.

113. The cumulative effect of Article 10 of the Election Code governing independent and new party candidates for US Representative poses a severe and invidious burden upon ballot access, and violates rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

### Preservation of Evidence

114. Plaintiffs request that Defendants secure and preserve all original ballot access petitions submitted by Candidate, Byron Sigcho Lopez, and all email, filings, spreadsheets, notes, transcripts, and other documents in the possession of

35

Defendants related to the SOEB proceeding *Rivera, et al. v. Byron Sigcho Lopez*, No. 26 SOEB GE 508.

115. Notice is provided to the Attorney General as attorney for the Defendants that Plaintiffs seek a decision regarding the constitutionality of Illinois law.

## Prayer For Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter findings and an order as follows:

A. Finding that the Defendants have no compelling state interest in enforcing the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than 8% of the total votes cast in the district at the last election;

B. Finding that all legitimate state interests in the signature requirement in 10 ILCS 5/10-3 governing independent candidates for US Representative are met through the Defendants' 10% apparent conformity review (1,082-1,980 signatures) and/or through filing of 5,000 signatures;

C. Declaring that the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than 8% of the total votes cast in the district at the last election to be unconstitutional because it denies Plaintiffs their rights under the First and Fourteenth Amendments to the United States Constitution;

D. Declaring that the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than 8% of the total votes cast in the district at the last election to be unconstitutional because it denies Plaintiffs their rights of Equal Protection

under the US Constitution;

E.    Entering a preliminary injunction and permanent order against Defendants enjoining the Defendants from enforcing the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than 8% of the total votes cast in the district at the last election and enjoining and directing Defendants to certify and print the name of Plaintiff, Byron Sigcho Lopez, upon the November 3, 2026 general election ballot as an independent candidate for US Representative for the 4th Congressional Dist. in Illinois;

F.    The entry of a permanent injunction enjoining the Defendants from enforcing the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than 8% of the total votes cast in the district at the last election;

G.    An award of damages as authorized by law and appropriate;

H.    Awarding litigation costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and,

I.    Retaining jurisdiction over this action to enforce this honorable court's orders, and grant any further equitable relief which may in the discretion of this Court to be just and appropriate.

Respectfully submitted:

By:    /s/  Andrew Finko
       One of Plaintiffs' attorneys

Andrew Finko
875 N. Michigan Ave.
Suite 3100
Chicago, IL 60611
P  (773) 480-0616
Finkolaw@Fastmail.FM

## Verification pursuant to 28 U.S.C. § 1746

The undersigned, BYRON SIGCHO LOPEZ declares on personal knowledge and verifies under penalty of perjury under the laws of the United States of America that the facts contained in the foregoing Verified Complaint are true and correct to the best of his knowledge and belief.

By: _____
Byron Sigcho Lopez

## Verification pursuant to 28 U.S.C. § 1746

The undersigned, JOSE GUERRA, declares on personal knowledge and verifies under penalty of perjury under the laws of the United States of America that the facts contained in the foregoing Verified Complaint are true and correct to the best of his knowledge and belief.

By: _____
               Jose Guerra

# EXHIBIT A

Case: 1:26-cv-09156 Document #: 1 Filed: 03/31/26 Page 41 of 94 PageID #:41

# GALLUP®

JANUARY 12, 2026

# New High of 45% in U.S. Identify as Political Independents

More independents lean Democratic than Republican, giving Democrats edge in party affiliation for first time since 2021



BY **JEFFREY M. JONES**

WASHINGTON, D.C. — A record-high 45% of U.S. adults identified as political independents in 2025, surpassing the 43% measured in 2014, 2023 and 2024. Meanwhile, equal shares of U.S. adults — 27% each — identified as either Democrats or Republicans.

7/26/26, 11:05 AM
Case: 1:26-cv-09156 Document #: 1 Filed: 03/31/26 Page 42 of 94 PageID #:42
New high of 46% in U.S. identify as political independents

In most years since Gallup began regularly conducting its polls by telephone in 1988, independents have been the largest political group. However, the independent percentage has increased markedly in the past 15 years, typically registering 40% or higher, a level not reached prior to 2011.



**U.S. Political Party Identification, 1988-2025**

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*

— % Republican    - - % Independent    — % Democrat

Based on annual averages of Gallup telephone interview data

Get the data • Download image

GALLUP

The 2025 findings are based on interviews with more than 13,000 U.S. adults throughout the year. In each survey, Gallup asks U.S. adults whether they identify politically as a Republican, a Democrat or an independent.

The recent increase in independent identification is partly attributable to younger generations of Americans (millennials and Generation X) continuing to identify as independents at relatively high rates as they have gotten older. In contrast, older

generations of Americans have been less likely to identify as independents over time. Generation Z, like previous generations before them when they were young, identify disproportionately as political independents.

In 2025, majorities of Gen Z adults and millennials identified as political independents, as did more than four in 10 Gen X adults. One-third or less of baby boomers and Silent Generation adults were politically independent.

## Party Identification by Birth Cohort, 2025

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*
*As of today, do you lean more to the Democratic Party or the Republican Party?*

|  | Republican % | Independent % | Democrat % |
|---|---|---|---|
| Generation Z (born 1997-2007) | 17 | 56 | 27 |
| Millennials (born 1981-1996) | 21 | 54 | 24 |
| Generation X (born 1965-1980) | 31 | 42 | 25 |
| Baby boomers (born 1946-1964) | 34 | 33 | 32 |
| Silent Generation (born before 1946) | 37 | 30 | 32 |

Based on annual averages of Gallup telephone interview data

"No opinion" responses are not shown.

Get the data • Download image                                    **GALLUP**

The higher rate of political independence also results from younger adults today being more likely than young adults in the past to identify as independents. The 56% of Gen Z adults identifying as independents today compares with 47% of millennials in 2012 and 40% of Gen X adults in 1992.

## Democratic-Leaning Independents Give Democrats Edge

Gallup has regularly asked political independents since 1991 whether they lean more toward the Republican or Democratic Party.

Case: 1:26-cv-09156 Document #: 1 Filed: 03/31/26 Page 44 of 94 PageID #:44

Last year, more political independents said they lean toward the Democratic Party than the Republican Party, with the 45% of political independents breaking down into 20% Democratic leaners, 15% Republican leaners and 10% non-leaners. That is a shift from 2024, representing a three-point decline in Republican leaners and a three-point increase in Democratic leaners.

Between 2024 and 2025, identification with both the Republican and Democratic parties fell by one percentage point.

## Changes in U.S. Adults' Party Identification and Leanings, 2024-2025

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*
*As of today, do you lean more to the Democratic Party or the Republican Party?*

|  | 2024 % | 2025 % | Change (pct. pts.) |
|---|---|---|---|
| Republican identifiers | 28 | 27 | -1 |
| Republican-leaning independents | 18 | 15 | -3 |
| Non-leaning independents | 8 | 10 | 2 |
| Democratic-leaning independents | 17 | 20 | 3 |
| Democratic identifiers | 28 | 27 | -1 |

Based on annual averages of Gallup telephone interview data

Get the data • Download image                                      GALLUP

Taking into account Americans' party identification and political leanings, an average of 47% identified as Democrats or said they were independents who lean toward the Democratic Party, while 42% identified as Republicans or leaned Republican. This breaks a three-year stretch in which Republicans held an edge in party affiliation.

