UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BYRON SIGCHO LOPEZ,<br>JOSE GUERRA,<br><br>Plaintiff,<br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, and its members, in their official capacities, LAURA K. DONAHUE, Chair, RICK S. TERVEN, SR., Vice Chair, JENNIFER M. BALLARD CROFT, CRISTINA D. CRAY, TONYA L. GENOVESE, CATHERINE S. McCRORY, JACK VRETT, and CASSANDRA B. WATSON,<br><br>Defendants. | ) | No. 26-cv-9156<br><br>Hon. Franklin U. Valderrama |

**<u>Plaintiffs' Emergency Motion for Preliminary Injunction</u>**

Plaintiffs, Byron Sigcho Lopez and Jose Guerra, file their emergency motion for preliminary injunction and respectfully request expedited review of their motion because this case pertains to the November 3, 2026 general election, and the First Amendment rights of Plaintiffs and their supporters have been denied by the Defendants, Illinois State Board of Elections.

Plaintiffs adopt and incorporate assertions in their Verified Complaint (Dkt.#1) and in the Declarations of Byron Sigcho Lopez and Richard Winger (attached).

In further support, Plaintiffs also file their memorandum of law in support of their emergency motion for preliminary injunction.

## Introduction[1]

On May 26, 2026 Plaintiff, Byron Sigcho Lopez ("Candidate"), filed with the Defendant Illinois State Board of Elections ("ISBE") his ballot access petitions for the office of US Representative for the 4th Congressional Dist. with 17,727 signatures. Please see Complaint (Dkt.1) and Candidate declaration attached as **Exhibit A**.

For the November 3, 2026 general election the Election Code required independent candidates to submit at least 5% but not more than 8% of the total votes in the district at the last election, or 10,816 signatures for the 4th Congressional Dist. by operation of 10 ILCS 5/10-3. (Dkt. #1, Exh. E) In elections following redistricting, independent candidates for US Representative in **any** Congressional district may gain ballot access by submitting 5,000 signatures, with no maximum signature restriction. 10 ILCS 5/10-3. The office being elected at all elections is the same two year office of US Representative as defined in the U.S. Constitution, Article I, section 2, clause 2.

Independent candidates are also governed by a 90 day duration to gather signatures with each sheet requiring a notarial *jurat*, rather than certification under penalty of perjury (10 ILCS 5/10-4, 10-6) which are the same requirements for established party candidates (10 ILCS 5/7-10, 8-8). However, independent candidates gain no benefits from success at the election in subsequent elections, as would a new political party that received at least 5% of the vote at the election, and independent candidates are required to gather and file the same number of

1 This is a summary of facts and provisions of the Election Code as stated in the Verified Complaint, and in the Declaration of Byron Sigcho Lopez (Exhibit A attached) and in the Declaration of Richard Winger (Exhibit B attached).

signatures at each election, even if the candidate prevailed at the election (10 ILCS 5/10-1 and 10-2 for new political party benefiting from established party provisions of Article 7 of the Election Code, compared to 10 ILCS 5/10-3 for independents).

No candidate for US House in Illinois has ever overcome a general election signature requirement of 10,000 or more and survived an objector's challenge to the petition, and since 1890, only 3 have done so in the country (Wendell Fant in North Carolina in 2010; Frazier Reams in Ohio in 1954; Jack Gargan in Florida in 1998). See Winger Declaration, attached as **Exhibit B**, Par. 11.

Only one candidate for US House has ever overcome a signature requirement of 5% of votes cast at the last election in Illinois, and that was H. Douglas Lassiter in the 15th Congressional District in 1974, when there was no restriction upon the duration of time a candidate could gather signatures. *Id*. at ¶12.

Only 5 candidates, out of all the US House races since 1890 have been able to overcome a general election requirement of 10,000 or more: Wendell Fant in North Carolina in 2010; Frazier Reams in Ohio in 1954; Jack Gargan in Florida in 1998; Cindy Sheehan in California in 2008 (10,198); and Steve Kelly in Montana in 1994 (10,186). *Id*. at ¶14.

An objectors' petition was filed challenging the validity of Candidate's ballot access petitions (Dkt. #1 Par. 59) and against a second independent candidate, Mayra Macias (Dkt. #1, Par. 66-68), and thereafter the ISBE convened as the State Officers Electoral Board ("SOEB") and reviewed the signatures submitted by Candidate.

On July 21, 2026 the SOEB entered its decision removing Plaintiff from the general election ballot based upon its determination that of the 17,277 signatures

submitted by Plaintiff, only 9,594 were accepted as valid – meaning, each signer was registered to vote in the 4th Congressional Dist. at the address written, and the ink signed signatures on Candidate's petition sheets matched the voter's signature exemplar in the ISBE's database. (Dkt. #1, Par. 64)

The Illinois Election Code's requirement of at least 5% but not more than 8% of the total votes cast at the last election in the district (10 ILCS 5/10-3) imposes one of the more severe ballot access requirements for independent candidates for US Representative among all states. See Winger Declaration, Exh. B. Only two other states, besides Illinois require 10,000 or more signatures, and Candidate would have met the number of signatures required for independent candidates[2] for US Representative in 91.3% of the 435 Congressional districts. *Id*. at ¶15.

The Election Code on its face and as applied, violates Plaintiffs' First and Fourteenth Amendment rights because it poses a severe burden upon independent candidates for US Representative, and is not the least restrictive ballot access scheme to satisfy legitimate state interests – to maintain the integrity of elections – by requiring a modicum of support to deter frivolous candidates and/or ballot overcrowding, and allow the orderly administration of elections.

The requirement of 5,000 signatures from voters of a congressional district (10 ILCS 5/10-3) for independent candidates for US Representative at elections after redistricting is an enacted ballot access scheme that satisfies all legitimate state

2 In Illinois candidates seeking the nomination of an established political party at a primary need submit one half of one percent (0.5%) of (only) their party's highest vote recipient in the district at the last election. 10 ILCS 5/7-10(b) and (k). For the March 17, 2026 primary Democratic candidates were required to submit 697 signatures, and Republican candidates were required to submit 371 signatures; in the first primary following redistricting, the requirement is 600 signatures in any congressional district. 10 ILCS 5/7-10(b). The candidates selected by their party at a primary are then placed upon the general election ballot.

interests. This is a less restrictive signature requirement than 5% to 8% of the total votes cast in the district. History confirms that even with a minimum 5,000 signature requirement (and no maximum restriction) very few independent candidates have been able to gain ballot access. See Exhibit B, attached.

The Election Code's requirement for signatures of at least 5% but not more than 8% for all years ***other than*** elections following redistricting (10 ILCS 5/10-3) also violates Plaintiffs' right to equal protection – Plaintiffs are being denied their First Amendment right to support and see the candidate of their choice appearing on the ballot this election, and being discriminated against and held to a higher signature requirement than independent US Representative candidates at elections following redictricting. There is no difference in the office of US Representative being elected at elections following redistricting as compared to other elections in between redistricting.

Similarly, there is no legitimate state interest, or any valid reason, for imposing considerably more burdensome ballot access requirements upon independent candidates seeking election at years in between post-redistricting elections. Plaintiffs' right to equal protection is being denied when Defendants require Candidate to submit more than two times the number of signatures this election, than Defendants would accept for independent candidates for the very same federal office being elected immediately after redistricting.

The election for US Representative for the 4th Congressional Dist. this year is unique because three independent candidates filed ballot access petitions for US Representative in the 4th Congressional Dist. – one was not challenged (Getty), and

the two who were challenged (Sigcho Lopez and Macias) were removed from the ballot by the Defendants.

