**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BYRON SIGCHO LOPEZ, and JOSE GUERRA,<br><br>Plaintiffs,<br><br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, *et al.*,<br><br>Defendants. | No. 1:26-cv-9156<br>Judge Franklin U. Valderrama |

**MEMORANDUM OPINION AND ORDER**

For over a century, independent candidates for political office in the United States have faced restrictions on access to the ballot.[1] This case is the latest example in the ongoing battle. The Illinois Election Code requires an independent candidate for congress to obtain the signatures of qualified voters in the district in order to gain access to the general election ballot. 10 ILCS 5/10-3. The number prescribed is generally at least 5% but not more than 8% of the total number of votes cast in the last election for that office. *Id.*

Plaintiff Byron Sigcho Lopez, an aspiring candidate for the 4th Congressional District of Illinois, submitted what he thought were enough signatures to allow his name to appear on the ballot. Unfortunately for Byron Sigcho Lopez, objectors filed objections to many of his signatures asserting that they were invalid. R. 1, Compl.

---

[1] *See* Brian L. Porto, *The Constitution and the Ballot Box: Supreme Court Jurisprudence and Ballot Access for Independent Candidates*, 7 BYU J. PUB. L. 281, 287–88 (1992).

¶ 59.[2] The Illinois State Board of Elections (the ISBE) found that some of the signatures were invalid and that Byron Sigcho Lopez did not meet the signature requirement. *Id.* ¶ 63. The Board therefore ruled that his name should not appear on the ballot for the general election. *Id.* ¶ 64. Byron Sigcho Lopez and Jose Guerra, a registered voter in the 4th Congressional District, who signed and circulated ballot access petitions for Byron Sigcho Lopez (together, Sigcho Lopez[3]), sued the Board and its members Laura K. Donahue, Rick S. Terven, Sr., Jennifer M. Ballard Croft, Cristina D. Cray, Tonya L. Genovese, Catherine S. McCrory, Jack Vrett, and Cassandra B. Watson (collectively, Individual Board Members, and together with the ISBE, the Board), asserting that the Election Code signature provisions for independent candidates violate the First and Fourteenth Amendments. Compl. Before the Court is Sigcho Lopez's motion for a preliminary injunction in which Sigcho Lopez asks the Court to enjoin enforcement of Illinois's signature requirements as applied to the 4th Congressional District. R. 19, Pls. Am. Mot. PI. Also before the Court is the Board's motion to dismiss the complaint. R. 26, Defs. Mot. Dismiss. For the reasons stated below, the Court grants the Board's motion to dismiss and denies Sigcho Lopez's motion for a preliminary injunction.

[2]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

[3]For clarity, when the Court must distinguish which plaintiff it is referring to, it will use "Guerra" and "Byron Sigcho Lopez." When it refers to them together, it uses just "Sigcho Lopez," and for readability, uses singular pronouns even though there are two plaintiffs.

## Background

The Illinois Election Code (the Code) governs eligibility for ballot access. *See* 10 ILCS 5/1-1, *et seq*. Ballot access requirements differ with respect to three categories of candidates: candidates of established political parties, candidates of a new political party, and independent candidates. *Id*. §§ 5/10-2, 5/10-3. Established parties for congressional elections are those which receive at least five percent of the vote in the district's last election. *Id*. § 5/7-2. Established parties nominate their congressional candidates through primary elections. *Id*. Other parties are considered "new" political parties, and they generally must collect more signatures on petitions to show that they have sufficient level of support to be placed on the ballot, but they generally do not engage in primaries. *Id*.

Independent candidates are those individuals who are not candidates of any political party, and are not nominated at a primary, but rather are candidates at the general election competing for election against the nominated political party candidates and are listed on the ballot with the designation "independent," as defined in the Code. Compl. ¶ 22; 10 ILCS 5/10-3. To gain access to the ballot, an independent candidate must generally obtain the signatures of qualified voters in the district. 10 ILCS 5/10-3. In elections that do not follow redistricting, the number prescribed is at least 5% of the number of persons who voted in the next preceding regular election for that office and a maximum of 8% of those signatures. *Id*. In elections that follow redistricting, on the other hand, the Code requires independent candidates for U.S. Representative in any Congressional district to submit 5,000 signatures with no

maximum signature restriction, in order to gain ballot access. 10 ILCS 5/10-3. Only 2 other states require over 10,000 signatures for independent U.S. Representative candidates. Pls. Am. Mot. PI., Exh. B, Winger Decl. ¶ 15.[4]

For the November 2026 general election for the 4th Congressional District, independent candidates were required to submit at least 10,816 signatures but not more than 17,304 signatures from voters in the district. Compl. ¶ 56. Practically, if a candidate submitted more than the maximum number of signatures, the Board only considered the first 17,304 signatures submitted. *Id.* For the March 17, 2026 established party primary, U.S. Representative candidates for the 4th Congressional District were required to submit 697 signatures to be eligible for the Democratic Party nomination, and 371 signatures to be eligible for the Republican Party nomination. *Id.* ¶ 45.

All established party candidates seeking their party's nomination at their primary are allowed 90 days to gather the required number of signatures. Compl. ¶ 33. Similarly, new party and independent candidates seeking ballot access at a

---

[4]The Court may consider the declarations submitted by Sigcho Lopez in support of his preliminary injunction motion when considering that motion, but the Court also considers the evidence, as relevant, in deciding the Board's motion to dismiss, so long as they are consistent with the allegations of the Complaint. *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1067 (N.D. Ill. 2020) ("a plaintiff may supplement its argument in opposition to a motion to dismiss with unpleaded facts that are consistent with the allegations of the complaint is that, to the extent that they are consistent with the allegations of the complaint, a plaintiff may rely on facts adduced at a preliminary injunction hearing when responding to a contemporaneous motion to dismiss.") (citing, *inter alia*, *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove" so long as they are consistent with the allegations of the complaint); *In re Dealer Management Systems Antitrust Litig.*, 313 F. Supp. 3d 931, 938–39 & n.1 (N.D. Ill. 2018)).

general election also have a 90-day period to gather signatures. *Id.* ¶ 34; 10 ILCS 5/10-4. For the November 3, 2026 general election ballot, independent and new political party candidates' 90-day circulation time was from February 25, 2026 to May 26, 2026. *Id.* ¶ 34; 10 ILCS 5/10-6. Petitions may be circulated by any United States citizen who is at least age 17 and will be 18 or older at the next general election. *Id.*; 10 ILCS 5/3-6(c). For each petition sheet circulated, the circulator must sign a notarized certification that the signatures on that sheet were signed in their presence within the correct 90-day period, that the signatures are genuine, that to the best of the circulator's knowledge and belief the person so signing was at the time of signing the petition a duly registered voter and that their respective address is correctly stated. *Id.* The Code does not allow "dual circulators," that is, persons who previously circulated a petition for a candidate seeking a political party's nomination at a primary from later circulating a petition for an independent or new political party candidate at the general election ballot. Compl. ¶ 37; 10 ILCS 5/10-4.