Party preferences in 2025 essentially reverted back to what they were during Donald Trump's first term as president, when Democrats held leads averaging five points. Democrats — who usually hold an edge — have had larger advantages than now in

1992 and 1993, 1996 through 1999, and 2006 through 2009.



The shift in the annual average leaned party preferences, moving from a one-point Republican advantage in 2024 to a five-point Democratic advantage in 2025, somewhat obscures the true extent of movement in party affiliation that has occurred over the past 16 months. In the fourth quarter of 2024, which spanned the last month of the presidential election campaign and most of the Trump presidential transition, Republicans held a four-point lead in party affiliation. By the first quarter of 2025, that advantage had disappeared and the parties were on equal footing. By the second quarter, Democrats had gained an edge of three points, 46% to 43%, which expanded to seven points in the third quarter and eight points in the fourth quarter.



**Recent Quarterly Averages of U.S. Adults' Party Identification and Leaning**

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*
*As of today, do you lean more to the Democratic Party or the Republican Party?*

— % Republican/Lean Republican — % Democrat/Lean Democratic

Based on quarterly averages of Gallup telephone interview data

U.S. adults with no party identification or leaning are not shown.

Get the data • Download image

GALLUP®

## Conservative Lead in Ideology Narrowest Yet

In addition to asking Americans for their party identification and leanings, Gallup asks respondents in each survey to describe their political views using a scale ranging from very liberal to very conservative. As usual, more Americans in 2025 described their views as "very conservative" or "conservative" (35%) than as "very liberal" or "liberal" (28%), with 33% identifying as "moderate." However, the seven-point conservative advantage over liberals in 2025 is the smallest Gallup has measured in annual averages dating back to 1992. It is only the third time the conservative lead has been less than 10 points.



**U.S. Political Ideology Identification, 1992-2025**

*How would you describe your political views — very conservative, conservative, moderate, liberal or very liberal?*

— % Very conservative/Conservative    — % Moderate    - - % Very liberal/Liberal

Based on annual averages of Gallup telephone interview data

Get the data • Download image

GALLUP

Over time, more Americans have identified as liberal (up from 17% in 1992) and fewer as moderate (down from 43%), with conservative identification more steady.

Changes in ideological identification are mainly apparent among Democrats — 59% now identify as liberal, up from 33% in 2005 and 25% in 1994. Increased liberal identification in recent years is seen among most subgroups of Democrats.

Republicans' and independents' ideological identification has changed less over time, although more Republicans identify as conservative today (77%) than in 1994 (58%). Meanwhile, slightly less than half of independents, 47%, continue to identify as moderates, with the remainder tilting more toward conservative than liberal identification.

# Trends in Ideological Identification, by Political Party

*How would you describe your political views — very conservative, conservative, moderate, liberal or very liberal?*

— % Very conservative/Conservative    — % Moderate    -- % Very liberal/Liberal

### Republicans



### Democrats



### Independents



Based on annual aggregates of Gallup telephone interview data

**GALLUP**

Case: 1:26-cv-09156 Document #: 1 Filed: 03/31/26 Page 49 of 94 PageID #:49

# Bottom Line

The political landscape in the U.S. changed greatly in the first year of Trump's second term as president. A record-high percentage of U.S. adults said they identify with neither major party, and a shift in independents' political leanings caused the Republican Party advantage that aided Trump's reelection to dissipate almost as soon as he took office. Over the course of the year, the Democratic Party regained and expanded its advantage in party leanings, a trend that was borne out in the party's strong performance in 2025 special elections compared to similar races in the more Republican-favorable 2024 election cycle.

Importantly, these party shifts do not indicate that Americans are warming to the Democratic Party. In fact, favorable ratings of the Democratic Party are no better than those of the Republican Party, and are among the worst Gallup has recorded for the Democratic Party historically.

Rather, as in 2022 through 2024, these recent political shifts appear to be a consequence of one party's association with an unpopular incumbent president (the Democrats with Biden and now Republicans with Trump). Negative evaluations of the president's performance appear to persuade a subset of Americans, primarily political independents who have weaker attachments to either party, to side with the opposition party.

This dynamic has led to frequent changes in the party power structure in Washington in recent federal election cycles, with the incumbent president's party losing control of the presidency or one house of Congress in each of the past six presidential or midterm elections.

*Stay up to date with the latest insights by following @Gallup on X and on Instagram.*

*Learn more about how the Gallup Poll Social Series works.*

SURVEY METHODS

Case: 1:26-cv-09156 Document #: 1 Filed: 03/31/26 Page 50 of 94 PageID #:50

RELEASE DATE:    January 12, 2026

SOURCE:   Gallup https://news.gallup.com/poll/700499/new-high-identify-political-independents.aspx

CONTACT:   Gallup World Headquarters, 901 F Street, Washington, D.C., 20001, U.S.A

+1 202.715.3030

Copyright © 2026 Gallup, Inc. All rights reserved.

Gallup uses cookies to ensure the best website experience. Please select the cookies you want. You can change this setting anytime, but doing so may impair functionality on our websites. Privacy Statement

Accept All        Manage Preferences

New High of 46% in U.S. Identify as Political Independents

# Cookie Settings

Gallup uses cookies to ensure the best website experience. Please select the cookies you want. You can change this setting anytime, but doing so may impair functionality on our websites. Privacy Statement

☑

Essential

We use essential cookies to provide our visitors basic functions through our websites. Without these cookies, our websites will not work properly.

☐

Analytics

We use statistics cookies to collect information anonymously. This information helps us understand how our visitors use our websites.

☐

Marketing

Marketing cookies help Gallup improve the ads we display on third-party websites and allow third parties to gather web-usage information required to determine ad performance.

Accept All     Save Preferences

# EXHIBIT B

Case: 1:26-cv-09156 Document #: 1 Filed: 07/31/26 Page 54 of 94 PageID #:54

# GALLUP®

AUGUST 18, 2022

# Millennials, Gen X Clinging to Independent Party ID



BY **JEFFREY M. JONES**

### Story Highlights

- More millennials identifying as independent as they get older
- Generation X maintaining higher levels of independent identification
- Republican identification much higher among older generations

WASHINGTON, D.C. -- Historically, Americans have had weak attachments to the two major U.S. political parties in young adulthood, but as they get older, they usually became more likely to identify as a Republican or a Democrat. That historical pattern, evident in the Silent and baby boom generations, appears to be changing. Generation X and millennials, who are now middle aged or approaching it, have maintained or even expanded their identification as political independents in recent decades.

Currently, 44% of Generation X identifies as political independents, which is unchanged from three decades ago, when the first part of the generation was entering adulthood. The majority of millennials, 52%, are independent, and that percentage has increased by five percentage points in each of the past two decades.

Meanwhile, Gallup data show far lower, and declining, proportions of independents among the Silent Generation (now 26%) and baby boomers (now 33%), consistent with the historical pattern.

Members of Generation Z who have reached adulthood match millennials in the percentage of political independents, at 52%.

The data also reveal that each younger generation has had a greater proportion of independents throughout their lives than the prior generation did, even at similar stages in their life. For example, the 44% of Generation X (now aged 42 to 57) that currently identifies as independent is 10 points higher than the 34% of baby boomers who said they were independents in 2002 (when they were aged 38 to 56).