No one else filed ballot access petitions as an independent candidate for US Representative at the November 3, 2026 general election in any of the other 16 congressional districts, which had notably higher signature requirements than the 4th Cong. Dist. (Dkt. #1, Exh. E).

For example, in the 5th Congressional Dist. (which had 383,509 ballots cast at the 2024 general election) the 5% to 8% signature requirement in 10 ILCS 5/10-3 required independent candidates in that district to submit at least **19,175** but not more than **30,680** signatures. (Dkt. #1 Exh. E). The 5% to 8% requirement becomes more oppressive as voter turnout increases, and the November 3, 2026 (mid-term) general election is anticipated to have higher than usual voter participation.

If a group of independent candidates intended to field candidates in each of the 17 congressional districts elected this year, they would need to gather at least **285,234** signatures statewide, and then survive the SOEB's electoral challenge process. Strikingly, new political party candidate for **statewide** office (10 ILCS 5/10-2) and independent candidates for **statewide** office (10 ILCS 5/10-3) – with no gerrymandered district boundaries to trap unwary petition signers – would be required to submit at least **25,000** signatures. The 25,000 signature requirement, amplified by the objection process, has stymied new political party formation in Illinois for almost a century as confirmed by elected officials being largely affiliated with one of the two major parties. See also Winger Declaration, Exh. B.

The qualifications for the office of US Representative are defined in the US Constitution, Article I, section 2, clause 2, as follows: "No Person shall be a

Representative who shall not have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." The 5% to 8% signature requirement is more than double what the State deems sufficient during elections following redistricting, and imposes and additional and improper qualification for the office of US Representative.

The state interest in maintaining the integrity of the election of US Representative is the same for elections after redistricting as it is for every other election. There should be no additional qualifications added by the State for independent candidates for the office of US Representative during the years in between the post-redistricting election.

**A. <u>First Amendment and Voting Rights at Issue.</u>**

The U.S. Supreme Court declared in *Reynolds v. Sims* that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362 (1964). The strong First Amendment rights at issue were confirmed by the Supreme Court in 1983:

> As we have repeatedly recognized, voters can assert their preferences only through candidates or parties or both. "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish*, 415 U. S. 709, 716 (1974). The right to vote is "heavily burdened" if that vote may be cast only for major-party candidates at a time when other parties or other candidates are "clamoring for a place on the ballot." *Ibid*.; *Williams v. Rhodes*, supra, at 31. The exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens.

*Anderson v. Celebrezze*, 460 U.S. 780, 786-788 (1983). See also, *Burdick v. Takushi*, 504

U.S. 428, 433 (1992).

The Illinois Supreme Court similarly confirmed that " '[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.' " *Anderson v. Schneider,* 67 Ill.2d 165, 172, 365 N.E.2d 900 (1977), quoting *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535 (1964). See also, *Tully v. Edgar*, 171 Ill.2d 297, 664 N.E.2d 43 (1996) (legislation that restricts a candidate's effort to gain access to the ballot or that limits the people's right to nominate candidates implicates the right to vote).

Ballot-access requirements that place more burdensome restrictions on certain types of candidates than on others implicate rights under the Equal Protection Clause as well. See *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

The Election Code requirements governing independent candidates must be reviewed in their totality. *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006). Plaintiffs' complaint asserts also that the combined effect of the signature requirement of 5% to 8% of the total votes cast in the district in combination with other requirements (and the petition objection process) violates their First and Fourteenth Amendment rights. Independent candidates are limited to the same 90 day circulation duration with each sheet being notarized, as applicable to established party candidates, but additionally restricted by the "dual circulator" bar in 10 ILCS 5/10-4 which dramatically reduces the pool of potential circulators, and virtually excludes all professional circulation companies.

Legislation that imposes greater burdens upon independent candidates to protect or insulate the two-party system is not permitted, explained by the

Supreme Court as follows:

> Our U.S. Supreme Court has observed that interest in political stability 'does not permit a State to completely insulate the two-party system from minor parties' or independent candidates' competition and influence"

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 366-87, 117 S. Ct. 1364 (1977).

To be sure, "[s]tates may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S. Ct. 533 (1986).

The *Anderson* court, citing to *Storer* rejected a litmus-paper test, and explained the procedure for review of challenged legislation as follows:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. *Storer*, supra, at 730. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. See *Williams v. Rhodes*, supra, at 30-31; *Bullock v. Carter*, 405 U. S., at 142-143; *American Party of Texas v. White*, 415 U. S. 767, 780-781 (1974); *Illinois Elections Bd. v. Socialist Workers Party*, 440 U. S. 173, 183 (1979). The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made." *Storer v. Brown*, supra, at 730.[10]

*Anderson v. Celebrezze*, 460 U.S. 780, 789-790 (1983). See also, *Green Party of Georgia v. Georgia, 55*1 Fed. Appx 982 (11th Cir. 2014).

A Court's " 'primary concern is with the tendency of ballot access restrictions 'to limit the field of candidates from which voters might choose.' Therefore, '[i]n

approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'" *Anderson*, 460 U.S. at 786. *(citation omitted.)*

Plaintiffs' complaint demonstrates a very diligent candidate that explored options for professional circulators, enlisted hundreds of individuals to circulate his petitions, raised over $180,000, and filed ballot access petitions that represented the voices of over 17,000 petition signers. The 5% to 8% signature requirement dramatically limits the field of candidates, and denies of Candidate's petition signers their right to see their candidate's name upon the ballot.

The cumulative effect of the 5% to 8% signature requirement alongside the additional ballot access requirements is multiplied and enhanced when independent candidates are required to gather and submit 15 to 30 times the number of signatures that established party candidates submit (Dkt. #1 Exh. E) within the same 90 day duration.

As discussed recently in *Hall v. Merill*,

> In this analysis, "the burden is on the state to 'put forward' the 'precise interests ... [that are] justifications for the burden imposed by its rule,'" and to "explain the relationship between these interests" and the challenged provision. *Fulani*, 973 F.2d at 1544 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564). "The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access." *Bergland*, 767 F.2d at 1554.

*Hall v. Merrill*, 212 F.Supp.3d 1148 (Dist. Court, MD Alabama, 2016).

Even so, where states may argue a compelling state interest, they must "adopt the least drastic means to achieve their ends." *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 185, 99 S. Ct. 983 (1979).

In determining whether the burden on ballot access is unconstitutionally

severe the Court of Appeals for the Seventh Circuit has advised that:

> What is ultimately important is not the absolute or relative number of signatures required but whether a "reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Bowe v Bd. of Election Comm'rs of City of Chicago,* 614 F.2d 1147, 1163 (7th Cir. 1980) (citing *Storer*, 415 U.S. at 742).

*Stone v. Bd. of Elections Comm'rs of City of Chicago*, 750 F. 3d 678, 682 (7th Cir 2014).

The *Stone* decision follows the guidance provided by the U.S. Supreme Court in *Storer,* which explained:

> [p]ast experience will be a helpful, if not always, an unerring guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.

*Storer v. Brown*, 415 U.S. 724, 742, 94 S. Ct. 1274, 1285 (1974). See also, *Lee v. Keith,* 463 F.2d 763, 771-772 (7th Cir. 2006) (excessive signature requirement for independent legislative candidates was unconstitutional because no candidates could overcome the requirement from 1980 to 2006).

The 5% to 8% signature requirement for independent candidates is not the least restrictive means to achieve legitimate state interests, when 5,000 signatures is written into the Election Code and achieves all legitimate state interests. History confirms that the 5% to 8% signature requirement insulates the two party system, and serves no purpose that is not addressed by a 5,000 signature requirement.