Nomination papers for a primary and ballot access petitions for a general election that are received by the ISBE are subjected to an apparent conformity review. Compl. ¶ 28. The review is limited to determining: (1) whether a signed Statement of Candidacy has been filed, and (2) whether the filed nominating sheets contain gross signatures equal to or exceeding 10% of the minimum number of signatures required for the office sought. *Id.* ¶ 29; 10 ILCS 5/10-4.

Once accepted by the ISBE, nomination papers, including petitions, are subject to challenge by objectors, who may challenge whether the candidate or party has

submitted the requisite number of valid signatures and whether other legal requirements for nomination have been met. Compl. ¶ 38; ILCS 5/10-8. Under the Code and the ISBE's Rules of Procedure, when an objection is raised to a candidate's nomination papers, a hearing officer conducts an evidentiary hearing and develops the record. 10 ILCS 5/10-9, 5/10-10; R. 27-2, Exh. B, Rules of Procedure ¶¶ 4(a), 5.[5] The parties have the right to counsel, to conduct discovery, and to cross-examine witnesses. Rules of Procedure ¶¶ 3(a), 4(a), 8, 10(a). The hearing officer then issues a written recommendation to the Electoral Board. *Id.* ¶ 5. The Electoral Board then decides whether to accept the hearing officer's recommendation and either sustains or overrules the objection. *Id.* ¶ 5(d); 10 ILCS 5/10-10. Based on the Electoral Board's decision, the ISBE does or does not certify the candidate to the ballot. 10 ILCS 5/10-14. The losing party, meaning the candidate or the objector, can seek judicial review in the Circuit Court on an expedited basis. *Id.* § 5/10-10.1.

Byron Sigcho Lopez, an aspiring independent candidate to become the U.S. Representative for the 4th Congressional District, exerted considerable time, effort, and expense in gathering over 17,000 signatures from the District. Compl. ¶ 12. On May 26, 2026, Byron Sigcho Lopez submitted to the ISBE his nominating petition to appear on the November 2026 General Election ballot as an independent candidate for U.S. Representative for the 4th Congressional District. *Id.* Objectors affiliated

[5]The Court takes judicial notice of the exhibits attached to the Board's motion to dismiss, as they are public records "not subject to reasonable dispute." *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012); *see also Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir. 2004) (allowing judicial notice of records of administrative proceedings); Fed. R. Evid. 201(b)(2) (allowing judicial notice of facts "whose accuracy cannot reasonably be questioned"); Fed. R. Evid. 902(6) (official documents are self-authenticating).

with the Democratic Party candidate for the U.S. Representative of the District filed an objection to Byron Sigcho Lopez's petition, asserting that many of Byron Sigcho Lopez's signatures were invalid for various reasons. *Id.* ¶ 59. After a records examination on June 11–12, 2026, the hearing officer found that Byron Sigcho Lopez had only 9,594 valid signatures and recommended that the Electoral Board sustain the objection. *Id.* ¶¶ 61, 63, 64. The Electoral Board adopted the hearing officer's recommendation on July 21, 2026 and ruled that Byron Sigcho Lopez's name should not appear on the November 2026 ballot. *Id.* ¶ 64. According to Sigcho Lopez's expert, his 9,594 valid signatures would have satisfied the signature requirement for independent candidates for U.S. Representative in 91.3% of the 435 congressional districts. Winger Decl. ¶ 15.

Sigcho Lopez also points to his expert's declaration, which states that no candidate for U.S. Representative in Illinois has ever overcome a general election signature requirement of 10,000 or more and survived an objector's challenge to the petition, and since 1890, only 3 have done so in the country. Pls. Am. Mot. PI at 3 (citing Winger Decl. ¶ 11). That does not mean that independent candidates never make the ballot, however. In fact, in the 4th Congressional District (in which Byron Sigcho Lopez sought to run), independent candidate Chris Getty will appear on the ballot. Compl. ¶ 1.

On August 12, 2026, the ISBE was scheduled to certify all candidates for the general election ballot for the November 3, 2026 general election. Compl. ¶ 15. The Board stated at oral argument that, pursuant to the Uniformed and Overseas

Citizens Absentee Voting Act (UOCAVA), military and overseas voter ballots must be mailed out no later than September 18, 2026.

On July 31, 2026, Byron Sigcho Lopez and Guerra, a citizen and registered voter in the 4th Congressional District, sued the ISBE and Individual Board Members in their official capacities. Compl. Sigcho Lopez alleges that the signature requirement violates the First Amendment facially (Count I) and as applied (Count II); violates the Equal Protection Clause (Count III); constitutes an impermissible expansion of the Qualifications Clause (Count IV); and that the combined effect of the signature and notarization requirements, the 90-day signature gathering period, the objection process, and the dual-circulator rule violate the First and Fourteenth Amendment (Count V). On August 12, 2026, Sigcho Lopez filed a motion for preliminary injunction, seeking to enjoin the Board from applying and enforcing the 5–8% signature requirement and to certify Byron Sigcho Lopez as an independent candidate for the United States Representative for Illinois's 4th Congressional District on the November 2026 ballot. R. 4. (Sigcho Lopez filed an amended motion on August 13, 2026 in response to the Court's Minute Entry. R. 16.). The Board in turn, moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). R. 26. The motions were fully briefed as of September 11, 2026 and the Court held oral argument on the motions on September 16, 2026. R. 34; R. 36.

## Legal Standards

### I. Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### II. Federal Rule of Civil Procedure 12(b)(1)

A Rule 12(b)(1) motion, on the other hand, tests whether the court has subject matter jurisdiction. *Hallinan* 570 F.3d at 820. In order to survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing that subject matter jurisdiction exists. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). When deciding a facial challenge to subject matter jurisdiction—that is, when the defendant argues that the plaintiff's allegations as to jurisdiction are

inadequate—"the district court must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). But district courts may also "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether *in fact* subject matter jurisdiction exists." *Taylor*, 875 F.3d at 853 (citing *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009)). In that case, "no presumptive truthfulness attaches to plaintiff's allegations," and the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Apex Digit.*, 572 F.3 at 444 (citation modified).