These emerging generational patterns of party identification help explain why independent identification has reached levels in the past decade never seen before in Gallup polling. Since 2011, 40% or more of U.S. adults have identified as political

independents in nearly every year. Before that year, that level had never been reached.

# Independent Identification Varies Inversely With Republican Identification

Whereas younger generations tend to be more politically independent than older generations, older Americans are much more likely to identify as Republicans. In fact, Republican identification is most common among the oldest generation of Americans -- the Silent Generation, at 39% -- and is less common at each lower rung on the generational ladder, down to 17% among Generation Z.

Democratic Party identification is more uniform across the five generational groupings, ranging between 27% and 35%.

## Party Identification, by Generation, 2022 to Date

In politics, as of today, do you consider yourself a Republican, a Democrat, or an independent?

| | % Republican | % Independent | % Democrat |
|---|---|---|---|
| Silent Generation (born 1928-1945) | 39 | 26 | 35 |
| Baby boomers (born 1946-1964) | 35 | 33 | 32 |
| Generation X (born 1965-1980) | 30 | 44 | 27 |
| Millennials (born 1981-1996) | 21 | 52 | 27 |
| Generation Z (born 1997-2012) | 17 | 52 | 31 |

January-July 2022

Get the data • Download image

GALLUP®

These results are based on aggregated data from 2022 Gallup surveys to date, encompassing more than 6,000 interviews with U.S. adults and at least 500 in each generation. The results for 2022 are similar to those for 2021, which are based on even larger samples.

Gallup also analyzed its 1992, 2002 and 2012 data to show how party identification has changed among the generations over time. The most notable changes in recent decades are that the Silent Generation has become increasingly Republican and less independent, while independent identification among Generation X and millennials has held steady or increased, compared with when the groups first entered adulthood.

The following sections show the trends in party identification for each generation over the past 30 years. There are no trend data for Generation Z because no one in that generation had reached adulthood until 2015.

## Silent Generation

Members of the Silent Generation were born between 1928 and 1945 and, therefore, are primarily between the ages of 77 and 94 today. The group has been less likely to identify as independents than other generations over the past 30 years and is even less likely to do so today.

Since 1992, the percentage of Silent Generation members who identify as political independents has decreased from 35% to 26%, which has been accompanied by an equal increase in Republican identification.

Over the past 30 years, the proportion of Silent Generation people who identify as Democrats has been relatively stable.



**Trend in Party Identification Among U.S. Adults in the Silent Generation, 1992-2022**

The Silent Generation is defined as those born between 1928 and 1945.

— % Republican    ···· % Independent    — % Democrat

Members of the Silent Generation were aged 47 to 64 in 1992; 57 to 74 in 2002; 67 to 84 in 2012; and are 77 to 94 now.

Get the data • Download image

GALLUP

## Baby-Boom Generation

The pattern in party identification among baby boomers, born between 1946 and 1964 and aged 58 to 76 today, is largely similar to that for the Silent Generation. Fewer baby boomers today (33%) than in 1992 (40%) identify as political independents, with most of that change offset by an increase in Republican identification, from 29% to 35%. The 32% of baby boomers who identify as Democrats is largely unchanged over the past 30 years.

Baby boomers' party preferences have been evenly split over the past three decades.

Case: 1:26-cv-09156 Document #: 1 Filed: 07/31/26 Page 59 of 94 PageID #:59



### Trend in Party Identification Among U.S. Adults in the Baby Boom Generation, 1992-2022

The baby boom generation is defined as those born between 1946 and 1964.

— % Republican   ···· % Independent   — % Democrat

Members of the baby boom generation were aged 28 to 46 in 1992; 38 to 56 in 2002; 48 to 66 in 2012; and are 58 to 76 now.

Get the data • Download image

**GALLUP**

## Generation X

Generation X, whose members were born between 1965 and 1980 and are aged 42 to 57 today, has a higher proportion of independents than preceding generations and, unlike those generations, that percentage has not shrunk over time.

In 1992, when only about half of Gen X had reached adulthood, 44% identified as independents. Ten years later, when all generation members were at least 22 years old, a slightly smaller percentage, 39%, said they were independent. But in both 2012 and 2022, the proportion of Generation X members who are independent has returned to the mid-40% range.

The adult members of Generation X in 1992 were more likely to identify as Republicans than Democrats, 32% to 24%. This group came of age when Republicans held the White House for 12 years between 1981 and 1992. Over time, and as more of Generation X reached adulthood, Republicans and Democrats have claimed roughly equal proportions of the generation, including 30% of the former and 27% of the latter this year.



**Trend in Party Identification Among U.S. Adults in Generation X, 1992-2022**

Generation X is defined as those born between 1965 and 1980.

— % Republican  ···· % Independent  — % Democrat

Adult members of Generation X were aged 18 to 27 in 1992; 22 to 37 in 2002; 32 to 47 in 2012; and are 42 to 57 now.

Get the data • Download image

GALLUP

# Millennial Generation

Millennials, born between 1981 and 1996 and aged 26 to 41 today, have become increasingly independent since 2002, when the oldest members of the generation were first turning 18. That year, 42% of adult millennials were independent. Ten years later, when all but the youngest millennials were adults, 47% identified as independent. Now, a 52% majority of the group does.

Millennials have been more likely to identify as Democrats than Republicans over the past 20 years, but fewer align with either party than did 10 and 20 years ago.



**Trend in Party Identification Among U.S. Adults in the Millennial Generation, 2002-2022**

The millennial generation is defined as those born between 1981 and 1996.

— % Republican  ····% Independent  — % Democrat

Adult members of the millennial generation were aged 18 to 21 in 2002; 18 to 31 in 2012; and are 26 to 41 now.

Get the data • Download image

GALLUP

Case: 1:26-cv-09156 Document #: 1 Filed: 07/31/26 Page 62 of 94 PageID #:62

# Bottom Line

Younger generations of U.S. adults are much more likely than older generations to identify as independents and, to this point, Generation X and millennials have become no less likely to do so as they have gotten older, in contrast to the generations that preceded them.

The youngest adults, those in Generation Z, are as likely as millennials to think of themselves as independents. In fact, like millennials, more describe themselves this way than identify with either political party.

These population trends appear at odds with the political parties' actions, as they have seemingly tried to appeal more to their own bases than to the larger group of unaffiliated voters. This disconnect may explain low levels of trust in government and poor views of both parties in general. While Republican messaging in recent decades may have increased the party's support among older generations of Americans in recent decades, it may have cost the party support among younger generations, with only about one in five adults younger than 41 identifying as Republican.

The trends to date for Generation X and millennials do not preclude their showing declining political independence as they continue to age. However, even if those generations become less likely to identify as independents in the future, they will still likely have higher proportions of independents than members of their preceding generations had at similar points in their lives.

*To stay up to date with the latest Gallup News insights and updates, follow us on Twitter.*

*Learn more about how the Gallup Poll Social Series works.*

SURVEY METHODS ⊕

RELEASE DATE:    August 18, 2022

SOURCE:    Gallup https://news.gallup.com/poll/397241/millennials-gen-clinging-independent-party.aspx

Millennials, Gen X Clinging to Independent Party Id

Case: 1:26-cv-09156 Document #: 1 Filed: 07/31/26 Page 63 of 94 PageID #:63

CONTACT: Gallup World Headquarters, 901 F Street, Washington, D.C., 20001, U.S.A

+1 202.715.3030

Copyright © 2026 Gallup, Inc. All rights reserved.