## B. <u>Requirements for Issuance of a Preliminary Injunction.</u>

To obtain a preliminary injunction, Plaintiffs must show the following: "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)). See also *Lambert v. Buss*, 498 F.3d 446, 451

(7th Cir. 2007). "If this showing is made, 'the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest.'" *Id*. (quoting *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013)). See also *Girl Scouts of Manitou v. Girl Scouts, America,* 549 F. 3d 1079, 1086 (7th Cir. 2008).

The "equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.* See also *Merrill Lynch, Pierce, Fenner & Smith v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993).

This framework establishes a "flexible standard," according to which "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged restriction burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Under this standard, "reasonable, nondiscriminatory restrictions" are subject to less exacting review, whereas laws that imposes "severe" burdens are subject to strict scrutiny. See *id*. (citations omitted). But in every case, "However slight [the] burden may appear ... it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion County Election Bd.*, 553 US 181, 128 S.Ct. 1610, 1616 (2008) (citation and quotation marks omitted).

As the Seventh Circuit has explained, "[m]uch of the action takes place at the first stage of *Anderson's* balancing inquiry," because the severity of the burden imposed is what determines whether strict scrutiny or a less demanding level of review applies. *Stone v. Board of Election Com'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) (citing *Burdick*, 504 U.S. at 534).

Defendants have no such legitimate, actual *state interest* for enforcing the

severely burdensome 5% to 8% signature requirement in 10 ILCS 5/10-3, when the Election Code already defines a less burdensome (though still vigorous) requirement of at least 5,000 signatures (with no maximum) for independent candidates at elections following decennial redistricting. The lower 5,000 signature requirement satisfies all legitimate state interests, as a matter of law.

Plaintiffs have met the requirements for injunctive relief, as they have no adequate remedy at law for denial of their First Amendment right to associate and see the candidate of their choice on the ballot, due to the unconstitutional restriction of their right to ballot access through denial of over 17,000 petition signers of their right to support the independent candidate of their choice and see their independent candidate's names upon the general election ballot.

There is no cost or burden involved to the Defendants, and no impact upon the Defendants or any election authority should this honorable court agree to issue a preliminary injunction.

Indeed, the issuance of a preliminary injunction, enjoining the enforcement of the 5% to 8% signature requirement in 10 ILCS 5/10-3 and directing that Candidate, Byron Sigcho Lopez's name is printed upon the ballot preserves Candidate's First and Fourteenth Amendment rights, should he prevail in this case. In addition, printing Candidate's name upon the ballot at this time would also avoid the need (and cost) for a special election, should Candidate prevail after the November 3, 2026 election.

The balancing of harms also weighs heavily in favor of Plaintiff, since the Defendants would suffer no harm from printing Plaintiff's name upon the ballot. Yet, Plaintiff and all his petition signers, would suffer irreparable harm if the

preliminary injunction is denied, through the denial of their First amendment rights to associate and support the candidate of their choice, and exercise their right to vote for the candidate of their choice.

Plaintiffs satisfy constitutional standing requirements because the challenged action of the Defendants caused an "injury in fact" that is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62, 112 S.Ct. 2130 (1992). The alleged injury must be concrete and particularized, and either actual or imminent. *Massachusetts v. EPA*, 549 U.S. 497, 517, 127 S.Ct. 1438 (2007). Protecting core political speech from improper denial has warranted court intervention and the granting of preliminary injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

Candidate diligently gathered far more signatures than needed to show a modicum of support from voters, and he represents all petition signers who desire to see his name on the ballot, and Plaintiffs and all petition signers have been harmed through the denial of ballot placement. Plaintiffs have satisfied constitutional standing. See also, *Bost v. Illinois State Bd. of Elections*, 146 S.Ct. 513, 519, 607 U.S. 71 (2026) citing *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983 (1979) (candidates have an interest in the electoral process – a process "of the most fundamental significance under our constitutional structure.")

**C. <u>Injunctive relief requested.</u>**

Plaintiffs respectfully request that this Honorable Court enjoin the Defendants from enforcing the signature requirement for independent candidates of at least 5% but not more than 8% of the total votes cast at the last general election

as contained in 10 ILCS 5/10-3, and direct Defendants to certify Plaintiff, Byron Sigcho Lopez's name to the ballot as an independent candidate for US Representative for the 4th Congressional Dist.. until such time as a decision on the merits is issued.

WHEREFORE, Plaintiffs respectfully request that this honorable Court allow expedited consideration of this emergency motion for preliminary injunction, and grant Plaintiffs' motion, or for any other relief that is just and appropriate.

Respectfully submitted:

By: /s/ Andrew Finko
One of Plaintiffs' attorneys

Andrew Finko
875 N. Michigan Ave.
Suite 3100
Chicago, IL 60611
P (773) 480-0616
Finkolaw@Fastmail.FM

## Certificate of Service

I, the undersigned attorney, certifies under penalty of perjury under the laws of the United States of America, 28 U.S.C. § 1746, that on August 12, 2026 the undersigned emailed a copy of the foregoing Motion directly to the following attorneys:

**Defendants, Illinois State Board of Elections and its members:**

c/o: Sarah H. Newman, Civil Rights Unit Supervisor
Office of the Illinois Attorney General
sarah.newman@ilag.gov

c/o: Marnie Malowitz, General Counsel
Illinois State Board of Elections
MMalowitz@elections.il.gov

***Notice to election authorities for the 4th Congressional Dist.:***

**Chicago Board of Election Commissioners**
c/o: Adam Lasker, General Counsel
Chicago Board of Election Commissioners
ElectionAttorney@gmail.com

**Cook County Clerk**
c/o: Kierra Williams, General Counsel, Elections
Cook County Clerk, Elections Division
Kierra.Williams@cookcountyil.gov

**DuPage County Clerk**
c/o: Patrick K. Bond
Biond, Conway, Smith law firm
patrickbond@bondconway.com

/s/ Andrew Finko

# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BYRON SIGCHO LOPEZ,<br>JOSE GUERRA,<br><br>Plaintiff,<br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, and its members, in their official capacities, LAURA K. DONAHUE, Chair, RICK S. TERVEN, SR., Vice Chair, JENNIFER M. BALLARD CROFT, CRISTINA D. CRAY, TONYA L. GENOVESE, CATHERINE S. McCRORY, JACK VRETT, and CASSANDRA B. WATSON,<br><br>Defendants. | ) | No. 26-cv-9156<br><br>Hon. Franklin U. Valderrama |

## Declaration of Byron Sigcho Lopez

The undersigned Byron Sigcho Lopez, under penalties of perjury, affirms and certifies the following facts based upon his personal knowledge, and if called to testify under oath, would testify to the following facts.

1. I am is a US Citizen, a registered voter and long-time resident of the 4th Congressional District of Illinois,

2. In 2019 I ran for and was elected Alderperson for the 25th Ward in Chicago, and in 2023 I was re-elected as Chicago's 25th Ward Alderperson. I have experience in how to organize a campaign, how to fund raise for a political campaign, how to gather signatures, and how to file petitions to gain a place on the election ballot for non-partisan elected office.

3. In 2025, I relied upon Rep. Chuy Garcia public representations that he was seeking re-election, and based upon this information, I did not seek the Democratic party's nomination for US Rep for the 4th Congressional Dist.

4. Had Rep. Garcia announced that he would not be seeking re-election I would have sought the Democratic party's nomination for US Rep. for the 4th Congressional Dist. at the March 17, 2026 primary, particularly since Rep. Chuy Garcia was not doing all he could for the residents of the 4th Congressional Dist. for some time, and I heard criticism of Rep. Chuy Garcia more often and more vocally in 2025.