## III. Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Tully v. Okeson*, 78 F. 4th 377, 378 (2023) (citation modified). To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) that it will suffer irreparable harm if the relief is not granted. *Richwine v. Matuszak*, 148 F.4th 942, 952 (7th Cir. 2025). "Of all these factors, the likelihood of success on the merits ordinarily carries the most weight." *Minocqua Brewing Co., LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025) (citation modified). To establish a likelihood of success on the

merits, the movant need not show that it will unquestionably win the case. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, a mere "possibility of success is not enough" and "neither is a better than negligible chance."[6] *Id*. at 762 (cleaned up). A strong showing of likelihood of success on the merits normally includes the movant showing how he or she proposes to prove the key elements of its case. *Id*. at 763.

"If the plaintiff establishes these threshold requirements, then the court must balance the equities, weighing the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party and the public—including third parties—if it is granted." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023). The Seventh Circuit has described this balancing test as a "sliding scale": "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win[,] the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citing *Planned Parenthood, of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)). Finally, in balancing the harms, the Court must consider the interests of non-parties in granting or denying the requested relief. *Ty, Inc., v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

---

[6]Sigcho Lopez initially argued that he is only required to show that he has a better than negligible chance of success on the merits of at least one of his claims. Pls. Am. Mot. PI at 11. However, in his reply, he acknowledged that he cited the incorrect standard. R. 30, Pls. PI Reply/Resp. Dismiss at 19.

## Analysis

### I. Motion to Dismiss

The Court begins with the Board's motion to dismiss and then turns, as necessary, to Sigcho Lopez's motion for a preliminary injunction.

#### A. Subject Matter Jurisdiction

The Court begins, as it must, with the Board's arguments relating to subject matter jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (holding that a court "may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."). The Board raises two jurisdictional arguments: (1) that Sigcho Lopez lacks standing to bring claims on behalf of *other* candidates and their supporters and (2) that Sigcho Lopez's claims against the ISBE, and his damages claims against the Individual Board Members, are barred by Eleventh Amendment sovereign immunity. R. 27, Defs. PI Resp./Memo. Dismiss at 23, 26.

*1. Standing*

The Court starts with the Board's standing argument. "Article III of the Constitution confines the federal courts to adjudicating actual cases or controversies." *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010); U.S. Const. art. III, § 2. Article III standing is a matter of subject matter jurisdiction, consisting of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). An injury in fact must be concrete, "that is, real, and not abstract." *Id*. at 424.

In his response to the Board's motion to dismiss, Sigcho Lopez clarifies that the suit is brought only on behalf Byron Sigcho Lopez and Guerra, who signed Byron Sigcho Lopez's petition and was a circulator for Byron Sigcho Lopez. R. 30, Pls. PI Reply/Resp. Dismiss at 21. At oral argument, Sigcho Lopez also confirmed that he was not bringing any claims on behalf of other candidates or their supporters, so the Board conceded that the issue of standing was moot. The Board does not argue that Byron Sigcho Lopez or Guerra do not have standing to bring the asserted claims on their own behalf. The Court agrees. Here, based on the Verified Complaint, the Court finds that Byron Sigcho Lopez has alleged that he suffered an injury in fact, specifically his inability to be on the ballot for the general election. That this injury is fairly traceable to the Board's conduct, and that this injury is likely to be redressed by a favorable judicial decision. Similarly, Guerra signed a petition for Byron Sigcho Lopez to be on the ballot and was a circulator of Byron Sigcho Lopez's petitions, so he suffered an injury by not being able to vote in the general election for his candidate of choice. *See* Pls. PI Reply/Resp. Dismiss at 21.

*2. Sovereign Immunity*

Turning to the Board's second subject matter jurisdiction argument, sovereign immunity, as stated above, the Board contends that the Eleventh Amendment bars

all of Sigcho Lopez's claims against the ISBE, as well as all damages claims against the Individual Board Members. Defs. PI Resp./Memo. Dismiss at 23.

The Eleventh Amendment provides, "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend XI. Eleventh Amendment sovereign immunity generally bars federal lawsuits against states, state agencies, and state officials acting in their official capacities. *Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 881 (7th Cir. 2012); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). Eleventh Amendment immunity is not absolute, as States can be sued when (1) Congress has authorized such a suit; or (2) the state voluntarily waives "its sovereign immunity by consenting to federal jurisdiction or by invoking that jurisdiction through its behavior." *Bd. Of Regents of Univ. Of Wisconsin Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 458 (7th Cir. 2011). Moreover, the Supreme Court created an exception in *Ex parte Young*, allowing "private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Essentially, the Supreme Court said that "a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citation modified).

Starting with Sigcho Lopez's claims against the ISBE, the Board contends that the "Eleventh Amendment provides immunity to states and state agencies as 'arms of the state.'" Defs. PI Resp./Memo. Dismiss at 23 (quoting *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005) (citation modified)). Additionally, argues the Board, the ISBE is not a "person" subject to suit under Section 1983. Defs. PI Resp./Memo. Dismiss at 23 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989)).

Sigcho Lopez retorts that the ISBE was named as a defendant in *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 187 (1979), and in that case the Supreme Court enjoined the ISBE from requiring independent candidates and new political parties to obtain more than 25,000 signatures within the City of Chicago. *Socialist Workers Party,* however, did not address the issue of sovereign immunity. True, the defense can be waived. *See Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). But, to the extent that Sigcho Lopez relies on *Socialist Workers Party* to argue that any waiver of the defense in *that* case constitutes a waiver to suit in all subsequent cases, including this one, he cites no authority supporting that proposition and, as the Board contends in reply, a state's waiver of Eleventh Amendment immunity must be "unequivocally expressed." Defs. Reply Dismiss (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)). Accordingly, *Socialist Workers Party* does not support Sigcho Lopez's argument that the ISBE is not protected by sovereign immunity.

Sigcho Lopez also relies on the *Ex parte Young* doctrine to contend that the ISBE is subject to suit because "the 11th Amendment can never be enforced to uphold an unconstitutional statute and defeat the provisions of the 14th Amendment." Pls. PI Reply/Resp. Dismiss at 18. "[T]he *Ex parte Young* doctrine only permits suit against officials who act unconstitutionally in their official capacities—not against the state itself." *Est. of Wobschall by Wobschall v. Ross*, 488 F. Supp. 3d 737, 751 (E.D. Wis. 2020) (citing, *inter alia*, *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 685 (1982) ("There is a well-recognized irony in *Ex parte Young*; unconstitutional conduct by a state officer may be 'state action' for purposes of the Fourteenth Amendment yet not attributable to the State for the purposes of the Eleventh.")). Indeed, as the Board points out in reply, courts routinely dismiss constitutional claims against the ISBE as barred by the Eleventh Amendment. Defs. Reply Dismiss at 15 (citing *Bost v. Illinois State Bd. of Elections*, 684 F. Supp. 3d 720, 735 (N.D. Ill. 2023), *aff'd,* 114 F.4th 634 (7th Cir. 2024), *rev'd and remanded on other grounds,* 607 U.S. 71 (2026); *Libertarian Party of Illinois v. Illinois State Bd. of Elections*, 2012 WL 3880124, at *2 (N.D. Ill. Sept. 5, 2012)).