Gallup uses cookies to ensure the best website experience. Please select the cookies you want. You can change this setting anytime, but doing so may impair functionality on our websites. Privacy Statement

Accept All      Manage Preferences

# Cookie Settings

Gallup uses cookies to ensure the best website experience. Please select the cookies you want. You can change this setting anytime, but doing so may impair functionality on our websites. Privacy Statement

Essential

We use essential cookies to provide our visitors basic functions through our websites. Without these cookies, our websites will not work properly.

☐

Analytics

We use statistics cookies to collect information anonymously. This information helps us understand how our visitors use our websites.

☐

Marketing

Marketing cookies help Gallup improve the ads we display on third-party websites and allow third parties to gather web-usage information required to determine ad performance.

Accept All       Save Preferences

# EXHIBIT C

State of Illinois

# 2026

# CANDIDATE'S

# GUIDE

Issued by the

Illinois State Board of Elections

*Amended on 2/17/2026*

# AMENDMENTS

| Date | Revised Page Number | Change Made |
|---|---|---|
| 7/2/2025 | N/A | Original Issue Date |
| 7/7/2025 | 32 | Added State Senate districts not on the 2026 election ballot unless a vacancy in office occurs |
| 7/7/2025 | 34 | Maximum signature requirement added to Independent column and removed from New Party column |
| 7/7/2025 | 42 | Subcircuits SBE Form P-16A added |
| 7/7/2025 | 71 | Districts elected to 2-year terms and 4-year terms corrected |
| 7/10/2025 | 59 | Signature requirements corrected |
| 7/10/2025 | 35 | Minimum signature requirement for District 36 Independent and New Party corrected |
| 7/10/2025 | 36 | Maximum signature requirement District 86 updated |
| 7/10/2025 | 28 | Maximum signature requirement for District 4 Independent updated |
| 7/31/2025 | 53 | Updated State Central Committeepersons Gender Declaration Form link |
| 8/5/2025 | 70 | Updated term begins date |
| 2/17/2026 | 71 | Form P-7C updated to include 2026 signature requirements |

# PREFACE

## THE 2026 CANDIDATE'S GUIDE

This Candidate's Guide has been prepared to provide information for candidates seeking office in 2026. Information is provided regarding nomination procedures and the objection process. A signature requirements section is included with each specific office in this guide. Answers to some of the more frequently asked questions about nominating petitions and procedures can be found on page 75.

All citations contained in this guide refer to the Illinois Election Code (10 ILCS 5/1-1 *et seq.*, as amended) or as otherwise indicated. This guide may be amended to include new legislation and court decisions as they arise. Please visit the Illinois State Board of Elections' website (www.elections.il.gov) for any updates

**Legal information contained in this guide is not binding and should not be construed as legal advice or sufficient argument in response to an objection to any candidate's nominating papers. The State Board of Elections recommends that all prospective candidates consult with competent legal counsel when preparing their nomination papers.**

Statutory deadlines for filing objections and for withdrawing from all but one incompatible office will depend on the filing period. Specific deadline dates can be found in the SBE Election and Campaign Finance Calendar for 2026 located on the publications page under "Election Guides." The calendar, this guide, and filing date announcements can be found on the State Board of Elections' website.

Additional information may be obtained by contacting your election authority or the State Board of Elections.

## APPARENT CONFORMITY

The State Board of Elections conducts an "apparent conformity" review of all nominating petitions filed therewith. The review will take place after a petition is filed and will be limited to determining the following:

(1) whether a signed Statement of Candidacy has been filed, and (2) whether the filed nominating sheets contain gross signatures equal to or exceeding 10% of the minimum number of signatures required for the office sought.

All candidates whose petitions fail the apparent conformity review will be notified in writing and given the opportunity to appear before the State Board of Elections at its first meeting after the petition filing deadline to show good cause why the petition should not be rejected on the basis of non-conformity.

Please note, SBE employees are not available during filing periods to notarize documents.

## OTHER PUBLICATIONS

The State Board of Elections also produces additional guides that can be helpful when preparing to run for office. The Election and Campaign Finance Calendar lists more specific dates and deadlines to follow, and the County Officials book and Federal and State Officers book, located on the publications page under "Directory of Officials," have relevant contact information for elected officials. On our website under the Campaign Disclosure tab, you can find information regarding campaign disclosure and tutorials on the financial filing process.

## CONTACT INFORMATION

Illinois State Board of Elections – Springfield Office
2329 South MacArthur Boulevard
Springfield, Illinois 62704
Phone: (217) 782-4141
Fax: (217) 782-5959

Illinois State Board of Elections – Chicago Office
69 West Washington Street, Pedway LL-08
Chicago, Illinois 60602
Phone: (312) 814-6440
Fax: (312) 814-6485

webmaster@elections.il.gov

www.elections.il.gov

# EXHIBIT D

# UNITED STATES REPRESENTATIVE

## NOMINATION PAPERS

**Petitions:** Established Party ([SBE Form P-11](#)); Independent ([SBE Form P-3](#)); New Party ([SBE Form P-8](#))

**Statement of Candidacy:** Established Party ([SBE Form P-1](#)); Independent ([SBE Form P-1B](#)); New Party ([SBE Form P-1D](#))

**Loyalty Oath (optional):** All candidates ([SBE Form P-1C](#))

**Statement of Economic Interests**: Not required for federal offices.

## SIGNATURE REQUIREMENTS

**Established Party:** Not less than .5% (.005) of the qualified primary electors of their party in the congressional district. (10 ILCS 5/7-10(b))

**Independent:** Not less than 5% nor more than 8% (or 50 more than the minimum, whichever is greater) of the total number of persons who voted at the last regular general election within the congressional district. (10 ILCS 5/10-3)

**New Party:** Not less than 5% of the total number of persons who voted at the last regular general election within the congressional district. There is no maximum signature requirement. (10 ILCS 5/10-2)

## FILING INFORMATION

**Established Party:** Not more than 141 nor less than 134 days prior to the General Primary. (10 ILCS 5/7-12)

**Independent & New Party:** Not more than 169 nor less than 162 days prior to the General Election. (10 ILCS 5/10-6)

---

QUALIFICATIONS:

- 25 years of age
- United States citizen for seven years
- Inhabitant of Illinois at the time of the election
- Registered voter

(United States Constitution, Article 1, Section 2; 10 ILCS 5/7-10, 10-5)

FILING PERIODS:

**Established Party:**
October 27 – November 3, 2025

**Independent and New Party:**
May 18 – May 26, 2026

TERM:

**Term of office:** Two years (United States Constitution, Article 1, Section 2)

**Term begins:** Noon, January 3, 2027 (United States Constitution, Amendment XX, Section 2)

---

All candidates will file with the Illinois State Board of Elections, 2329 S. MacArthur Blvd., Springfield, IL 62704, either by mail or in person. Nomination papers received via other delivery methods (such as UPS or FedEx) will not be included in a ballot placement lottery.

**Campaign Contributions:** All candidates file with the Federal Election Commission (FEC), 1050 First Street NE, Washington D.C., 20463 (20002 for other delivery services outside U.S. Postal Service). If you have specific questions, you may call them at (800) 424-9530.