5. I was denied the opportunity for a meaningful Democratic primary nomination for US Representative for the 4th Congressional Dist. That is, due to the coordination between Rep. Chuy Garcia and his chief of staff, Patty Garcia to misdirect the public during the 90 day petition gathering time, and use Rep. Chuy Garcia's standing and support in the Democratic party to deter and discourage other candidates from filing nomination papers for US Representative at the Democratic party primary. The coordination and timing of the filing of nomination papers where Rep. Chuy Garcia filed on the first day in the first hour, and Patty Garcia filed on the last day of petition filing in the last hour prevented me and other candidates from being able to file Democratic party nomination papers.

6. Due to the timing of Rep. Chuy Garcia's publicly announced withdrawal from the Democratic party's nomination process, I decided to campaign as an independent candidate for US Representative for the 4th Congressional Dist. In early 2026 I organized my federal political campaign, raised money, hired staff and consultants, and embarked upon the process to gather signatures as an independent candidate.

7. My US Representative campaign started gathering signatures on February 25, 2026, which was the first day of the 90 day time period, and continued working to gather signatures through the 89th day allowed for gathering signatures. On May 26, 2026, which was the 90th day for signature gathering and last day to file ballot access petitions, I drove with campaign staff and supporters from Chicago to the State Board of Elections' Springfield office to file my ballot access petitions, since the State Board did not allow candidate petitions to be filed at its Chicago office.

8. My campaign team ultimately gathered almost 20,000 signatures, largely through volunteers and paid individual circulators. After we removed some signatures from the petition because we were over the maximum number, we filed very close to the maximum number of signatures the Election Code allowed for an independent candidate for US Representative for the 4th Congressional District at the November 3, 2026 general election. If there was no maximum number restriction, we would have filed between 19,000 and 20,000 signatures.

9. To supplement petition gathering efforts of campaign volunteers and paid individual circulators, my campaign hired professional circulator Willie Burton, who had experience working for US Rep. Danny Davis, State Rep. LaShawn Ford, and Ald. Walter Burnett. Willie Burton was hired early in petitioning specifically to gather up to 10,000 petition signatures on my petitions for US Representative in 2026, which Mr. Burton agreed to provide. However, after about two weeks, Mr. Burton provided about 20 sheets with voter signatures that his circulators had obtained, due in large part to the fact that most of Mr. Burton's circulators were not eligible to circulate for my independent candidacy because they had previously circulated nomination petitions for Democratic candidates for the March 17, 2026 primary. Circulation was also more difficult this year, due to fear and apprehension within the community resulting from ICE activity.

10. My campaign staff and I relied upon Willie Burton to provide about half the signatures, we intended to gather. Willie Burton's inability to gather the promised signatures created a major petition gathering issue for the campaign mid-way through the 90 day circulation time. The campaign contacted two or three other professional circulators, including John Preston who agreed to provide up to 5,000 signatures, but none had circulators available who had not previously circulated petitions for Democratic or Republican candidates seeking nomination at the March 17, 2026 primary. John Preston refunded the partial payment from my campaign because he was unable to gather the promised signatures.

11. As a result of being unable to hire professional/experience paid circulators, my campaign increased the number of individuals who were hired to circulate petitions, many of whom had not previously circulated petitions. Individual circulators required additional time and coordination by campaign staff.

12. I did not recall this year if I circulated petition sheets in the fall 2025 for a Democratic candidate for the March 17, 2026 primary, it could have been one or two or so sheets, but I don't remember if they were turned in or not, so I was very reluctant to circulate my own petition sheets for US Representative, and risk losing all signatures on those sheets. There were more than few volunteers and supporters that did not recall if they circulated and/or turned in petition sheets for a Democratic candidate in 2025, and could not affirmatively say if they were eligible to circulate my independent US Representative candidate petitions.

13. There were Democratic party committeepeople and many union members who supported my US Representative campaign, and directly offered to help gather signatures. However, nearly every union member and committeeperson that offered to help was unable to do so, because they had circulated petition sheets for a Democratic party candidate at the March 17, 2026 primary. Based upon my past experience circulating petitions and familiarity with this group's ability to gather petition signatures in prior elections, I believe this group of volunteers could have gathered about 5,000 signatures for me from the 4th Congressional Dist.

14. Overall my campaign had about 320 petition circulators, consisting of volunteers and individual paid circulators.

15. My independent US Representative campaign was well-supported, and supporters contributed about $180,000 toward my independent candidacy in 2026. A large amount of campaign funds were for direct paid circulators to gather signatures, along with funding for staff and consultants running our field and volunteer operations. We had the money to pay Willie Burton to gather 10,000 signatures, and to pay other professional circulators, if they were not restricted on who could circulate for independent candidates.

16. This year was much harder to gather signatures than in my prior years circulating in the same geographic areas, due to community-wide trauma and fear after ICE raids targeted many areas within the 4th Congressional Dist. The 4th Congressional Dist. has a majority Latino population, and was one of the hardest

targeted areas in Cook County. Non-citizens and citizens were equally afraid of being surrounded, physically assaulted, arrested, and removed to a detention facility. There was a very real and palpable fear in the Latino community that started last year and continued this year during the petition gathering.

17. My campaign tried door-to-door canvassing for signatures, going to addresses with known registered voters, but a large percentage of those door-to-door residents were highly reluctant to open their doors to people they did not personally know. Door-to-door was not yielding signatures, and my campaign changed our petition gathering efforts to focus on public venues and/or on the street. However, street circulation resulted in a lower validity rate since many signers did not recall where they were registered to vote, or if they resided in the 4th Congressional Dist., and/or how their signature looked when they signed their voter cards.

18. Another complication of petition circulation the streets was the irregular shape of the 4th Congressional Dist., and increased the risk that petition signers would not be residents of the 4th Congressional Dist. My campaign staff and I noticed that many people did not know the congressional district that they lived in, or even if their voter registration was up-to-date at their current address, or was still listed at a prior address.

19. The illogical, and meandering boundaries of the 4th Congressional Dist. that included parts of Cook County and DuPage County, created additional challenges when gathering signatures at public venues and/or on the street because voters could sign – voters largely did not know their congressional district, and petition circulators could not check voter addresses on the street to see if they were in the 4th Congressional Dist.

20. After we filed my independent US Representative petitions they were challenged by supporters of Democratic candidate Patty Garcia. The State Board of Elections reviewed the signatures at its Springfield office, and determined based upon its calculation that I had 9,594 validated signatures. See attached report from State Board of Elections.

21. My campaign staff were able to validate hundreds of additional signatures through checking voter registration records and obtaining affidavits. However, because of the expedited electoral board proceeding we were not able to finish validating other signatures, and we were not allowed additional time to gather more signatures if there was a need for showing more support for my candidacy.

22. Pursuant to 28 U.S.C. Sec. 1746(2) I hereby declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

Byron Sigcho Lopez

Illinois State Board of Elections
State Officers Electoral Board


6/12/2026
9:18:36PM

# OBJECTION SUMMARY REPORT

## 26SOEBGE508 / Rivera, Munoz, Mendez v. Sigcho Lopez

OBJECTOR(S)

Jeremy Rivera
6037 S. Albany Ave.
Chicago, IL 60629

Rene A. Munoz
4843 S. Keeler Ave.
Chicago, IL 60622

Sandra Mendez
3116 S. Komensky Ave.
Chicago, IL 60623

CANDIDATE(S)

Byron Sigcho Lopez
1901 W. 21st St.
Chicago, IL 60608

INDEPENDENT
4TH CONGRESS

OBJECTION TOTALS

| | | | | | |
|---|---|---|---|---|---|
| Petition pages | 1,891 | | Examined | 10,257 | |
| Lines with signatures | 17,227 | | Valid | 2,624 | 25.6% |
| Lines with objections | 10,257 | 59.5% | Invalid | 7,633 | 74.4% |
| Unchallenged lines | 6,970 | 40.5% | Pending | 0 | 0% |

| | | |
|---|---|---|
| Pages with objections | 0 | 0% |
| Pending | 0 | |
| Overruled | 0 | |
| Sustained | 0 | |
| Signatures subtracted | 0 | |

| | | | |
|---|---|---|---|
| Required signatures | 10,816 | Over/Under required signatures | -1222 |

9,594 valid

# EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BYRON SIGCHO LOPEZ,<br>JOSE GUERRA,<br><br>Plaintiff,<br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, and its members, in their official capacities, LAURA K. DONAHUE, Chair, RICK S. TERVEN, SR., Vice Chair, JENNIFER M. BALLARD CROFT, CRISTINA D. CRAY, TONYA L. GENOVESE, CATHERINE S. McCRORY, JACK VRETT, and CASSANDRA B. WATSON,<br><br>Defendants. | ) | No. 26-cv-9156<br><br>Hon. Franklin U. Valderrama |

**Declaration of Richard Winger**

The undersigned, Richard Winger, affirms and declares under penalty of perjury the following facts based upon his personal knowledge, expertise in ballot access requirements in the US, and experience.