Finally, as to the ISBE, Sigcho Lopez fails to respond to the Board's argument that the ISBE is not a "person" subject to suit under Section 1983 and thus has waived the argument. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Waiver aside, the Court agrees with the Board. *See Will*, 491 U.S. at 70–71 ("neither a State nor its officials acting in their official capacities are "persons" under § 1983.").

As to the Individual Board Members, the Board concedes, as it must, that, "under the *Ex parte Young* doctrine, private parties may sue individual state officials for prospective relief to enjoin ongoing violations of federal law." Defs. PI Resp./Memo. Dismiss at 23 (quoting *Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023) (citation modified)). Sigcho Lopez may not, however, argues the Board, seek damages against the Individual Board members, as such claims are barred under the Eleventh Amendment. *Id.* (citing *Pennhurst*, 465 U.S. at 102). In response, Sigcho Lopez contends that his Complaint, "largely seeks forward-looking relief," and he alleges "financial losses to address anticipated Art. III standing arguments." Pls. PI Reply/Resp. Dismiss at 17. He clarifies that "[t]he request for monetary relief is only for 'damages as authorized by law and appropriate' along with 'litigation costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988,'" noting, but without citing to any authority, that "there have been dozens of decisions against individual members in reported decisions." *Id.* By failing to cite authority, Sigcho Lopez has waived any argument that damages claim against the Individual Board Members in their official capacity claims are permitted. *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("We have repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citation modified).

Again, setting aside waiver, the Court agrees with the Board that it is well-settled that claims for damages against the Individual Board Members are barred under the Eleventh Amendment. *Pennhurst*, 465 U.S. at 102–03 ("when a plaintiff

sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief."). So, those damages claims are dismissed. The Court notes, however, "the Eleventh Amendment has no application to an award of attorney's fees, ancillary to a grant of prospective relief, against a State," so the dismissal of Sigcho Lopez's damages claims against the Individual Board Members does not preclude him from seeking fees under Section 1988. And, as acknowledged by the Board, Sigcho Lopez's claims against the Individual Board Members seeking prospective relief are permitted under the *Ex parte Young* doctrine.

In sum, the Court dismisses Sigcho Lopez's claims against the ISBE, as well as his damages claims against the Individual Board Members, without prejudice as barred by the Eleventh Amendment. Although only the Individual Board Members are left in the suit, the Court still refers to them as "the Board" for the remainder of this Opinion.

**B. Failure to State a Claim**

The Court, having satisfied itself that it has subject matter jurisdiction over Sigcho Lopez's claims for injunctive relief against the Individual Board Members, now turns to the Board's 12(b)(6) motion to dismiss and Sigcho Lopez's motion for a preliminary injunction.

As a preliminary matter, the Board argues that while Sigcho Lopez purports to assert individual counts, he essentially brings a single claim that the Election Code violates his constitutional rights under the First and Fourteenth Amendments. Defs.

PI Resp./Memo. Dismiss at 6 (citing, *inter alia*, *Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997); *Burdick v. Tashi*, 504 U.S. 428, 434 (1992)). According to the Board, "there is one constitutional test that is used to weigh the propriety of ballot access requirements." *Id.* (quoting *Flowers v. Illinois State Bd. of Elections*, 2026 WL 1286839, at *4 (C.D. Ill. May 11, 2026)). Sigcho Lopez counters that he plausibly alleges five counts and has demonstrated a likelihood of success for each count. Pls. PI Reply/Resp. Dismiss at 8. Sigcho Lopez maintains that the Board's argument for consolidation of all counts is unsupported. *Id.* Notably, Sigcho Lopez does not cite any authority in support of this proposition. At oral argument, Sigcho Lopez conceded that, at bottom he brings a claim for the violation of his First and Fourteenth Amendment rights, but posits that the remedy can be pursued through different avenues (that is, the different counts included in the Complaint).

Recall that Sigcho Lopez brings five counts, all challenging the constitutionality of Illinois's ballot access requirements. Count I alleges that the signature requirement violates the First and Fourteenth Amendments facially; Count II alleges that the ballot access requirement violates the First and Fourteenth Amendments as applied; Count III alleges that the ballot access requirement violates the Equal Protection Clause of the First and Fourteenth Amendment; Count IV claims an impermissible expansion of the Qualifications Clause in violation of the Tenth Amendment. And Count V alleges that the combined effect of the signature and notarization requirements, the 90-day signature gathering period, the objection process, and the dual-circulator rule violates the First and Fourteenth Amendment.

Complaints plead claims, which is to say grievances. *ACF 2006 Corp. v. Mark C. Ladendorf, Attorney at Law, P.C.*, 826 F.3d 976, 981 (7th Cir. 2016). "Counts, by contrast, typically describe different legal theories by which those facts purportedly give rise to liability and damages." *Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1002 (N.D. Ill. 2017) (citation modified). "No matter how many legal theories, or 'counts,' a plaintiff may assert, they constitute a single 'claim' to the extent premised on the same facts; 'different legal theories . . . do not multiply the number of claims for relief.'" *Mannes v. Ford Motor Co., Inc.*, 2014 WL 7332616, at *2 (N.D. Ill. Dec. 22, 2014) (quoting *NAACP v. Am. Family Mut. Ins. Co.,* 978 F.2d 287, 292 (7th Cir. 1992)). Here, notwithstanding the fact that the Complaint includes five enumerated counts, Sigcho Lopez in effect only asserts one claim: that the Illinois Election Code violates his constitutional rights under the First and Fourteenth Amendments. "It is well-established that such claims are subject to a single constitutional analysis." *Flowers*, 2026 WL 1286839, at *4 (citing *Libertarian Party of Ill.*, 108 F.3d at 773).

With that preliminary matter out of the way, the Court now evaluates whether Sigcho Lopez has adequately stated a claim for a violation of his First and Fourteenth Amendment rights.