**NOTE:** Federal filing requirements are subject to change by the FEC. We advise that you contact the FEC for the latest information on filing requirements.

## SIGNATURE CALCULATIONS

| District | Democrat | Republican | Independent | New Party |
|---|---|---|---|---|
| 1 | 1071 | 546 | 16,652 − 26,641 | 16,652 |
| 2 | 979 | 471 | 15,065 − 24,103 | 15,065 |
| 3 | 875 | 445 | 13,664 − 21,861 | 13,664 |
| 4 | 697 | 371 | 10,816 − 17,304 | 10,816 |
| 5 | 1271 | 577 | 19,176 − 30,680 | 19,176 |
| 6 | 984 | 852 | 18,959 − 30,333 | 18,959 |
| 7 | 1164 | 232 | 14,161 − 22,656 | 14,161 |
| 8 | 865 | 707 | 15,721 − 25,152 | 15,721 |
| 9 | 1173 | 540 | 17,852 − 28,562 | 17,852 |
| 10 | 995 | 656 | 16,814 − 26,902 | 16,814 |
| 11 | 1000 | 799 | 18,465 − 29,543 | 18,465 |
| 12 | 520 | 1362 | 18,840 − 30,143 | 18,840 |
| 13 | 957 | 727 | 16,885 − 27,015 | 16,885 |
| 14 | 918 | 780 | 17,056 − 27,288 | 17,056 |
| 15 | 583 | 1545 | 19,273 − 30,835 | 19,273 |
| 16 | 738 | 1555 | 19,800 − 31,679 | 19,800 |
| 17 | 852 | 744 | 16,035 − 25,654 | 16,035 |

# EXHIBIT E

| | | O.5% | | O.5% | | 5% | 5% | 8% |
|---|---|---|---|---|---|---|---|---|
| District | Republican votes cast | signature requirement | Democratic votes cast | signature requirement | Total Ballots Cast | New Party signature requirement | Minimum Independent signature requirement | Maximum Independent signature requirement |
| 1st Congressional | 109,192 | 546 | 214,172 | 1071 | 333,022 | 16,652 | 16,652 | 26,641 |
| 2nd Congressional | 94,004 | 471 | 195,777 | 979 | 301,292 | 15,065 | 15,065 | 24,103 |
| 3rd Congressional | 88,940 | 445 | 174,825 | 875 | 273,274 | 13,664 | 13,664 | 21,861 |
| 4th Congressional | 74,153 | 371 | 139,343 | 697 | 216,305 | 10,816 | 10,816 | 17,304 |
| 5th Congressional | 115,269 | 577 | 254,174 | 1271 | 383,509 | 19,176 | 19,176 | 30,680 |
| 6th Congressional | 170,358 | 852 | 196,647 | 984 | 379,169 | 18,959 | 18,959 | 30,333 |
| 7th Congressional | 46,368 | 232 | 232,778 | 1164 | 283,202 | 14,161 | 14,161 | 22,656 |
| 8th Congressional | 141,339 | 707 | 172,920 | 865 | 314,401 | 15,721 | 15,721 | 25,152 |
| 9th Congressional | 107,933 | 540 | 234,483 | 1173 | 357,028 | 17,852 | 17,852 | 28,562 |
| 10th Congressional | 131,025 | 656 | 198,873 | 995 | 336,278 | 16,814 | 16,814 | 26,902 |
| 11th Congressional | 159,630 | 799 | 199,825 | 1000 | 369,290 | 18,465 | 18,465 | 29,543 |
| 12th Congressional | 272,254 | 1362 | 103,926 | 520 | 376,794 | 18,840 | 18,840 | 30,143 |
| 13th Congressional | 145,329 | 727 | 191,339 | 957 | 337,693 | 16,885 | 16,885 | 27,015 |
| 14th Congressional | 155,887 | 780 | 183,446 | 918 | 341,103 | 17,056 | 17,056 | 27,288 |
| 15th Congressional | 308,825 | 1545 | 116,519 | 583 | 385,446 | 19,273 | 19,273 | 30,835 |
| 16th Congressional | 310,925 | 1555 | 147,403 | 738 | 395,995 | 19,800 | 19,800 | 31,679 |
| 17th Congressional | 148,677 | 744 | 170,261 | 852 | 320,681 | 16,035 | 16,035 | 25,654 |
| **Statewide Total Signatures** | | **12,909** | | **15,642** | | **285,234** | **285,234** | **456,351** |

| | Dem[1] | Rep[2] | Indep / New Party Min. 5%[3] | Indep / New Party Min. 5,000[4] |
|---|---|---|---|---|
| 1 | 1,071 | 546 | 16,652 | 5,000 |
| 2 | 979 | 471 | 15,065 | 5,000 |
| 3 | 875 | 445 | 13,664 | 5,000 |
| 4 | 697 | 371 | 10,816 | 5,000 |
| 5 | 1,271 | 577 | 19,176 | 5,000 |
| 6 | 984 | 852 | 18,959 | 5,000 |
| 7 | 1,164 | 232 | 14,161 | 5,000 |
| 8 | 865 | 707 | 15,721 | 5,000 |
| 9 | 1,173 | 540 | 17,852 | 5,000 |
| 10 | 995 | 656 | 16,814 | 5,000 |
| 11 | 1,000 | 799 | 18,465 | 5,000 |
| 12 | 520 | 1,362 | 18,840 | 5,000 |
| 13 | 957 | 727 | 16,885 | 5,000 |
| 14 | 918 | 780 | 17,056 | 5,000 |
| 15 | 583 | 1,545 | 19,273 | 5,000 |
| 16 | 738 | 1,555 | 19,800 | 5,000 |
| 17 | 852 | 744 | 16,035 | 5,000 |
| Total Voter Signatures for ALL Districts | 15,642 | 12,909 | 285,234 | 85,000 |

[1] 10 ILCS 5/7-10(b) "the candidate's petition for nomination must contain at least the number of signatures equal to 0.5% of the qualified primary electors of his or her party in his or her congressional district." [signatures are not limited by a maximum percent]

10 ILCS 5/7-10(k) "For political subdivisions, the number of primary electors shall be determined by taking the total vote cast for the candidate for that political party who received the highest number of votes in the political subdivision at the last regular election at which an officer was regularly scheduled to be elected from that subdivision."

[2] Same as for Democratic Party, fn. 1.

[3] 10 ILCS 5/10-3 "by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area." [signatures above the 8% maximum number are not counted]

[4] 10 ILCS 5/10-3 "For the first election following a redistricting of congressional districts, nomination papers for an independent candidate for **congressperson** shall be signed by at least **5,000** qualified voters of the congressional district. For the first election following a redistricting of legislative districts, nomination papers for an independent candidate for State Senator in the General Assembly shall be signed by at least 3,000 qualified voters of the legislative district. For the first election following a redistricting of representative districts, nomination papers for an independent candidate for State Representative in the General Assembly shall be signed by at least 1,500 qualified voters of the representative district."