1. I am over 18 years of age, and a resident of the State of California. I provide the statements in this Declaration based upon my own personal knowledge and research that I have conducted for decades studying ballot access laws throughout the United States, and if called to testify would testify under oath to the contents of this Declaration.

2. I graduated from the University of California at Berkely in 1966 with a B.A. degree in political science. Since 1985 I have been the editor and publisher (and recently co-editor with Bill Redpath) of Ballot Access News, a non-partisan newsletter and website ( https://ballot-access.org/ ) that reports on developments in ballot access laws throughout the nation, and developments in the law which affect

political parties.

3. I have researched the ballot access laws of all 50 sates from the year 1888 to present. I have become well-versed in how the ballot access laws of each state have worked historically and how those laws compare with the laws of Illinois.

4. As stated in my attached curriculum vitae I have offered expert testimony and testified in ballot access cases in over half the states.

5. In 1891 Illinois enacted a 2% signature requirement for independent and new or minor party candidates (commonly referred to as "third parties") to get on the ballot.

6. There was a US Senate election in 1926 and 1930 (although no gubernatorial election). In 1926 there were 12 candidates, and in 1930 there were nine.

7. In 1927 Illinois enacted Senate Bill 585, enabling "third parties" to get on the ballot by party convention or caucus meeting.

8. In 1931 Illinois repealed the provision it enacted in 1927 through SB 585 applicable to "third parties" and also increased the signature requirement for "third party" and independent candidates to 5% of the total votes from the last election. This change was enacted primarily to keep Communist candidates off the ballot, as many Communist affiliated candidates used the 1927 law to get on the ballot.

9. Illinois is the only state which allows candidates who file less than the required number of signatures to get on the ballot if no one filed an objector's petition against such a candidate. The Illinois Election Code does not define or authorize an "apparent conformity" review, but the Illinois State Board of Elections

has adopted such a procedure in recent elections, in which it checks for a statement of candidacy and at least 10% of the required signatures, which would then allow a candidate to get on the ballot, even with less than the required number of signatures, if no objection is filed.

10. When I use the phrase "overcome a signature requirement" for Illinois, I am referring to a candidate who has overcome an objector's petition and has appeared on the general election ballot.

11. No candidate for US House in Illinois has ever overcome a general election signature requirement of 10,000 or more, and since 1890, only 3 have done so in the country (Wendell Fant in North Carolina in 2010; Frazier Reams in Ohio in 1954; Jack Gargan in Florida in 1998).

12. Only one candidate for US House has ever overcome a signature requirement of 5% of votes cast at the last election in Illinois, and that was H. Douglas Lassiter in the 15th Congressional District in 1974, when there was no restriction upon the duration of time a candidate could gather signatures.

13. From 1890 to 2024, there would have been over 25,000 regularly-scheduled US House races – there are 435 districts with two year House terms.

14. Only 5 candidates, out of all the US House races since 1890 have been able to overcome a general election requirement of 10,000 or more: Wendell Fant in North Carolina in 2010; Frazier Reams in Ohio in 1954; Jack Gargan in Florida in 1998; Cindy Sheehan in California in 2008 (10,198); and Steve Kelly in Montana in 1994 (10,186).

15. Only three states require 10,000 or more signatures for independent US House candidates to get on the general election ballot: Illinois (5% to 8% of total

votes in the district at last election), South Carolina (5% of reg. voters or 10,000) and Georgia (5% of registered voters). North Carolina lowered its signature requirement from 4% of the registered voters to 1.5% of the registered voters.

16. In 2026, a candidate with 9,594 signatures (as was the final count of validated signatures for Byron Sigcho Lopez), would have satisfied the signature requirement for an independent candidate for US Representative in **91.3**% or 397 of the 435 US House Districts – that is, 9,594 signatures would have met the signature requirement in all districts in all states **except** Illinois, South Carolina, and Georgia.

17. It is my opinion that a reasonably diligent candidate for US House in Illinois could not be expected to be able to meet a signature requirement of 10,816 or more signatures within 90 days to gain a place on the Illinois ballot. When Jack Gargan got his signatures in Florida in 1998, he had a petitioning period that ran from January 1 of the election year to July 15 of the election year. And when Wendell Fant got his signatures he had from November 2008 until May 2010 to collect them. And when Frazier Reams got his in 1954 he was free to start as early as he wished. I base this opinion upon my years of study of elections and ballot access laws, and the historical fact that no one ever met a requirement of 10,816 in such a short petitioning window as the 90-day Illinois window.

18. Illinois also severely restricts independent candidates also by applying the same 90 day allotted circulation time for independent candidates, as is applies to established party candidates with a fraction of the signature requirement.

19. Illinois has a reduced signature requirement of at least 5,000 signatures, with no maximum restriction, for independent US House candidates seeking ballot placement at elections following redistricting, for the same office of

US Representative that is elected at all other election years. Even with a reduced 5,000 signature requirement and the 90 day time to gather signatures, Illinois elections for US Representative have not been overcrowded or burdened by an excessive number of independent candidates.

20. Illinois' 5,000 signature requirement with no maximum number, is still a higher signature requirement than the average and the median signature requirements in all other states.

21. Since the Election Code was amended in 1931, there has not been ballot overcrowding in Illinois elections for US Representative, and there has never been an election with too many independent or new political party candidates on any ballot in Illinois that has impacted election administration. I base this opinion upon my historical review of elections in Illinois.

22. Pursuant to 28 U.S.C. Sec. 1746(2) I hereby declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

Richard Winger

Richard Winger

**Richard Winger Curriculae Vitae**
3201 Baker Street
San Francisco, California 94123
Updated July 26, 2026

EDUCATION

BA, Political Science, University of California, Berkeley, 1966
Graduate study, Political Science, UCLA, 1966-67

EMPLOYMENT

*Ballot Access News*, Editor 1985-Present
Editor of newsletter covering legal, legislative and political developments of interest to minor parties and independent candidates. Researcher of ballot access laws of all 50 states from years 1888-present; well versed in how ballot access laws of each state work historically and how they compare to each other. Responsible for reading all statutes, regulations, legal opinions, and state attorney general opinions on rights of political parties and the publications of minor parties.

On the Editorial Board of *Election Law Journal*, published by Mary Ann Liebert, Inc., Larchmont, N.Y., since 2001.

PUBLICATIONS

Wrote a chapter or two in each of these books:

*Libertarianism: John Hospers, the Libertarian Party's 50th Anniversary, and Beyond*, Jameson Books, 2021, editors C. Ronald Kimberling and Stan Oliver. My chapter is "The Libertarian Party has Been the Nation's Leading Force for More Lenient Ballot Access Laws."