The First Amendment, made applicable to the States by the Fourteenth Amendment, "protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social

changes desired by the people." *Krislov v. Rednour*, 226 F.3d 851, 858 (7th Cir. 2000) "Associating for the purpose of placing a candidate on the ballot is one of the actions protected by the First Amendment." *Id*. "Restrictions on ballot access, therefore, can violate several constitutionally protected interests." *Id*.

These rights, however, are not absolute. *Burdick v. Takushi*, 504 U.S. 428, 433, (1992). States have strong and valid interests in regulating elections, including interests in: "(1) limiting the number of candidates to avoid ballot overcrowding; (2) preserving the fairness and integrity of the electoral process; and (3) avoiding confusion, deceptions, or frustration of the democratic process." *Summers v. Smart*, 65 F. Supp. 3d 556, 562 (N.D. Ill. 2014); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986); *Libertarian Party of Ill.,* 108 F.3d at 774. As the Seventh Circuit has recognized, "[t]he Constitution does not prohibit the States from enacting laws which incidentally burden candidates, for such a proscription would similarly preclude the regulation of elections and efforts to ensure their integrity. Because elections must be regulated to remain free from fraud and coercion, some latitude is given to regulations designed to serve these purposes." *Krislov*, 226 F.3d at 859. A state is not required to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of such reasonable restrictions on ballot access. *Munro*, 479 U.S. at 194–95. Relevant here, "States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Id*. at 194 (citation modified).

Courts, in evaluating restrictions on access to the ballot, employ a fact-intensive balancing test articulated in *Anderson v. Celebreze*, 460 U.S. 780 (1983) and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Under that test, a court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick,* 504 at 434 (quoting *Anderson*, 460 U.S. at 789). A regulation that severely burdens First Amendment rights must be justified by a compelling interest and must be narrowly tailored to serve that interest. *Anderson*, 406 U.S. at 789. On the other hand, a state law that imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters passes muster if it serves important state regulatory interests. *Burdick*, 504 U.S. at 434.

As stated above, in his Complaint, Sigcho Lopez asserts a facial challenge, as well as an as-applied challenge to the 5% Requirement. There are two types of First Amendment challenges: "facial" and "as-applied." The difference between the two types of challenges "is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). That said, "[t]he distinction is both instructive and necessary, for it goes to

the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id.* The Court first addresses the facial challenge.

1. *Facial Challenge*

The Code's 5% Requirement provides, in relevant part that:

> Nominations of independent candidates (not candidates of any political party), . . . for public office within any district …may be made by nomination papers signed in the aggregate for each candidate by qualified voters of such district, . . . equaling not less than 5%, nor more than 8% . . . of the number of persons who voted at the preceding regular election in such district . . . . However, whenever the minimum signature requirement for an independent candidate petition for a district . . . shall exceed the minimum number of signatures for an independent candidate petition for an office filled by the voters of the State at large at the next preceding State-wide election, such State-wide petition signature requirement shall be the minimum for an independent candidate petition for such district . . . . For the first election following a redistricting of congressional districts, nomination papers for an independent candidate for congressperson shall be signed by at least 5,000 qualified voters of the congressional district . . . .

10 ILCS 5/10-3.

"A facial challenge is an attack on a statute itself as opposed to a particular application." *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015). Such challenges are the most difficult to mount. *Id*. As the Supreme Court has explained, "[u]nder the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a law is unconstitutional in all of its applications." *Id* at 419 (citation modified). Sigcho Lopez has not cleared this hurdle. His arguments only concern the statute's application to Byron Sigcho Lopez and Guerra and fail to identify any other context in which the statute is unconstitutional. Indeed, his briefs are devoid of any argument and authority in support of this proposition and thus he has waived them. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("perfunctory and

undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.”).

Waiver aside, the Court finds that the wealth authority cited by the Board—in which the Supreme Court, Seventh Circuit, and in-Circuit district courts have upheld nearly identical 5% signature requirements—makes it clear that any facial challenge fails. *See* Defs. PI Resp./Memo. Dismiss at 9–10 (citing *Jenness v. Fortson*, 403 U.S. 431, 442 (1971); *Norman v. Reed*, 502 U.S. 279, 295 (1992); *Libertarian Party of Ill.,* 108 F.3d at 775–76; *Tripp v. Scholz*, 872 F.3d 857, 866 (7th Cir. 2017); *Gill v. Scholz*, 2022 WL 992729, at *7–8 (C.D. Ill. Mar. 31, 2022), *vacated on other grounds and remanded sub nom. Gill v. Linnabary*, 63 F.4th 609 (7th Cir. 2023)[7]; *Jones v. McGuffage,* 921 F. Supp. 2d 888, 898 (N.D. Ill. 2013); *Flowers*, 2026 WL 1286839, at *5).

Accordingly, the Court rejects Sigcho Lopez's facial challenge to the 5% signature requirement and turns to Sigcho Lopez's as-applied challenge.

*2. As-applied*

As stated above, the Board argues that Sigcho Lopez fails to state a claim because the “challenged 5% signature requirement of Section 10-3 of the Election Code-along with nearly identical requirements in related contexts-have been repeatedly upheld by the Supreme Court, the Seventh Circuit, and sister circuits.” Defs. PI Resp./Memo. Dismiss at 9–10 (citing, *inter alia Jenness*, 403 U.S. at 442; *Libertarian Party of Ill.,* 108 F.3d at 775–76; *Flowers*, 2026 WL 1286839, at *5). All

[7]The Seventh Circuit vacated *Gill* because subsequent redistricting in Illinois mooted the dispute, but the district court's reasoning remains persuasive.

of these cases, asserts the Board, have found that the 5–8% signature requirement is not a severe burden on the respective plaintiff's First Amendment rights. *Id.* at 10. The Board also contends that, contrary to Sigcho Lopez's assertion, independent Congressional candidates have been listed on the ballot for the general election. Memo Dismiss at 11. Indeed, notes the Board, the Complaint alleges that Chris Getty, an independent candidate, "will appear on the ballot for the very seat Sigcho Lopez sought." *Id.* (citing Compl. ¶ 69). It matters not, argues the Board, that Getty's petition did not receive an objection; as the court in *Gill* found, the fact "Illinois allows unobjected-to independent candidates to appear on the ballot—and that several have—makes it clear that Illinois's election laws in no way freeze the status quo, but implicitly recognize the potential fluidity of American political life." *Id.* (quoting *Gill*, 2022 WL 992729, at *12 (citation modified)). In short, the way the Board sees it, "this recent ballot access history demonstrates that any burden that Illinois's 5% signature requirement places on [Sigcho Lopez's] First and Fourteenth Amendment rights is not severe as courts have found time and again." *Id.* (citing *Tripp*, 872 F.3d at 864).