# EXHIBIT F

Case: 1:26-cv-09156 Document #: 1 Filed: 07/31/26 Page 77 of 94 PageID #:77

NEWS > POLITICS

# House admonishes Rep. Jesús 'Chuy' García over ballot maneuver as most Democrats defend Chicago congressman

 

By **DANIEL C. VOCK** | dcvock@gmail.com | For the Chicago Tribune and **DAN PETRELLA** | dpetrella@chicagotribune.com | Chicago Tribune

PUBLISHED: November 18, 2025 at 5:48 PM CST

Getting your **Trinity Audio** player ready…

WASHINGTON — Twenty-three congressional Democrats — including two fellow members from Illinois — joined with Republicans on Tuesday in favor of a resolution admonishing U.S. Rep. Jesús "Chuy" García for using old-school tactics to clear the way for his own House successor.

● Opt-Out Signal Honored

Case: 1:26-cv-09156 Document #: 1 Filed: 07/31/26 Page 78 of 94 PageID #:78

U.S. Reps. Bill Foster of Naperville and Eric Sorensen of Moline were the only Illinois Democrats to join Republicans in voting 236-183 for the resolution that chastises García for his move two weeks ago in which he suddenly dropped out of his reelection race and cleared the way for his then-chief of staff, Patty García, to succeed him. The resolution was introduced by a Democrat from the state of Washington who argued the move deprived voters in Illinois' heavily Democratic 4th Congressional District of a meaningful choice in the Democratic primary for his House seat next year.

While the resolution will have no practical impact on the congressman's remaining time in office or on Patty García's efforts to take the seat, its passage is the latest slap at the outgoing congressman for his insider political maneuvering and could cast a cloud over Patty García, who is no relation to the congressman, should she win the office next year.

Chuy García originally filed for reelection but later changed his mind. Instead of making a public announcement right away, the congressman helped Patty García, who has since resigned as chief of staff, collect the necessary signatures to appear on the ballot, which were submitted at the last minute.

Rep. Marie Gluesenkamp Perez, an iconoclastic Democrat from Washington state, led the effort to reprimand the prominent Chicago lawmaker. During a debate Monday night, she insisted the vote was not about García's long record of public service, but about how he decided to leave public life.

"The consequences of subverting an election and choosing your successor are a slide toward a very ugly future for our country," Gluesenkamp Perez said. "We know about it. That conveys on us a responsibility, not just when it's politically convenient to condemn someone, but when it's in your own family. ... Whether it hurts you or not, you have to have confidence that Americans will make the choice for themselves."

García defended his last-minute decision, saying he had a change of heart after considering his own health, his wife's multiple sclerosis and their recent decision to adopt one of their grandchildren after the death of his daughter.

● Opt-Out Signal Honored

"I wasn't expecting to stand here to debate my retirement," he told his colleagues, "but before any of us are members of Congress, we are husbands, we are grandfathers, we're sons, we're mothers, we're sisters. We're regular people. But life reminds us that our jobs come second to the people waiting for us at home."

Most members of the Democratic caucus, including House Minority Leader Hakeem Jeffries and the Congressional Hispanic Caucus, rallied around García. Many Democrats objected to having to deal with an intraparty dispute as soon as they returned from a nearly two-month House recess to end a government shutdown.

U.S. Rep. Sydney Kamlager-Dove, a California Democrat, called the motion "character assassination."

She said House Democrats shouldn't be fighting each other at a time when the Trump administration cut food stamps during a government shutdown, was ordering military strikes on boats in international waters without congressional approval and was presiding over the rolling back of health care subsidies. House Democrats were also pushing for legislation requiring the Justice Department release documents related to its investigation of the late convicted sex offender Jeffrey Epstein, she noted, a measure that eventually passed the House overwhelmingly.

"Those are issues that are far more pressing and critical to Americans," she said. "I was home in my district this weekend. Not one person asked me about Chuy García. Not one person."

U.S. Rep. Jan Schakowsky, a Democrat who represents parts of the North Side of Chicago and many north suburbs, chafed at the idea that a lawmaker from outside the area was coming after García, who had a long career in Chicago politics.

"For someone who doesn't know about the city of Chicago and the role that (García) has played, to find some outside idea that he has somehow cheated the city of Chicago, or the people of the city of Chicago: Are you kidding?" Schakowsky said. "There has not been one single person that has stood up in Chicago and said that there should be some sort of punishment for our great friend."

⬤ Opt-Out Signal Honored

Patty García declined to comment Tuesday on the resolution through a spokeswoman. But she defended the ballot maneuver in an interview with the Tribune last week at a restaurant in Chicago's Little Village neighborhood.

Given the timing of the congressman's decision, there was little time to consider making a public announcement to would-be primary opponents, his former chief of staff said.

"I'll be honest, I mean, on that Friday, there's so many trains having to run," she said.

Before declaring her own candidacy, she had to resign from her federal position and "make sure that my congressional team is in good hands," she said. At the same time, she was working with district staff and allies to help constituents whose families had been affected by federal immigration enforcement actions, she said.

"The immediate reaction was: 'Are we going to be OK not having you help the team, right?' ... I've been kind of (the) lead on these rapid response (efforts) with our team members," García said.

On top of that, the political organization also had to quickly put together plans to gather the necessary signatures to secure her spot on the ballot, she said, an effort that used 75 volunteers to collect about 2,500 signatures in just a couple of days.

A spot on the 4th Congressional District primary ballot required only 697 valid voter signatures for the March primary election, but candidates typically collect several times that amount to ensure they can withstand any legal challenges to their petitions. The period for filing objections closed Nov. 10, without anyone challenging her petitions.

Like her former boss, García said their political organization thought other candidates already were circulating petitions to challenge the congressman, given that he faced a primary challenge two years ago, although she acknowledged she wasn't aware of any specific candidates.

And while she will be uncontested in the primary, García noted she'll still face at least one Republican opponent in November, along with possible independent candidates.

◉ Opt-Out Signal Honored

Progressive Ald. Byron Sigcho-Lopez, 25th, has said he is considering a bid, and Mayra Macías, formerly of the group Latino Victory Project, is said to be exploring a run. The related Latino Victory Fund has endorsed Gluesenkamp Perez in her reelection campaign.

"There's still a misconception of like, 'Well, the race is done. You're it,'" García said. "And the reality is, it isn't. I have an endorsement from the congressman, and it's that, it's an endorsement, and I still have to run a campaign."

Prior to joining the congressman's staff in 2019, Patty García worked for groups including the National Association of Latino Elected and Appointed Officials Educational Fund. She earned a doctorate in educational policy studies from the University of Illinois Urbana-Champaign in 2011.

*Petrella reported from Chicago.*

## MORE FROM OUR NEWSROOM



**Letters: The Obama Presidential Center tower is a monument to the former...**
Saturday, June 20



**ICE arrests shift to courthouses and immigration check-ins as enforcement...**
Friday, June 19



**Boyfriend charged with murder in fatal stabbing of Calumet City woman, 27, in...**
Friday, June 19

● Opt-Out Signal Honored

**Editorial: Attorney Dan**

# H. Res. 878

# *In the House of Representatives, U. S.,*

*November 18, 2025.*

Whereas, on October 27, 2025, Representative Chuy García of Illinois filed nominating petitions to be on the Democratic primary ballot in March 2026;

Whereas, on November 5, 2025, on the last day of filing, Representative García's Chief of Staff, Patty García, submitted her own paperwork to enter the Democratic primary;

Whereas, on November 6, after the filing deadline, Representative García confirmed that he would not be seeking another term in 2026 and would be withdrawing his nominating petitions;

Whereas Representative García's Chief of Staff was the only Democrat who filed to run in the primary at the direction of Representative García, undermining the process of a free and fair election; and

Whereas Representative García's actions are beneath the dignity of his office and incompatible with the spirit of the United States Constitution: Now, therefore, be it

2

*Resolved,* That the House of Representatives disapproves of the behavior of the Representative from Illinois Mr. García.