*The Best Candidate: The Law of Presidential Nomination in Polarized Times*, Cambridge University Press, 2020, editors Eugene D. Mazo and Michael R. Dimino. My chapter is "The Nomination of Presidential Candidates by Minor Parties."

*America Votes! A Guide to Modern Election Law and Voting Rights*, 2nd edition, 2012, published by the American Bar Association's Section of State and Local Government Law, editor Benjamin E. Griffith. My chapter is "Significant Ballot Access Issues."

*Others, Vol. 2, Third Parties During The Populist Period*, by Darcy G. Richardson (2007: iUniverse, Inc., New York). Wrote the book's Appendix, "Early Ballot Access Laws for New and Minor Parties."

*Democracy's Moment*
edited by Ronald Hayduk and Kevin Mattson (2002: Rowman & Littlefield, Lanham, Md.). My chapter is, "More Choice Please! Why U.S. Ballot Access Laws are Discriminatory and How Independent Parties and Candidaes Challenge Them."

*The Encyclopedia of Third Parties in America*
edited by Immanuel Ness and James Ciment (2000: M.E. Sharpe, Inc., Armonk, N.Y.). My article is "History of U.S. Ballot Access Law for New and Minor Parties."

*Multiparty Politics in America*
edited by Paul S. Herrnson (1997: Rowman & Littlefield, Lanham, Md.). My chapter is "Institutional Obstacles to a Multi-Party System.

*The New Populist Reader*
edited by Karl Trautman (1997: Praeger, Westport, Ct.)

*Libertarianism, John Hospers, the Libertarian Party's 50th Anniversary, and Beyond*, edited by C. Ronald Kimberling and Stan Oliver. My chapter is, "The Libertarian Party Has Been the Nation's Leading Force for More Lenient Ballot Access Laws."

Additional articles published in these periodicals:
*Seton Hall Journal of Legislation & Public Policy*, vol. 48, book 1, 2023
*Fordham Law Review,* Vol. 90, #2, November 2021
*University of Arkansas Little Rock Law Review,* Vol. 29, #4, summer 2007
*Wall Street Journal*, October 26, 1984 and also November 2, 1988.
*The Long Term View,* Mass. Sch. of Law, vol. 2 #2 (spring 1994)
*American Review of Politics,* U. of Akron, vol. 16, Winter 1995
*California Journal,* July 1977
*Election Law Journal* (two articles), Vol. 1 #2 (2002) and Vol. 5 #2 (2006)
*Cleveland State Law Review,* Vol. 45 #1 (1997)
*Chronicles Magazine,* November 1994
*Price Costco Connection,* Dec. 1995
*Fordham Urban Law Journal,* Vol. 32 #3 (May 2005)
*Fordham Law Review,* Vol. 85 #3 (December 2016)
*Oklahoma Politics,* Vol. 8 (October 1999)
*Harvard Law Record,* internet, April 25, 2016

Also, I wrote "Election Law Decisions" in all issues of the newsletter of the American Political Science Association's Section on Representation and Electoral Systems, 2005-2014. The publication appeared twice each year.

I wrote articles for "Voice for Democracy", the newsletter of Californians for Electoral Reform, in these issues: Spring 2012, February 2014, August 2014, November 2014, and February 2015.

NATIONAL INTERVIEWS on Minor Parties, Independents, Ballots and Ballot Access

| | |
|---|---|
| *NBC* | *National Public Radio* |
| *ABC* | *Pacifica Radio* |
| *CNN* | *MSNBC* |
| *C-SPAN* | |

CASES: TESTIMONY or AFFIDAVITS (political party or candidate prevailing, or case pending)
**Alabama**: Hall v Bennett, U.S. Dist. Ct., 212 F.Supp.3d 1148 (m.d. 2016).
**Alaska**: Libertarian Party v Coghill, state superior court, 3rd dist., 3AN-92-08181, 1992: court enjoined petition deadline for minor party presidential petitions.
**Arizona:** Campbell v Hull, 73 F Supp 2d 1081 (1999). Az. Libt. Party v Hull, superior ct., Maricopa Co. 96-13996, 1996: deadline for submitting presidential elector

candidates too early. Nader v Brewer, 531 F 3d 1028 (9th cir., 2008). De La Fuente v Hobbs, 19-16868 (pending in 9th circuit): signature requirement for independent candidates.
**Arkansas**: Citizens to Establish a Reform Party v Priest, 970 F Supp 690 (E.D. Ark. 1996). Green Party of Ark. v Priest, 159 F.Supp.2d (E.D. Ark. 2001). Green Party of Ark. v Daniels, U.S. District Court, 448 F.Supp 2d 1056 (E.D.Ark. 2006). Moore v Martin, 854 F 3d 1021. Libertarian Party of Arkansas v Thurston, e.d., 4:19cv-214 (2019): signature requirement for new parties.
**California:** California Democratic Party v Jones, 530 US 567 (2000). California Justice Committee v Bowen, 2012 WL 5057625 (C.D.Cal.): deadline for new party qualification too early.
**Colorado**: Ptak v Meyer, 94-N-2250, U.S. Dist. Ct., 1994. Signature requirement for independent legislative candidates.
**Florida**: Libt. Party of Fla. v Mortham, 4:96cv258-RH, n.d. 1996: Libertarian vice-presidential candidate put on ballot even though he was not on the petition. Reform Party v Black, 885 So.2d 303 (Fla. 2004).
**Georgia**: Bergland v Harris, 767 F 2d 1551 (11th cir., 1985). Remanded case back to U.S. District Court; before District Court acted, legislature substantially eased law, so case became moot. Green Party of Georgia v Kemp, 171 F Supp 3d 1340 (n.d. 2016), affirmed, 674 F.Appx. 974 (11th cir., 2017). Libertarian Party of Georgia v Raffensperger, n.d., 1:17cv-4660: number of signatures for U.S. House.
**Hawaii**: Libt. Party of Hi. v Waihee, cv 86-439, U.S. Dist. Ct., 1986: petition deadline for new parties.
**Illinois**: Nader v Ill. State Bd. of Elections, 00-cv-4401, U.S. Dist. Ct., N.D., 2000: petition deadline enjoined. Lee v Ill. State Bd. of Elections, 463 F.3d 763 (7th cir. 2006). Jones v McGuffage, 921 F Supp 2d 888 (N.D.. Il, 2013). Libertarian Party of Illinois v Scholz, 164 F Supp 3d 1023 (n.d. 2016), affirmed 872 F.3d 518 (7th cir., 2017). Gill v Scholz, central dist., 3:16cv-3221: case pending in 7th circuit on 5% petition requirement for independent candidates for U.S. House; U.S. District Court put candidate on ballot, but 7th circuit stayed that action. Jones v McGuffage, n.d., 1:12cv-9997: number of signatures in special U.S. House elections; judge reduced number of signatures.
**Iowa**: Oviatt v Baxter, s.d., 4:92-10513, U.S. Dist. Ct., 1992: signature requirement for U.S. House candidates. Libertarian Party of Iowa v Pate, s.d., 4:19cv-241. Petition deadline.
**Kansas**: Merritt v Graves, 87-4264-R, U.S. Dist. Ct., 1988: independent petition deadline, requirement that independent petitions not be circulated outside of circulator's home precinct, and requirement that voters could only register in qualified parties. This case should not be confused with another by the same name decided in December, 1988.
**Kentucky**: Libt. Pty. of Ky. v Ehrler, 776 F Supp 1200 (E.D. 1991). Sweeney v Crigler, e.d., 2:19cv-46 (2019): deadline for declaration of candidacy.
**Louisiana**: Carpenter v Landry, m.d., 3:26cv-791.
**Maine**: Libertarian Party of Me v Dunlap, 2:16cv-2: deadline for new party.
**Maryland**: Dixon v Md. State Adm. Bd. of Elec. Laws, 878 F 2d 776 (1989, 4th cir.). Green Party v Bd. of Elections, 832 A 2d 214 (Md. 2003).
**Michigan:** Graveline v Johnson, 336 F.Supp.3d 801 (e.d. 2018), affirmed, 747 F Appx 408 (6th circuit 2018). Number of signatures for independent candidates.
**Montana**: Kelly v Johnson, U.S. Dist. Ct. 08-25 (2012): independent candidate petition deadline. Breck v Stapleton, 259 F.Supp.3d 1126 (2017). Montana Green Party v

Stapleton, 9th circuit, 20-35340. Unequal distribution requirement for petitions for party status.