And, argues the Board, there is nothing about the 4th Congressional District that alters the analysis. Defs. PI Resp./Memo. Dismiss at 11. The 4th Congressional District, notes the Board, has the lowest signature requirement of any district in the State. *Id.* (citing R. 27-1, 2026 Candidate's Guide at 27–28). The 4th Congressional District, according to the Board, is a "dense, wholly urban district of only 95.8 square miles, with a population of 721,991 residents and a population density of approximately 7,540 people per square mile . . . ." *Id.* (citing R. 27-3, *119th Congress,*

*Illinois – Congressional District 4*). From the Board's point of view, these figures weigh against any finding that the burden of gathering signatures in the 4th Congressional District is severe, "as the 5% requirement has been upheld as applied to districts of far larger geographic size and far lower population densities—factors which contribute to the difficulty of gathering signatures due to increased travel times and decreased community infrastructure." *Id.* at 12 (citing *Gill*, 2022 WL 992729, at *10 (five percent requirement as applied to district of 5,793 square miles with population density of 123.0 people per square mile was constitutional); *Tripp v. Smart*, 2016 WL 4379876, at *4 (S.D. Ill. Aug. 17, 2016), *aff'd sub nom. Tripp v. Scholz*, 872 F.3d 857 (7th Cir. 2017) (the challenges of petition circulation such as "drive time and residency questioning . . . look far more like the hard work and sacrifice required of volunteers and candidates during an election, and not the kind of burden that unreasonably interferes with access to the ballot.").

Indeed, here, points out the Board, Byron Sigcho Lopez did not actually fail to collect enough signatures—in fact, he alleges that his campaign collected almost 20,000 signatures—but rather, he failed to collect enough *valid* signatures. Defs. PI Resp./Memo. Dismiss at 12 (citing Compl. ¶ 57). That is, the Electoral Board found that only 9,594 of the 17,304 signatures submitted by Byron Sigcho Lopez were valid, and Sigcho Lopez cannot, and does not, argue that the requirement that only registered voters who reside within the relevant district sign a candidate's petition or that those signatures be legitimate are a severe burden. *Id.* The total number of valid signatures upheld by the Board (9,594) was only 1,222 shy of meeting the 5%

requirement for the 4th Congressional District (10,816). *Id.* at 12–13. Although the Board concedes that "a reviewing electoral board would not consider any signatures after the first 17,304," candidates may present their petition signature pages for Electoral Board review in any order and may strike invalid signatures from their petitions. *Id.* at 13 (citing Compl. ¶ 56; 10 ILCS 5/7-10, 8-8, 10-3). "Reasonably diligent" campaign staff could have reviewed the signatures and struck any invalid ones to be replaced with the additional signatures collected; Sigcho Lopez does not allege, however, that Byron Sigcho Lopez's campaign staff reviewed his petition signatures for validity before submitting them.

And, asserts the Board, the 5–8% signature requirement clearly serves the State's important interest in regulating elections, as states may legitimately require that new parties or independent candidates make a showing that they have a modicum of support before gaining ballot access and signatures requirements are the main way to accomplish this. Defs. PI Resp./Memo. Dismiss at 13 (citing, *inter alia*, *Libertarian Party*, 108 F.3d at 775). So too do the other requirements—including the notarization requirement, the 90-day signature gathering period, the objection process, and the dual-circulator rule—serve state interests in maintaining the integrity of elections, order in the electoral process, voter participation in the electoral process, and avoiding voter confusion. *Id.* at 14–18. At oral argument, Sigcho Lopez confirmed that he does not, at this time, allege that the foregoing procedural rules are themselves unconstitutional, as they are "ephemeral," but rather contends that

the Court should consider how those rules impact the severity of the burden of the 5–8% rule.

According to Sigcho Lopez, the cases cited by the Board do not establish that the 5–8% rule is constitutional because each case turned on the facts of the particular case and there is no "litmus-paper" test. Pls. PI Reply/Resp. Dismiss at 9 (citing *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020)). Sigcho Lopez also takes aim at the Board's assertion that prior independent candidates have met the 5–8% signature requirement. *Id*. at 10–11, This assertion, from Sigcho Lopez's perspective is inaccurate and not supported by the facts because the "number of signatures submitted by the past candidates is not known to the [Board], or to any other district court." *Id*. at 11. Sigcho Lopez points to the declaration of his expert, Winger, who states that Illinois is the only state that allows candidates who file less than the required number of signatures to get on the ballot if no one filed an objector's petition against such a candidate, so long as they meet the 10% conformity review." *Id.* at 11. Unless an objection is filed, the number of signatures is not counted. *Id.* And the number of independent candidates that have made it on the ballot relied on by the Board (seven), argues Sigcho Lopez, is misleading, because four of those seven made it on in a redistricting year, meaning they needed only 5,000 signatures total. *Id.* at 10 (citing *Flowers*, 2026 WL 1286839, at *8). And, points out Sigcho Lopez, he alleges, as confirmed by his expert, that no independent candidate for U.S. Representative in Illinois has overcome a signature requirement of 10,000 or more and survived the objection process, and only 5 have done so in the United States. *Id.* at 8.

Sigcho Lopez also contends that the Board fails to address his argument, raised in his motion for a preliminary injunction, that a "5,000 signature requirement for U.S. Rep is the less restrictive ballot access requirement that is already enacted law." Pls. PI Reply/Resp. Dismiss at 12. The way Sigcho Lopez sees it, this 5,000-signature requirement satisfies all legitimate state interests. *Id.* Sigcho Lopez posits that Byron Sigcho Lopez would have succeeded in gaining ballot access had the requirement been 5,000 signatures with no maximum. *Id.*

Sigcho Lopez argues that the 5% requirement for independent candidates poses a severe and unnecessary burden on First Amendment rights. Pls. Am. Mot. PI at 11. From Sigcho Lopez's point of view, the severity and overbreadth of the 5% requirement is confirmed because, as discussed above, very few independent candidates have met the 5% requirement or the 5,000-signature requirement and have been able to overcome the objection challenge process to reach the ballot. *Id.* at 14. Therefore, reasons Sigcho Lopez, strict scrutiny review governs the 5% requirement. *Id.* Employing that test, Sigcho Lopez concludes that it does not pass muster. According to Sigcho Lopez, the 5% requirement is not narrowly drawn to advance the State's compelling interest, as there has never been ballot overcrowding or frivolous candidates in Illinois. *Id.* at 14–15. Sigcho Lopez also maintains that the Code's "higher than 5% Requirement" is arbitrary and discriminatory, in violation of his right to Equal Protection.[8] *Id.* at 15.