Attest:

*Clerk.*

# EXHIBIT G

STATE OF ILLINOIS  )
        ) ss
COUNTY OF COOK  )

**BEFORE THE STATE BOARD OF ELECTIONS SITTING AS THE STATE OFFICERS
ELECTORAL BOARD
FOR THE HEARING AND PASSING UPON OF OBJECTIONS
TO NOMINATION PAPERS OF NEW PARTY AND INDEPENDENT CANDIDATES
FOR THE NOVEMBER 3, 2026, GENERAL ELECTION**

| | |
|---|---|
| IN THE MATTER OF OBJECTIONS BY     ) | |
|                  ) | |
| Jeremy Rivera, Rene A. Munoz, and Sandra Mendez, ) | |
|         Objectors,     ) | |
|   v.              ) | **No. 26 SOEB GE 508** |
|                  ) | |
| Byron Sigcho Lopez,       ) | |
|         Candidate.     ) | |

<u>**DECISION**</u>

   The State Board of Elections, sitting as the duly constituted State Officers Electoral Board, and having convened on July 21, 2026, at 69 W. Washington, Chicago, Illinois, and via videoconference at 2329 S. MacArthur Blvd., Springfield, Illinois, and having heard and considered the objections filed in the above-titled matter, hereby determines and finds that:

1.  The State Board of Elections has been duly and legally constituted as the State Officers Electoral Board pursuant to Sections 10-9 and 10-10 of the Election Code (10 ILCS 5/10-9 and 5/10-10) for the purpose of hearing and passing upon the objections filed in this matter and as such, has jurisdiction in this matter.

2.  On June 2, 2026, Jeremy Rivera, Rene A. Munoz, and Sandra Mendez timely filed an objection to the nomination papers of Byron Sigcho Lopez, Independent candidate for the office of Representative in Congress for the 4th Congressional District.

3.  A call for the hearing on said objection was duly issued and was served upon the Members of the Board, the Objectors, and the Candidate by registered mail as provided by statute unless waived.

4.  On June 9, 2026, the State Officers Electoral Board voted to adopt the Rules of Procedure, and a hearing officer was assigned to consider arguments and evidence in this matter.

5. From June 11, 2026, through June 12, 2026, a records examination was conducted by the staff of the State Board of Elections. Candidate collected a total of 17,227 signatures. There were 10,257 line objections reviewed by State Board of Elections staff. Of those lines reviewed, 7,633 of the objections were sustained, and 2,642 were overruled. At the conclusion of the records examination, Candidate had 9,594 apparently valid signatures, which is 1,222 under the statutory minimum of 10,816 per Section 10-3 of the Election Code.

6. On June 11, 2026, Candidate filed a Motion to Dismiss. On June 15, 2026, Objectors filed a Response to Candidate's Motion to Dismiss. On July 1, 2026, Candidate filed a Memo of Law. On July 2, 2026, Objectors filed a Response to Candidate's Memorandum of Law.

7. On June 11, 2026, Candidate requested an extension of the Rule 9 Motion Period. The Hearing Officer granted the parties an extension of the Rule 9 Motion Period to June 24, 2026, to submit evidence.

8. On June 15, 2026, in their Response to Candidate's Motion to Dismiss, Objectors withdrew paragraph 16 of the Objection, that petition sheets 756, 998, and 1,786 contain insufficient notarizations or dates.

9. On June 25, 2026, the assigned Hearing Officer resigned. As set forth in Rule 5(c), the General Counsel assigned a replacement Hearing Officer to consider arguments and evidence in this matter.

10. On July 6, 2026, a hearing was held before the new Hearing Officer. During the hearing, Parties had the opportunity to proffer evidence, testimony, and argument before the Hearing Officer.

11. The Board's appointed Hearing Officer issued a recommended decision in this matter after reviewing all matters in the record, including arguments and/or evidence tendered by the parties.

12. Upon consideration of this matter, the Board adopts the findings of fact, conclusions of law, and recommendations of the Hearing Officer and the General Counsel and finds that:

A. Candidate's Motion to Dismiss is denied as:

    a. Objectors withdrew the circulator and notary objections in Paragraph 16 of the objection petition.

    b.  Candidate failed to identify any facial deficiency in Paragraph 11's allegation that signatures are not genuine.

    c.  Objector sufficiently pled a violation of Section 10-4's dual circulator prohibition, which the Board, as an administrative agency, must apply as written. *See Goodman v. Ward*, 241 Ill.2d 398, 411 (2011).

B.  The Board does not have jurisdiction to consider Candidate's constitutional challenges to the Election Code. *See Goodman*, 241 Ill.2d at 411.

C.  Candidate's petition sheets contained 9,594 apparently valid signatures after the conduct of a record examination evaluating Objectors' individual signature objections as found in Paragraphs 9-14, which is 1,222 fewer than the statutory minimum of 10,816 required for Independent candidates seeking placement on the ballot as Representative in Congress for the 4th Congressional District of Illinois.

D.  Due to Candidate's insufficient signatures, it is unnecessary to rule upon the remainder of Objectors' petition.

IT IS HEREBY ORDERED that Candidate's Motion to Dismiss DENIED, and the objection of Jeremy Rivera, Rene A. Munoz, and Sandra Mendez to the nomination papers of Byron Sigcho Lopez, Independent candidate for nomination to the office of Representative in Congress for the 4th Congressional District, is SUSTAINED based on the findings contained in Paragraph 12 above, and the name of the Candidate Byron Sigcho Lopez SHALL NOT be certified for the November 3, 2026, General Election ballot by the Illinois State Board of Elections.

DATED: 07/21/2026

*Laura K. Donahue* (signature)

Laura K. Donahue, Chair

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 21, 2026, the foregoing order was served upon the Objector(s) or their attorney(s) by:

☐ Placing a pre-paid certified mail envelope in a U.S. mailbox addressed to:

Ed Mullen
1505 W. Morse Ave.
Chicago, IL 60626

☐ Hand delivery at:
  ☐ 2329 S. MacArthur Blvd., Springfield, IL 62704
  ☐ 69 W. Washington St, Chicago, IL 60602

And on July 21, 2026, served upon the Candidate(s) or their attorney(s) by:

☐ Placing a pre-paid certified mail envelope in a U.S. mailbox addressed to:

Andrew Finko
875 N. Michigan Avenue
Suite 3100
Chicago, IL 60611

☐ Hand delivery at:
  ☐ 2329 S. MacArthur Blvd., Springfield, IL 62704
  ☐ 69 W. Washington St, Chicago, IL 60602

Sean Sarcu
Legal Counsel II
Illinois State Board of Elections

# EXHIBIT H

Some states have changed or may be changing their congressional districts for the 2026 elections. This map based on 2024 congressional districts is still the *correct map* for determining who *currently* represents you in Congress. But you may be in a different district when you vote in November.