**Nebraska**: Bernbeck v Gale, 4:18cv-3073 (2018). Number of signatures for independent candidates.

**Nevada**: Libt Pty. of Nev. v Swackhamer, 638 F Supp 565 (1986); Fulani v Lau, cv-N-92-535, U.S. Dist. Ct., 1992: minor party and independent petition deadline.

**New Jersey**: Council of Alternative Political Parties v Hooks, 999 F Supp 607 (1998); Council of Alternative Political Parties v State Div. of Elections, 781 A 2d 1041 (N.J.Super. A.D. 2001).

**New York**: Molinari v Powers, 82 F Supp 57 (E.D.N.Y. 2000). Schulz w Williams, 44 F 3d 48 (2nd cir., 1994). Green Party of N.Y. v N.Y. State Bd. of Elections, 389 F.3d 411 (2nd cir., 2004).

**North Carolina**: Obie v N.C. Bd. of Elections, 762 F Supp 119 (E.D. 1991). DeLaney v Bartlett, 370 F.Supp.2d 373 (M.D. 2004). Edwards v Berger, Wake County Superior Court, 18-cvs-9749 (2018): state could not give party labels to some candidates, but not all candidates, for the same office.

**Ohio**: Libertarian Party of Ohio v Blackwell, 462 F.3d 579 (6th cir. 2006). Libertarian Party of Ohio v Husted, U.S. Dist. Ct., middle district, 2:13cv-935 (2014): state could not create a new petition in September of odd year before election and expect it to be used in following year.

**Oklahoma**: Atherton v Ward, 22 F Supp 2d 1265 (W.D. Ok. 1998). De La Fuente v Ziriax, had been pending in 10th circuit, 17-6010, then legislature eased requirement for independent presidential candidates so case became moot.

**Pennsylvania**: Patriot Party of Pa. v Mitchell, 826 F Supp 926 (E.D. 1993).

**South Dakota**: Nader v Hazeltine, 110 F Supp 2d 1201 (2000). Libertarian Party of South Dakota v Krebs, 2018, 4:15cv-4111.

**Tennessee**: Libt Party v Goins, U.S. Dist. Ct., 793 F Supp 1064 (M.D. 2010). Green Party of Tennessee v Hargett, 7 F.Supp.3d 772 (m.d. 2014), aff'm, 791 F.3d 684 (6th cir. 2015): this is the case that struck down the law on how a party remains on the ballot, and should not be confused with the case of the same name on the requirements for a party getting on the ballot.

**Texas**: Pilcher v Rains, 853 F 2d 334 (5th cir., 1988). Collier v Nelson, w.d., 1:26cv-1574.

**Virginia**: Libt. Pty of Va. v Quinn, 3:01-cv-468, U.S. Dist. Ct., E.D. (2001): court ordered state to print "Libertarian" party label on ballot next to names of candidates.

**West Virginia**: State ex rel Browne v Hechler, 476 SE 2d 559 (Supreme Court 1996). Nader v Hechler, 112 F.Supp.2d 575 (S.D.W.V., 2000). McClure v Manchin, 301 F Supp 2d 564 (2003).

CASES: TESTIMONY or AFFIDAVITS (political party or candidate not prevailing)

**Alabama**: Swanson v Bennett, 490 F.3d 894 (11th cit. 2007). Stein v Chapman, 774 F.3d 689 (11th cir., 2014). De La Fuente v Merrill, m.d., 2:16cv-755: whether sore loser law applies to presidential primaries.

**Arizona**: Indp. Amer. Party v Hull, civ 96-1240, U.S. Dist. Ct., 1996: petition deadline for new parties. Browne v Bayless, 46 P 3d 416 (2002). Arizona Libertarian Party v Hobbs, 925 F.3d.1085 (2019).

**Arkansas**: Langguth v McKuen, LR-C-92-466, U.S. Dist. Ct., E.D., 1992: petition deadline for independent candidates. Christian Populist Party v Sec. of

State, 650 F Supp 1205 (E.D. 1987). Green Party of Ark. V Martin, 649 F.3d 675 (8th cir. 2011).
**California**: Socialist Workers Party v Eu, 591 F 2d 1252 (9th cir., 1978). Independent Party v Padilla, 184 F.Supp.3d 791 (Cal.,e.d. 2016). De La Fuente v Padilla, 930 F.3d 1101 (9th cir. 2019).
**D.C.**: Libertarian Party v D.C. Bd. of Elections, 682 F.3d 72 (D.C. Cir. 2012).
**Florida**: Fulani v Smith, 92-4629, Leon Co. Circuit Court, 1992: deadline for write-in filing. Libertarian Party of Fla. v State of Fla., 710 F 2d 790 (11th cir., 1983). U.S. Taxpayers Party v Smith, 871 F.Supp. 426 (n.d. Fla. 1993).
**Georgia**: Libertarian Party of Ga. v Cleland, U.S. Dist. Ct., n.d., 1:94-cv-1503-CC, U.S. Dist. Ct., N.D. (1994): number of signatures. Amendola v Miller, U.S. Dist. Ct, n.d., 1:96cv-2103 (1997): number of signatures. Esco v Secretary of State, E-53493, Fulton Co. Superior Court, 1998: number of signatures. Cartwright v Barnes, 304 F 3d 1138 (11th cir., 2002): number of signatures. Coffield v Kemp, 599 F.3d 1276 (2010): number of signatures.
**Idaho**: Nader v Cenarrusa, cv 00-503, U.S. Dist. Ct., 2000: number of signatures.
**Illinois**: Libt Party v Rednour, 108 F 3d 768 (7th cir., 1997). Nader v Keith, 385 F.3d 729 (7th cir. 2006). Summers v Smart, 65 F.Supp. 3d 556 (n.d. Ill. 2014).
**Kansas**: Hagelin for President Committee v Graves, 804 F Supp 1377 (1992).
**Maine**: Maine Green Party v Diamond, 95-318, U.S. Dist. Ct., 1995: definition of qualified party. Maine Green Party v Secretary of State, 96-cv-261, U.S. Dist. Ct., 1996: definition of political party.
**Maryland**: Ahmad v Raynor, R-88-869, U.S. Dist. Ct., 1988: number of signatures. Creager v State Adm. Bd. of Election Laws, AW-96-2612, U.S. Dist. Ct., 1996: number of signatures.
**Missouri**: Manifold v Blunt, 863 F 2d 1368 (8th cir. 1988).
**New Hampshire**: Werme v Gov. of N.H., 84 F 3d 479 (1st cir., 1996).
**New Mexico**: Parker v Duran, 180 F Supp 3d 851 (2014).
**North Carolina**: Nader v Bartlett, 00-2040, 4th cir., 2000: number of signatures.
**North Dakota**: Libertarian Party of N.D. v Jaeger, 659 F 3d 689 (2011).
**Ohio**: Schrader v Blackwell, 241 F 2d 783 (6th cir., 2001). State ex rel Fockler v Husted, State Supreme Court, 2016-1863: rules for primary ballot access. Libertarian Party of Ohio v Ohio Secretary of State, state appeals court, 10th dist., 16APE-07-496: definition of political party.
**Oklahoma**: Rainbow Coalition v Okla. State Elec. Bd., 844 F 2d 740 (1988). Nader v Ward, 00-1340, U.S. Dist. Ct., 1996: number of signatures. Clingman v Beaver, 544 U.S.581.
**Oregon**: Libt Party v Roberts, 737 P 2d 137 (Ore. Ct. of Appeals, 1987).
**Tennessee:** Green Party of Tennessee v Hargett, 882 F.Supp.2d 959 (m.d. 2012) and 953 F.Supp.2d 816 (m.d. 2013) (not to be confused with the case of the same name on how a party remains on the ballot). The final decisions are not reported and are 2016 US Dist Lexis 109161 (2016) and Sixth Circuit case 16-6299 (2017).
**Texas**: Texas Indp. Party v Kirk, 84 F 3d 178 (5th cir., 1996). Nat. Comm. of U.S. Taxpayers Party v Garza, 924 F Supp 71 (W.D. 1996). Kennedy v Cascos, 214 F.Supp.3d 559 (w.d. Tex, 2016).
**Virginia**: Wood v Meadows, 207 F 3d 708 (4th cir., 2000).
**Washington**: Washington State Republican Party v Washington State Grange, 876 F.3d 794 (2012).
**West Virginia**: Fishbeck v Hechler, 85 F 3d 162 (4th cir., 1996).