---

[8]As discussed above, the Court need not, and indeed does not, engage in a count-by-count analysis.

The Supreme Court has established that a 5% signature requirement in similar circumstances is not an undue burden. In *Jenness*, the Court upheld Georgia's requirement that independent candidates, to demonstrate substantial community support, submit a petition signed by 5% of the *total registered voters* in the last election. 403 U.S. at 432. As the Board points out and as the court in *Flowers* noted, although candidates had 6 months (as opposed to 90 days) to collect signatures, the 5% requirement of total registered voters is much higher than 5% of the people who voted in the last election, as required by the Code. Defs. Reply Dismiss at 5 (citing *Flowers*, 2026 WL 1286839, at *9). The *Jenness* court recognized the state's interest in requiring a preliminary showing of support before printing the candidate's name on a ballot—an interest in at least avoiding "confusion, deception and even frustration of the democratic process at the general election." 403 U.S. at 442. The Court upheld the signature requirement even though "it was apparently somewhat higher than the percentage of support required to be shown in many States." *Id*. Not long thereafter, in *American Party of Texas v. White*, 415 U.S. 767 (1974), the Court considered a First Amendment challenge, by among others, independent candidates, to Texas election laws requiring independent and minority political party candidates to submit signatures of-depending on the office-either 3% or 5% of the vote cast for governor in that district in the last election. 415 U.S. 789–90. The Court found the Texas election laws constitutional as they did not impose impermissible burdens on rights secured by the First Amendment.

In *Stone v. Bd. of Elections Comm'rs of City of Chicago*, 750 F. 3d 678, 679 (7th Cir 2014), relied on by Sigcho Lopez, the Seventh Circuit addressed an argument that the requirement of 12,500 signatures for mayoral candidates violated the Constitution. There, the plaintiffs argued that requiring candidates to collect 12,500 signatures in 90 days severely burdened "'Average Joes' and 'Janes', outsider candidates who [could not] draw on an existing political infrastructure or afford to hire persons (called circulators) to collect signatures on their behalf." *Id.* at 681. As the Seventh Circuit observed, "[w]hat is ultimately important is not the absolute or relative number of signatures required but whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Id.* at 682 (citation modified). Like the district court, the Seventh Circuit found the answer to be yes. The court found that the signature requirement was not a severe burden.

Here, the Court agrees with the Board that none of the allegations (or additional facts consistent with those allegations raised in Byron Sigcho Lopez's declaration or that of his expert) demonstrate that the 5–8% Requirement is a severe burden. That is, as the Board points out, the 4th Congressional District is an urban district with a dense population, removing the concerns raised by the Seventh Circuit in *Gill*. Defs. Reply Dismiss at 5 (citing 962 F.3d at 365). And, even if the Court were to consider cited difficulties (including the fact that the 4th Congressional District is 66.5% Latino and was the hardest targeted ICE enforcement area in Illinois, Compl. ¶ 77), as discussed above, Byron Sigcho Lopez did not have an issue collecting a large

number of signatures; rather, he fell short of collecting enough valid signatures. Perhaps that could be seen as distinction without a difference, because the 5% requirement mandates that candidates obtain *valid* signatures. But, again as discussed above, without an allegation that Byron Sigcho Lopez or his campaign reviewed his signatures for validity before submitting them, it is hard to find that he faced a "severe" burden, especially when he had between 2,000–3,000 extra signatures he could have submitted in lieu of invalid signatures and when he fell only 1,222 signatures short of the 5% requirement. *See Gill*, 2022 WL 992729, at *9 (noting that other independent and new party Congressional candidates collected a similar number of signatures and finding that, "[i]n light of the fact that other House candidates across the country have obtained more than 10,754 signatures or nearly that amount, it does not strike the Court that no reasonably diligent candidate could collect this number of signatures," especially when the plaintiff came "fairly close."). Here, Byron Sigcho Lopez came "fairly close" to the 5% requirement of valid signatures.

And, as the Board points out, there is evidence of other independent and new party candidates (new party candidates are subject to the same 5% requirement) who have been on the ballot for U.S. Representative since 2010, including, notably, Chris Getty, who is running in the 4th Congressional District this cycle. Defs. Reply Dismiss at 7–8 (naming six candidates in addition to Getty, and the Board identified one additional candidate at oral argument). That the Board does not know the exact number of signatures those candidates collected does not undermine the support their

candidacy lends to a finding that the 5% requirement is not severe. *See Gill*, 2022 WL 992729, at *12. Similarly, Sigcho Lopez's allegation that only two additional states require independent candidates to obtain more than 10,000 signatures is unavailing, as the Court agrees with the Board that the company of two other states in fact supports the fact that Illinois is not an outlier, and, regardless, a "court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature." Defs. Reply Dismiss at 9 (quoting *Nader v. Keith*, 2004 WL 1880011, at *6 n.1 (N.D. Ill. Aug. 23, 2004), *aff'd,* 385 F.3d 729 (7th Cir. 2004)).

The Court finds that the 5% requirement, on its own, is not a severe burden. Even when looking at the requirement in conjunction with the notarization requirement, the 90-day period for circulation, the objection process, and the dual circulator rule (which rules, as stated above, Sigcho Lopez does not contest are unconstitutional, on their own), the Court also finds, like other courts examining similar rules, that the ballot access requirements together are not severe. *See Flower*s, 2026 WL 1286839, at *6 (citing *Tripp*, 872 F.3d at 860). Indeed, the court in *Flowers*, relying on *Tripp* and *Gill*, found, during this same 2026 election cycle, the 5% requirement, in conjunction with the other ballot requirements (specifically addressing the notarization requirement, the 90-day circulation period, the early filing deadline, restrictions on voters eligible to sign independent candidates' petitions, and practical considerations like the large size of the relevant district, the "extreme" cold weather, and the high signature invalidation rates), did not constitute

a severe burden. *Id.* at *6–8. And, as the *Flowers* court noted, in 2017, the Seventh Circuit in *Tripp* evaluated the Code's 5% signature requirement for new party candidates, combined with the 90-day petitioning window, notarization requirement, and layout of the recently re-districted relevant districts (which had a much lower population density than the 4th Congressional district), and found that the procedural rules, combined with the 5% rule (which it found on its own not to constitute a severe burden) did "not dramatically tilt the constitutional scales." *Id.* at *6 (quoting *Tripp*, 872 F.3d at 860, 864, 866, 870). Similarly, in *Gill,* the court "considered essentially the same statutory scheme as that analyzed in *Tripp* and held that the plaintiffs 'failed to satisfy their burden of showing that the cumulative barriers to ballot entry in Illinois are severely burdensome.'" *Id.* (quoting *Gill*, 20222 WL 992729, at *12).