# EXHIBIT I

## Signature requirements for independent (or unaffiliated) US Representative candidates with code citations

**Arkansas** requires "not less than three percent (3%) of the qualified electors in the county, township, or district in which the person is seeking office, but in no event shall more than two thousand (2,000) signatures be required for a district, county, or township office." Arkansas Code Title 7. Elections § 7-7-103.

**California** has the same requirement for partisan and independent candidates as follows: either payment of a $1,740 filing fee, or 2,000 signatures; partial signatures may be submitted to cover all or part of the filing fee. Calif. Election Code §§8062(a)(1), (2), 8103, 8106(a).

**Colorado** requires the lesser of 2.5% of votes cast in the same district for US Representative at the last election, or 1,500 signatures. C.R.S. 1-4-802(1)(c).

**Georgia** requires a number of voters equal to 5 percent of the total number of registered voters eligible to vote in the last election for the filling of the office the candidate is seeking and the signers of such petition shall be registered and eligible to vote in the election at which such candidate seeks to be elected plus payment of a qualifying fee of $5,220. O.C.G.A § 21-2-170(b); O.C.G.A. § 21-2-131(a)(2)

**Hawaii** treats requires at least 25 signatures and a $75 filing fee for non-partisan candidates to compete on the primary, and advanced to general election is non-partisan candidate receives over 10% of the votes or receives votes equal or greater than the lowest voted partisan candidate. 2025 HRS § 12-5; HRS §12-41(b).

**Idaho** requires 500 qualified voters in the district plus a filing fee of $300. Idaho Code, § 34-708.

**Illinois** requires signatures of at least 5% but not more than 8% of the total votes cast in the district at the last general election, gathered in 90 days. 10 ILCS 5/10-4

**Indiana** requires signatures from 2% of total votes cast in the district at the last election for the secretary of state. Indiana Code IC 3-8-6-3.

**Iowa** requires at least 1,726 signatures, including at least 47 signatures from half of the counties in the district. Iowa Code §43.20, §45.1.

**Kansas** requires signatures from 4% of the registered voters in the district, but not less than 25 signatures nor more than 5,000 plus a filing fee of $1,740. KSA 25-303(d).

**Kentucky** requires 400 signatures plus a filing fee of $500. Kentucky Revised Statutes, 118.315(2).

**Louisiana** requires 250 signatures from anywhere in the state, or payment of a qualifying fee of $1,500. LA HB842 signed by Governor – Act 7 (5/14/2026).

**Maine** requires at least 2,000 signatures but not more than 2,500 signatures from the district. Maine Revised Statutes, 21-A §354(5)(D).

1

**Massachusetts** requires 2,000 signatures from the district.  Mass. Gen. Laws, Title VIII, ch. 53, § 44.

**Michigan** requires at least 3,000 signatures but not more than 6,000 signatures collected within 180 days.  MCL 168.544f; MCL 168.590b(3).

**Minnesota** requires 1,000 signatures plus a filing fee of $300. Minnesota Statutes section 204B.08 subd.3(b).

**Mississippi** requires either 1,000 signatures from voters anywhere in the state or 200 signatures of voters in the district plus a qualifying fee of $500. Miss. Code Ann.  §23-15-297;  §23-15-853.

**Missouri** requires at least 2% of the total number of voters who voted at the last election for candidates for the office being sought or is equal to 10,000 voters, whichever is less. Section 115.321.4, RSMo.

**Montana** requires 6,742 signatures for Dist. #1 and 7,274 signatures for Dist. #2 (with no time restriction on gathering signatures).  MCA 13-10-502.

**Nebraska** requires signatures from 20% of registered voters in the district who voted for president in 2024, or 2,000, whichever is less. Neb. Rev. Stat. §32-618.

**Nevada** has a signature requirement equal to 1% of the ballots cast in the district at the last general election plus a filing fee of $300.   NRS 293.200; NRS 293.193.

**New Hampshire** requires signatures from 1,500 voters in the district plus a filing fee of $50. NH RSA 655:42(II).

**New Jersey** requires 250 signatures; or 50 signatures for elections after redistricting N.J.S.A. 19:13-5.

**New Mexico** requires 2% of the ballots cast in the district at the last election, (Dist. 1 is 5,678 signatures, Dist. 2 is 3,903 signatures, Dist. 3 is 4,619 signatures.  New Mexico Code section 1-8-51.

**New York** requires signatures of at least 5% of votes cast for governor in the last election or 3,500, whichever is less.  NY Election Law section §6-142(2).

**North Carolina** requires 1.5% of the total number of registered voters in that district as of January 1 of the election year plus $1,740 filing fee.  N.C.G.S. § 163-122(a)(2); N.C.G.S. § 163-122(e); § 163-107.

**North Dakota** requires signatures of at least two percent of the resident population of the district as determined by the most recent federal decennial census, but in no case may more than three hundred signatures be required; circulation is 150 days.  ND Century Code § 16.1-12-02; § 16.1-12-02.3.

**Ohio** requires 25 signatures if the number of votes in the congressional district at the last election for governor was less than 5,000, or a number equal to 5% of the vote

whichever is less; if more than 5,000 votes cast then required signatures is 1% of the vote. Filing fee is $85. Ohio R.C. 3513.257.

**Oklahoma** requires signatures of at least 2% of the number of registered voters in the district, plus a filing fee of $1,000.  26 OK Stat § 5-112.

**Oregon** requires signatures equal to 1% of the number of votes cast in the district for president.  ORS 249.740.

**Pennsylvania** requires 2% of the largest vote cast in the district in the last election plus a filing fee of $150.  25 P.S. § 2911(b), § 2913(B.1)(2).

**Rhode Island** requires the same 500 signatures from partisan and independent candidates.  RI Gen. Laws § 17-14-7.

**South Carolina** requires at least 5% of the active, registered voters in the geographical area the office represents, based on the total number of registered voters in the geographical area 120 days prior to the election, but in no event more than 10,000 signatures. SC Code of Laws § 7-11-70.

**South Dakota** requires signatures of at least 1% of the total vote for Governor in 2022, or 3,502 signatures. SD Codified Laws § 12-7-1.

**Tennessee** requires at least 25 signatures of voters in the district. Tenn. Code Ann. § 2-16-204.

**Texas** requires signatures of at least 5% of all votes cast for governor in the district in the last election, or 500, whichever is less. Texas Elec. Code Title 9, § 142.007.

**Utah** requires signatures of at least 300 signatures or 5% of the voters in the district, whichever is less. Utah Code § 20A-9-502.

**Vermont** requires at least 500 signatures. 17 V.S.A. §2402.

**Virginia** requires at least 1,000 signatures.  § 24.2-506(A)(2).

**Washington** state allows ballot access through payment of a filing fee of $1,740 or for candidates who do not have the filing fee, they may submit a petition with at least 1,740 signatures.  RCW 29A.24.091.

**West Virginia** requires signatures of at least 1% of the votes in the district at the last election, or 2,272 signatures for Dist. 1 and 2,449 signatures for Dist. 2.  W. VA. Code § 3-5-23 and § 3-5-24.

**Wisconsin** has the same signature requirement of 1,000 but not more than 2,000 signatures for partisan and independent candidates. Wis.Stat. §8.20(1), 8.15(6).

**Wyoming** requires not less than two percent (2%) of the total number of votes cast for the office in that particular district in the last general election circulated during the same calendar year as election, plus a filing fee of $750. Wyoming Statutes 22-5-304(c); 22-5-305.