**Wyoming**: Spiegel v State of Wyoming, 96-cv-1028, U.S. Dist. Ct., 1996: petition deadline.

QUALIFIED EXPERT WITNESS

**Fishbeck v Hechler**, 85 F 3d 162 (4th cir. 1996, West Virginia case)
**Council of Alternative Political Parties v Hooks**, 999 F Supp 607 (1998, N.J.)
**Citizens to Establish Reform Party v Priest**, 970 F Supp 690 (E.D. Ark, 1996)
**Atherton v Ward**, 22 F Supp 2d 1265 (W.D.Ok. 1998)
**Calif. Democratic Party v Jones**, 530 US 567 (2000)
**Swanson v Bennett**, not reported, U.S. Dist. Ct., m.d.Ala. (02-T-644-N)
**Clingman v Beaver,** 544 U.S. 581.
**Green Pty v N.Y. Bd. Elec.**, 267 F Supp 2d 342 (EDNY 2003), 389 F.3d 411 (2nd 2004)
**Lawrence v Blackwell**, 430 F.3d 368 (6th cir. 2005)
**Hall v Merrill,** 212 F.Supp.3d 1148 (Alabama m.d. 2016)
**Graveline v Johnson,** 336 F.Supp.3d 801 (e.d. Mi. 2018), aff'm 747 F Appx 408 (6th cir. 2018)
**Green Party of Tennessee v Hargett,** 882 F.Supp.2d 959 (m.d. Tn. 2012); also 953 F.Supp.2d 816 (same)
**De La Fuente v Padilla,** 930 F.3d 1101 (9th cir. 2019)
**De La Fuente v State of Arizona**, 2:16cv-2419 (2019)

CASES IN WHICH DECISION MENTIONED MY EVIDENCE AND EITHER STRUCK DOWN OR ENJOINED THE LAW

**Hall v Merrill**, 212 F.Supp.3d 1148 (m.d. Ala. 2016), footnote 10. Eleventh Circuit later ruled that case was moot when it was decided and therefore vacated the decision, 902 F.3d 1294.
**Citizens to Establish a Reform Party in Arkansas v Priest,** 970 F.Supp.690 (e.d. 1996) at 695.
**Green Party of Arkansas v Priest**, 159 F.Supp.2d 1140 (e.d. 2001). Decision cites my evidence at p. 1143 but doesn't name me.
**Green Party of Arkansas v Daniels,** 445 F.Supp.2d 1056 (e.d. 2006) at 1059ff
**Libertarian Party of Arkansas v Thurston,** e.d. 4:19cv-214 (July 3, 2019)
**California Justice Committee v Bowen**, 2012 WL 5057625 (Oct. 18, 2012)
**Green Party of Georgia v Kemp,** 171 F.Supp.3d 1340 (n.d. 2016); aff'm, 674 F Appx 974 (11th cir. 2017)
**Gill v Scholz**, U.S. Dist. Ct., n.d. Ill. 16cv-3221. Court enjoined law and put candidate on ballot. Then the 7th circuit issued a one-sentence order removing the candidate from the ballot but not explaining why. Then another U.S. District Court Judge upheld law. Case is pending in the 7th circuit.
**Jones v McGuffage**, 921 F.Supp.2d 888 (2017) at 893.
**Lee v Keith,** 463 F.3d 763 (7th cir. 2006) at 766 (decision uses my evidence but does not name me)
**Libertarian Party of Illinois v Illinois State Bd. of Elections**, 164 F.Supp.3d 1023 (n.d. 2016). See footnote four.
**Graveline v Johnson**, 336 F.Supp.3d 801, aff'm 747 F Appx 408 (6th cir. 2018)
**Breck v Stapleton,** 6:18cv-87 (2017).

**Green Party of N.Y. v N.Y. State Board of Elections**, 389 F.3d 411 (2004) at 421
**Libertarian Party of Ohio v Blackwell**, 462 F.3d 579 (6th cir. 2006) at 589
**Libertarian Party of Ohio v Husted**, 2014 WL 11515569 (s.d. Oh. Jan. 7, 2014)(opinion misspells my surname as "Wagner")
**Libertarian Party of South Dakota v Krebs**, 290 F.Supp.3d 902 (2018)
**Libertarian Party of Tennessee v Goins**, 793 F.Supp.2d 1064 (m.d. 2010) at 1068
**Green Party of Tennessee v Hargett**, 882 F.Supp.2d 959 (m.d. 2012) at 976ff; on remand, 953 F.Supp.2d 816 (m.d. 2013) under heading "Parties' Expert Proof)

LIST OF ALL CASES IN LAST FOUR YEARS IN WHICH I TESTIFIED AT TRIAL OR AT DEPOSITION

**Green Party of Georgia v Kemp** (deposition 2015)
**Green Party of Tennessee v Hargett** (trial 2016)
**Libertarian Party of Illinois v Illinois State Election Board** (deposition 2017)
**De La Fuente v Padilla** (deposition 2017, California)
**Kennedy v Cascos** (court hearing 2016, Texas)
**Libertarian Party of South Dakota v Krebs** (trial 2018)
**Libertarian Party of Georgia v Raffensperger** (deposition 2019)
**Montana Green Party v Stapleton** (deposition 2019)
**Sweeney v Crigler** (deposition 2019)

SPEAKING ENGAGEMENTS: Colleges and Scholarly Meetings

Panel of New York City Bar Association, 1994. Ballot access.
Amer. Political Science Assn., nat. conventions of August 1995 and August 1996. Papers.
Capital University School, law school class, Columbus, Ohio, 1996. Guest lecturer.
Cal. State U., course in political science, Hayward, 1993 and 1996. Guest lecturer.
San Francisco City College, course in political science, 1996 and 1997. Guest lecturer.
Providence College, R.I., Oct. 1997, seminar on ballot access.
Harvard U., JFK School of Gov't, Oct. 18, 1995, guest lecturer, ballot access.
Voting Integrity Project national conference, Apr. 1, 2000, speaker on ballot access.
Center for Voting & Democracy nat. conference, Nov. 30, 2003, speaker on ballot access.
Robert Dole Institute of Politics, U. of Kansas, one of 5 panel members, Oct. 25, 2007.