True, as recognized by the court in *Flowers*, previous cases are persuasive only, "given the fact-intensive analysis of the *Anderson-Burdick* framework," but their reasoning is instructive. 2026 WL 1286839, at *6. As the Board points out, the presence of other independent candidates on the ballot in recent years, and particularly the presence of Getty on the 4th Congressional District's ballot this cycle, suggests that the Code's 5% requirement in conjunction with the other procedural rules, "does not operate to prevent such a group from ever getting on the ballot or freeze the political status quo." Defs. PI Resp./Memo. Dismiss at 19–20 (quoting *Flower*s, 2026 WL 1286839, at *9). In sum, the Court agrees with the Board that the Code's 5% requirement, in addition to the other procedural rules, does not create a

severe burden such that a reasonably diligent independent candidate cannot make it on the ballot.

Therefore, because the 5% signature requirement (even when combined with the other procedural rules enumerated in the Code) is not severe, the Court "need only determine whether Illinois has important interests that sufficiently justify the burden on plaintiffs' rights." *Tripp*, 872 F.3d at 866 (citation modified). So, the Code's requirements will only be struck down if they are "unreasonable." *Id.* at 870; *see also Libertarian Party of Ill.*, 108 F.3d at 776 (ballot access requirements were not unconstitutional because they "further[ed] the State's important interests in a rational manner"); *Stone*, 750 F.3d at 681 ("If the burden is merely reasonable and nondiscriminatory, . . . the government's legitimate regulatory interests will generally carry the day." (citation modified).

Here, as stated above, the Board posits that it has an important interest in maintaining the integrity and order of elections and in preventing voter confusion. Defs. PI Resp./Memo. Dismiss at 13. Again, *Flowers*, decided in this election cycle, is persuasive and on point. The Court finds there is no need to, and indeed it should not, reinvent the wheel. The *Flowers* court noted that the same interests have "repeatedly been found to be important." 2026 WL 1286839, at *11. In relevant part, it notes that "the *Jenness* court affirmed that '[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the

democratic process at the general election.'" *Id.* (quoting *Jenness*, 403 U.S. at 442). Indeed, as the Seventh Circuit has stated, "[t]here is ample caselaw supporting the proposition that ballot access laws serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections." *Id.* (quoting *Navarro v. Neal*, 716 F.3d 425, 431 (7th Cir. 2013) (collecting cases)).

And, the Court agrees with *Flowers* that binding Seventh Circuit authority has held that similar restrictions to ballot access further virtually identical state interests. 2026 WL 1286839, at *11 (citing *Stone*, 750 F.3d at 685 ("There is no question that the 12,500-signature requirement and accompanying rules[—namely, a 90-day petitioning window; requirement that voters sign no more than one nominating petition—]serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections." (citation modified)); *Libertarian Party of Ill.*, 108 F.3d at 775 (holding that a signature requirement disparity between new party candidates—the greater of 25,000 or 5% of votes cast in last election—and established party candidates—0.5% of qualified primary electors—"serves the State's important interest of ensuring that a political party that is new in a particular political subdivision demonstrates a modicum of public support before it can place its candidates on an election ballot"); *Tripp*, 872 F.3d at 866 (concluding that Illinois's "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate

on the ballot" sufficiently supported Illinois's 5% signature requirement (citation modified)). Like the court in *Flowers*, the Court finds that the reasoning of the foregoing supports a finding that the at-issue restrictions serve the State's interest in protecting the integrity of the election process. *Id.*

Sigcho Lopez disputes the reasonableness of the 5% requirement because there exist less restrictive alternatives, namely, the 5,000-signature requirement used in post-redistricting elections. *See* Pls. PI Reply/Resp. Dismiss at 10. True, the Seventh Circuit has held that "the existence of a less restrictive alternative may be relevant to an assessment of reasonableness; one way in which a requirement may be unreasonable is that it is unnecessary in light of another requirement that could be imposed instead." *Tripp*, 872 F.3d at 870 (citation modified). But, as the court in *Tripp* also stated, when a restriction "does not impose a severe burden, it need not be narrowly tailored," and the "Court need not enter the policy fray." *Id.* So, even though the 5,000-signature requirement may accomplish the same interests as the 5% requirement, "it is not the Court's job to wade into such policymaking waters when the regulations further legitimate interests." *Flowers*, 2026 WL 1286839, at *11 (citing *Tripp*, 872 F.3d at 870; *Nader*, 385 F.3d at 735 ("We cannot micromanage the regulation of the electoral process to the degree he seeks.").

In sum, as the Board points out, the Seventh Circuit concluded in *Stone* that,

> [Illinois's] approach undoubtedly places some burden on candidates and their supporters, who must work to gather the necessary signatures. But the scheme leaves room for reasonably diligent candidates to get on the ballot even as it directly furthers the state's legitimate interests in avoiding ballot overcrowding and preventing voter confusion. These interests are strong

> enough to justify the reasonable, nondiscriminatory burden on the plaintiffs' First and Fourteenth Amendment rights.

*Stone*, 750 F.3d at 685. So too here, the Court finds that the state interests articulated by the Board justify the 5% requirement, even when combined with the Code's other ballot access restrictions.

The Court therefore grants the Board's motion to dismiss Sigcho Lopez's claim for a violation of his First and Fourteenth Amendment rights.

## II. Preliminary injunction

Having granted the Board's motion to dismiss for the reasons discussed above, the Court finds that Sigcho Lopez has no likelihood of success on the merits. Therefore, his motion for a preliminary injunction fails at the first step, and is denied. *See Stanley v. Brown Cnty. Election Bd.*, 829 F. Supp. 3d 506, 518 (S.D. Ind. 2026) (denying preliminary injunction motion based on a lack of likelihood of success on the merits where court granted motion to dismiss all claims).

## Conclusion

For the foregoing reasons, the Court grants the Board's motion to dismiss [26] and denies Sigcho Lopez's amended motion for a preliminary injunction [19]. Given this is Sigcho Lopez's first pleading attempt, the dismissal is without prejudice. Sigcho Lopez may file an amended complaint on or before October 13, 2026.

Dated: September 21, 2026

United States District Judge
Franklin U. Valderrama