UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| BYRON SIGCHO LOPEZ,<br>JOSE GUERRA,<br><br>Plaintiff,<br>v.<br><br>LAURA K. DONAHUE, Chair, RICK S. TERVEN, SR., Vice Chair, JENNIFER M. BALLARD CROFT, CRISTINA D. CRAY, TONYA L. GENOVESE, CATHERINE S. McCRORY, JACK VRETT, and CASSANDRA B. WATSON,<br><br>Defendants. | No. 26-cv-9156<br><br>Hon. Franklin U. Valderrama |

**VERIFIED AMENDED COMPLAINT**

Plaintiffs, Byron Sigcho Lopez and Jose Guerra, through their attorneys, file their verified complaint against the Defendants, members of the Illinois State Board of Elections, in their official capacities ("Defendants") and incorporate the Declaration of Byron Sigcho Lopez (attached), and the Declaration and Supplemental Declaration of Richard Winger (attached) and further state as follows.

**Nature of the Case**

1. There is a growing majority of voters who are disenfranchised with the two established political parties, and identify as being independent, or non-partisan, yet the Illinois Election Code has not been modernized in the last century, and its provisions governing independent and new political party candidates impose unnecessary and overly burdensome requirements that deny First amendment ballot access rights to independent candidates and the growing majority of Illinois residents who do not affiliate with either of the two major political parties.

2. Data from Gallup polling confirms the trend since the 1990s that more

people consider themselves to be politically independent, or non-partisan. Gallup polling wrote[1]: "A record-high 45% of U.S. adults identified as political independents in 2025, surpassing the 43% measured in 2014, 2023 and 2024. Meanwhile, equal shares of U.S. adults — 27% each — identified as either Democrats or Republicans." See Gallup polling report attached as **Exhibit A**.

3. Among younger voters, Gallup polling wrote[2] in 2022 that 44% of Generation X (born 1965-1980) and 52% of Millennials (born 1981-1996) identified as politically independent. See Gallup polling report attached as **Exhibit B**.

4. This is an action to declare unconstitutional and to enjoin enforcement of a provision in Section 10-3 of the Illinois Election Code, 10 ILCS 5/10-3, requiring petitions "signed in the aggregate for each candidate by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district."

5. Plaintiffs seek a declaratory order including the following: (a) finding that the provision of 10 ILCS 5/10-3 requiring not less than 5%, nor more than 8% * * * of the number of persons, who voted at the next preceding regular election in such district" or at least 10,816 signatures but not more than 17,304 signatures for the 4th Congressional Dist. is an excessive, an unnecessary, and an unconstitutional restraint upon Candidate's and his petition signers' First and Fourteenth Amendment rights, (b) finding that the "dual circulator" bar in 10 ILCS 5/10-4 is an

1 https://news.gallup.com/poll/700499/new-high-identify-political-independents.aspx [last visited 10/20/2026]

2 https://news.gallup.com/poll/397241/millennials-gen-clinging-independent-party.aspx [last visited 10/20/2026]

unconstitutional restriction upon the content of independent candidate speech which severely burdens petition gathering efforts, (c) that the 8% signature maximum for independent candidates is an arbitrary and unconstitutional discrimination against independent candidates in violation of their right to Equal Protection; and (d) that the 5% to 8% signature requirement is a "super-modicum" qualification beyond the regular modicum of support that is satisfied with 5,000 signatures, in violation of the US Representative Qualifications Clause.

6. There is "no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 11 (1968). Article 10 of the Illinois Election Code governing independent and new political party candidates is not the least restrictive ballot access scheme that addresses legitimate state interests to maintain the integrity of the election.

7. It is thus no surprise that the Illinois General Assembly, which enacts Election Code provisions governing independent and new party candidates' ballot access rights, has been solely comprised of elected officials from only the two major established parties, and has not had an independent voice or vote in drafting laws governing independent candidates, which have benefitted and insulated the two major political parties.

**Jurisdiction & Venue**

8. This Complaint is brought pursuant to 42 U.S.C.§§1983 and 1988 and the First and Fourteenth Amendments to the United States Constitution.

9. Jurisdiction is founded on 28 U.S.C. §§1331, 1343(a)(3), and 1343(a)(4) and

the aforementioned statutory and constitutional provisions.

10. Venue in this Court exists and is proper pursuant to 28 U.S.C. §1391(b)(1) and 1391(b)(2), in that the Defendants maintain offices in Chicago, IL and Springfield, IL and simultaneously hold meetings via video conference equipment at both locations, and a substantial part of the events giving rise to the Plaintiffs' claims occurred within the Northern District of Illinois.

11. Declaratory relief and further relief requested is authorized by 28 U.S.C. §§2201 and 2202.

## Parties

12. Plaintiff, Byron Sigcho Lopez, is a US Citizen, a resident of Chicago, Illinois, a registered voter in the 4th Congressional Dist. of Illinois, and was an independent candidate for US Representative for the 4th Congressional Dist. in Illinois who sought ballot placement at the November 3, 2026 general election, and intends to seek ballot access as an independent candidate for US Representative at the November 7, 2028 general election.

13. Plaintiff, Jose Guerra, is a US Citizen, a resident of Chicago, Illinois, a registered voter in the 4th Congressional Dist. of Illinois, and a voter who signed, supported, and circulated ballot access petitions for Byron Sigcho Lopez as an independent candidate for US Representative for the 4th Congressional Dist. seeking ballot placement at the November 3, 2026 general election.

14. The Illinois State Board of Elections ("ISBE") is an Illinois executive branch agency created by the General Assembly in 1973 to supervise the administration of elections throughout the State, with statutory authority defined in the Election Code, 10 ILCS 5/1A-1, et seq. Since its creation, the ISBE has been granted greater

authority by the General Assembly beyond coordinating and overseeing election authorities throughout the State, 10 ILCS 5/1A-1, et seq., and the ISBE maintains its own copy of every election authority's electronic voter registration database. Incidental to its statutory authority, the ISBE regularly gathers information and offers recommendations to promulgate new laws and procedures to the General Assembly and the Election Laws Commission.

15. The ISBE is the state agency that certifies established party, independent, and new party candidates for US Representative to the general election ballot.

16. The same eight appointed ISBE members also serve in their official capacities as the State Officers Electoral Board ("SOEB"), which is a quasi-judicial governmental entity that is constituted and convened after an objection petition is filed against a candidate's ballot access petitions pursuant to 10 ILCS 5/10-8; 10-9. The Election Code authorizes the SOEB to determine the sufficiency of a candidate's ballot access petition, including holding evidentiary hearings, reviewing candidate's petition sheets signed by voters, and determining whether a candidate's name should appear on the general election ballot.

17. The ISBE and SOEB are compromised of four members who are self-proclaimed as being affiliated with the Democratic party and four members who are self-proclaimed as being affiliated with the Republican party 10 ILCS 5/1A-2; all members of the ISBE are appointed by the State Governor pursuant to 10 ILCS 5/1A-3. Where all state executive officers, including Attorney General, Secretary of State, Comptroller, and Treasurer, are affiliated with the same major political party, the Governor selects and appoints all members without candidate submissions from major party leadership. 10 ILCS 5/1A-3(4).

18. At no time has the Election Code authorized or allowed the appointment of members of the ISBE who were non-partisan or independent, nor has the Election Code allowed appointment of members who are affiliated with a minor (or third) established party – only self-proclaimed affiliates of the top two vote receiving established political parties are eligible to be appointed to the ISBE.

19. By virtue of the provisions of the Election Code, only members of the two major political parties have been appointed to the ISBE, and independent, non-partisan, and minor established political parties have not yet had a voice or a vote on the ISBE.

20. Defendants, Casandra B. Watson, Rick Terven Sr., Tonya Genovese, and Jennifer Ballard Croft are named in their official capacities as members of the ISBE and the SOEB that were selected and appointed by the State Governor as the ISBE members who are self-proclaimed as being affiliated with the Democratic party pursuant to 10 ILCS 5/1A-2, 1A-3.

21. Defendants, Jack Vrett, Catherine McCrory, Laura Kent Donohue, and Cristina Cray are named in their official capacities as members of the ISBE and the SOEB that were selected and appointed by the State Governor as the ISBE members who are self-proclaimed as being affiliated with the Republican party pursuant to 10 ILCS 5/1A-2, 1A-3.

**<u>Relevant Facts and Law Allegations</u>**

***(i) First Amendment Rights.***

22. "[V]oting is of the most fundamental significance under our constitutional structure." *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 990 (1979). The rights of candidates and the rights of voters are

inescapably intertwined. Citizens have a fundamental right to associate in order to advance political beliefs, and voters have the right to be given the means to vote effectively. *Id.* See also *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983); *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

***(ii) General Ballot Access Requirements.***

23. "Illinois classifies general-election candidates into three groups: those affiliated with an 'established' political party, those affiliated with a 'new' political party, and those running as independents. If a candidate is affiliated with a party, whether established or new, the party name appears alongside the candidate's name on the ballot." *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 521 (7th Cir. 2017).

24. Independent candidates are those individuals who are not candidates of any political party, and are not nominated at a primary, but rather are candidates at the general election competing for election against the nominated established political party candidates, and are listed on the ballot with the designation "Independent" as defined in 10 ILCS 5/10-3.

25. Illinois' signature collection requirement for ballot access for new party and independent candidates originated in 1891, when the requirement was 2% of the last vote in the relevant district. See ALL THE LAWS OF THE STATE OF ILLINOIS, THIRTY-SEVENTH GENERAL ASSEMBLY, § 291, at 93 (1891)[3].

26. In the 135 years since Illinois adopted this requirement, this signature gathering approach for independent candidates has not been modernized or relaxed, despite schools discontinuing teaching and using ink handwriting decades

3 https://archive.org/details/lawsofstateofill1891illi/page/92/mode/2up [last visited 7/26/2026]

ago, and the availability of less burdensome alternatives enabled by modern technology, which many other states have adopted.

27. The General Assembly's bias against independent and new party candidates was demonstrated in 1931 (and thereafter through decisions of the court) when the signature requirement for independent and new party candidates was raised to 5% specifically to deter candidates who were not from the two major established parties from gaining ballot access, as confirmed by ballot access expert Richard Winger in his affidavit, attached as **Exhibit K** and incorporated herein.

28. In almost a century since the minimum signature requirement was increased to 5%, the actual number of signatures required under Illinois law has significantly increased, particularly following presidential elections and hotly contested mid-term elections, as well as the addition of a 90 day time to gather all signatures that was added in 1985, the "dual circulator" restriction that limits potential circulators for independent and new party candidates, notarization of each petition, an objector-biased challenge process for controlling the ballot, as well as other "sore loser" and party lock-in restrictions for candidates, that have been added to the Election Code.

29. The Illinois Election Code has historically relied upon objectors, usually affiliated with an established political party or competing candidate, to review candidate petitions, and raise objections before the SOEB; prior to about 2016, candidates that did not face an objection, were automatically certified to the ballot, regardelss of the number of signatures submitted.

30. Since approximately 2016, the ISBE created its own "apparent conformity" review for candidate petitions received by the ISBE, whereby the ISBE checks for

signature lines equaling at least 10% of the signatures required by the Election Code, but the ISBE does not review or validate those signatures in this process.

31. There is no provision in the Election Code that authorizes the ISBE to deny ballot access to a candidate based upon its apparent conformity review, nor does the Election Code authorize or state a 10% unvalidated signature line requirement.

32. The Defendants' apparent conformity review confirms that Defendants believe that all legitimate state interests are satisfied and met, including deterrence of frivolous candidates, the showing of a modicum of support from voters, and avoidance of ballot overcrowding when the Defendants complete their apparent conformity review as defined in the Preface of the ISBE's 2026 Candidate's Guide (Preface attached as **<u>Exhibit C</u>**) as follows:

> APPARENT CONFORMITY
>
> The State Board of Elections conducts an "apparent conformity" review of all nominating petitions filed therewith. The review will take place after a petition is filed and will be limited to determining the following:
>
> (1) whether a signed Statement of Candidacy has been filed, and (2) whether the filed nominating sheets contain gross signatures equal to or exceeding 10% of the minimum number of signatures required for the office sought.
>
> All candidates whose petitions fail the apparent conformity review will be notified in writing and given the opportunity to appear before the State Board of Elections at its first meeting after the petition filing deadline to show good cause why the petition should not be rejected on the basis of non-conformity.
>
> Please note, SBE employees are not available during filing periods to notarize documents.

33. Defendants have many times in the past, and will continue in the future, to certify any candidate to the primary or to the general election ballot who submitted a Statement of Candidacy and at least 10% of the required signature lines when an objection either is not filed to that candidate's petitions, or when an objection is withdrawn despite direct knowledge by the Defendants that the candidate has fewer signatures than required by the Election Code.

34. Alternatively, Defendants agree that all legitimate state interests are satisfied and met, including the showing of a modicum of support from voters, when independent candidates for US Representative submit at least 5,000 signatures from their congressional district for ballot access at elections immediately following redistricting.

35. The General Assembly enacted the 5,000 signature requirement for US Representative elections following redistricting, and this signature requirement is presumed to meet all state interests because it is enacted law.

36. The Election Code mandates that signatures supporting a candidate's petitions be collected "in the presence of the petition circulator" and each circulator of a candidate's petition must then sign the required circulator's affidavit at the bottom of each petition sheet before a notary public affirming that all signatures were taken in their presence (10 ILCS 5/7-10, 8-8, 10-4).

37. The Election Code expressly prohibits a circulator's sworn statement upon a signature petition sheet being signed under penalty of perjury as allowed by 735 ILCS 5/1-109 or 28 U.S.C. §1746, and without a notary public's notarial *jurat*.

38. After candidates file their petitions, they are then subjected to one or more potential objection challenges (10 ILCS 5/10-8, 10-9) before an electoral board, such as the SOEB, and must overcome such an objection in order to reach the ballot. This objection process allows a voter to lend their name to an objectors' petition that is advanced by an attorney at an accelerated pace with limited due process, even though the electoral board proceeding is the most important stage, and the only opportunity to present evidence and arguments, but not any constitutional challenges.

39. Section 10-10 of the Election Code, 10 ILCS 5/10-10, does not require that the rules of procedure be written or published nor does it preclude an electoral board from adopting whatever rules it chooses. *Carnell v. Madison County Officers Electoral Board*, 299 Ill.App.3d 419, 701 N.E.2d 548 (1998).

40. The SOEB writes its own Rules governing objection proceedings, and has largely adopted the same Rules with the same accelerated deadlines for independent and new party candidates, that the SOEB has used for review of nomination petitions submitted by established party candidates with a 1/10th or smaller fraction of signatures than ballot access petitions submitted by independent and new political party candidates; the SOEB's use of the same Rules for independent candidates, who do not have political organizations, denies independent candidates their fundamental due process and equal protection, and often results in the striking of thousands of voter signatures.

41. The ISBE summarized the requirements for US Representative in its 2026 Candidate's Guide at pgs. 27-28, attached as **Exhibit D**.

**A. Signature requirements for established party US Representative candidates nominated at a primary, with winner automatically moving to general election ballot.**

42. Established political party voters select their candidates for the general election through a primary nomination process – a "primary" is not an election of any public officials, but is a publicly funded ***private*** organization's candidate selection process, which reaches the same result as a party caucus. The Democratic and Republican parties are the two major private organizations that select and support their own candidates to compete at the November general election, alongside independent and new political party candidates.

43. Candidates selected at a primary (excluding President) are then automatically placed upon the general election ballot without any further signature gathering or other filing requirements.

44. By operation of 10 ILCS 5/7-10 established party candidates seeking their party's nomination for US Representative at their primary are allowed 90 days to gather signatures from voters in the congressional district equal to 0.5% (one-half of one percent) of the votes cast **only** for the party's candidate that received the most votes at the last general election.

45. For inclusion in the March 17, 2026 primary nomination, established party candidates' 90 day circulation time (10 ILCS 5/7-12; 8-9) was from **August 5, 2025 to November 3, 2025.**

46. For the March 17, 2026 established party primary nominations the minimum signature requirement for all candidates, including candidates for US Representative for the 4th Congressional Dist. was defined in 10 ILCS 5/7-10 as follows:

> 10 ILCS 5/7-10(b) "the candidate's petition for nomination must contain at least the number of signatures equal to 0.5% of the qualified primary electors of his or her party in his or her congressional district."
>
> 10 ILCS 5/7-10(k) "For political subdivisions, the number of primary electors shall be determined by taking the total vote cast for the candidate for that political party who received the highest number of votes in the political subdivision at the last regular election at which an officer was regularly scheduled to be elected from that subdivision."

47. The signature requirement for established party candidates was calculated by the ISBE based upon 0.5% (multiplied by 0.005) of the votes cast at the 2024 general election for each established party's highest-vote recipient that represented the district, which is shown on the spreadsheet attached as **Exhibit E**.

48. For the March 17, 2026 established party primary, US Representative candidates for the 4th Congressional Dist. were required to submit at least 697 signatures to be eligible for the Democratic party nomination, and submit at least 371 signatures to be eligible for the Republican party nomination.

49. US Rep. Chuy Garcia publicly represented throughout the 90 day circulation period that he was seeking re-election and would seek the Democratic Party's nomination at the March 17, 2026 primary as its candidate for US Representative for the 4th Congressional Dist.; Rep. Chuy Garcia submitted his nomination papers on the first day of petition filing – October 27, 2025 at 8:00 AM.

50. Only one other candidate submitted nomination papers for the Democratic Party's nomination for US Representative for the 4th Congressional Dist., and that candidate was Rep. Chuy Garcia's chief of staff, Patty Garcia, who filed her nomination papers on the last day of filing – November 3, 2025 at 5:00 PM.

51. Rep. Chuy Garcia then withdrew his nomination papers so that his chief of staff, Patty Garcia, was the only Democratic party candidate that could be selected and nominated by Democratic party voters at the March 17, 2026 primary.

52. Rep. Chuy Garcia's misdirection of voters and the petition filing/withdrawal maneuver coordinated with his chief of staff, Patty Garcia, generated negative media with parallels to insider Democratic machine politics that denied candidates and voters a meaningful choice of Democratic party candidates, and resulted in a reprimand being issued by the US House of Representatives. See **Exhibit F** attached.

53. A minimum signature requirement of 0.5% (or one half of one percent) of the votes for the party's candidate at the last general election meets all legitimate

state interests in the electoral process.

54. There has never been ballot overcrowding, frivolous candidates, or voter confusion or any concerns about the integrity of the election at an established party primary nomination in Illinois because the 0.5% signature requirement for established political parties, alongside other provisions of the Election Code such as 90 days to gather signatures, with each sheet notarized, and subject to the objection challenge process allowed in 10 ILCS 5/10-8, addresses all legitimate state interests in the orderly administration of the primary.

55. Defendants knows of no facts to support any legitimate state interest for a higher signature requirement than the signature requirement stated in 10 ILCS 5/7-10 for established party US Representative candidate nominations, which meets all legitimate state interest, including deterring frivolous candidates, requiring a modicum of support, and maintaining the integrity of the primary.

**B. Ballot access requirements for independent US Representative candidates, *excluding* elections immediately after decennial redistricting.**

56. The Election Code, 10 ILCS 5/10-3, requires independent candidates to submit signature petitions "by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area."

57. The signature requirement for independent candidates was calculated based upon 5% to 8% of the total votes cast (for all candidates) at the last (2024) general election in the district. See spreadsheet attached as **Exhibit E**.

58. For the 2026 election, to field candidates in **each** of the 17 districts, the Democratic party needed to gather at least **15,642** signatures; the Republican party needed to gather at least **12,909** signatures to have a candidate in **each** of the 17 districts. If a group of independent candidates (or a new political party) wanted to have candidates in all 17 districts, that group of independent US Representative candidates would have been required by the Election Code to have gathered and submitted at least **285,234** signatures in total (**<u>Exhibit E</u>**).

59. For inclusion upon the November 3, 2026 general election ballot independent and new political party candidates were allowed 90 days to circulate their petitions (10 ILCS 5/10-6) from **February 25, 2026 to May 26, 2026**.

60. For the November 2026 general election, independent candidates in the 4th Congressional Dist. were required to submit at least 10,816 signatures from voters in the district. Unlike established political party and new political party candidates[4] who have no maximum signature limit, independent candidates face the 8% limit, or a maximum of 17,304 signatures; in practice, this means that if an objection is filed, an electoral board would **<u>not</u>** count or validate any signatures that are after the 17,304th signature in the petitions, regardless of the number submitted in excess, whether it was 20,000, 50,000, or 100,000.

61. The 8% maximum restriction is a severe burden to the well-funded or reasonably diligent and well-supported independent candidate, who would be able to submit more signatures, and this maximum restriction serves no legitimate state

4 Candidates desiring to become an established political party would need to form a new political party, gather at least 5% or 25,000 signatures (with no maximum limit) within 90 days while overcoming the "dual circulator" restriction, overcome an objection to their ballot access petitions, and thereafter receive at least 5% of the vote at the general election. 10 ILCS 5/10-1, 10-2, 10-3, 10-4.

interest, no relationship to election administration, and is an arbitrary ceiling to limit and restrict independent candidates only.

62. New political party candidates and independent candidates following redistricting are not restricted by a maximum signature limit, and statewide, new party candidates would be required to submit at least 25,000 signatures; however, based upon the potential invalidation of petition signers through an objection, new political party candidates are often advised to submit far more signatures, or even double the minimum requirement to overcome an objection.

63. Defendants have administered objection petitions and validated petition signatures for new party candidates with over 25,000 signatures, and there is no reason to limit independent candidates to a maximum of 8% of the votes at the last election in the district, and this requirement is an unconstitutional restriction.

64. Candidate, Byron Sigcho Lopez, organized his campaign with staff and volunteers who started gathering signatures on the first day of petition gathering which continued throughout the 90 day period, and yielded almost 20,000 signatures from voters in the 4th Congressional Dist. Separately, Candidate also undertook fundraising that generated $182,247 in campaign contributions. See Declaration of Byron Sigcho Lopez attached as **Exhibit J**, and incorporated herein.

65. Because of the 8% signature limit, Candidate re-tasked some volunteers to checking petitions and striking signatures to bring the total number of valid signatures at or below the 17,304 maximum; had there been no maximum and had he not been severely burdened by the "dual circulator" restriction, Candidate Sigcho Lopez would have been able to hire professional circulators, his petition reviewers would have been collecting signatures, and he would have gathered and

filed over 20,000 signatures. See **Exhibit J**.

66. Candidate Sigcho Lopez contacted 3 or 4 professional circulators, and hired two professional circulators to gather signatures for his independent candidacy, both circulators however were unable to complete their contracts because they could not locate petition circulators that had not previously circulated for an established party candidate at the March 17, 2026 primary. See **Exhibit J**.

67. The inability to hire professional paid circulators to gather petition signatures created a major obstacle for Candidate Sigcho Lopez, who then had to seek out additional volunteers and hire circulators that had no prior experience circulating petitions, which required additional time and coordination, and was a less efficient method for gathering signatures. See **Exhibit J**.

68. Many committeepeople, union members, and supporters of Candidate Sigcho Lopez were eager to circulate petitions, and this group could have gathered 5,000 signatures based upon past experience circulating petitions, but for concerns about the "dual circulator" provision. See **Exhibit J**.

69. Candidate Byron Sigcho Lopez also was not able to circulate his own petition sheets and promote his own candidacy through circulation because he may have previously circulated a few petitions for an established party candidate seeking nomination at the March 17, 2026 primary; in addition, many of Candidate's volunteers and 3 or 4 other paid professional circulators could not circulate petitions for Sigcho Lopez's independent candidacy because they had previously circulated petitions for established party candidates seeking their party's nomination at the March 17, 2026 primary. See **Exhibit J**.

70. Plaintiff, Byron Sigcho Lopez, exerted considerable time, effort, and

expense to diligently gather almost 20,000 signatures from the 4th Congressional Dist. and timely filed those signature petition and his statement of candidacy with the Defendant, ISBE, on May 26, 2026, confirming that he had a considerable showing of support for his candidacy from voters who exercised their First amendment right to support the candidate of their choice and for the purpose of seeing Candidate Byron Sigcho Lopez's name printed upon the November 3, 2026 general election ballot as an independent candidate for US Representative. See attached **Exhibit J**, Declaration of Byron Sigcho Lopez, incorporated herein.

71. The 4th Congressional Dist. was the hardest targeted ICE enforcement area in Illinois, and many residents have been living scared and traumatized; this palpable fear in the 4th Congressional district severely hampered petition gathering since a majority of voters would not open their doors to people they did not know, preventing door-to-door gathering, while voters at public locations were reluctant to write their names and addresses on documents that could be used by government agents and/or entered into a government database. See **Exhibit J**. This atmosphere of fear dramaticaly burdened and slowed signature gathering.

72. The 4th Congressional Dist. in Illinois (map attached as **Exhibit H**) had a population of 653,647 at the 2020 US Census, and increased to an approximate population of 712,078 in 2024 based upon 2024 American Community Survey 1-Year Estimates[5]. The ethnic demographics of the 4th Congressional Dist.[6] is 66.5% Hispanic, 23.4% White, 4.5% Back, 3.9% Asian.

73. The 4th Congressional district is also irregularly shaped, and petitioning

5 https://www.census.gov/mycd/?st=17 [last visited October 20, 2026]

6 https://en.wikipedia.org/wiki/Illinois%27s_4th_congressional_district [last visited Oct. 20, 2026]

in public locations was more difficult because a larger number of voters did not know which district they lived in, or where they were registered to vote. See **Exh. J**.

74. An objection to Candidate, Byron Sigcho Lopez's petition sheets as an independent candidate for US Representative was filed by Democratic candidate Patty Garcia's supporters, alleging that (a) fewer than 10,816 signatures were submitted after removal of voters who were not registered at the address written, were not registered in the 4th Congressional Dist., and/or whose signatures did not match their voter registration card signatures; and (b) fewer than 10,816 signatures after removal of all sheets under the "dual circulator" restriction (10 ILCS 5/10-4) because Plaintiff's circulators had previously circulated petition sheets for a Democratic party committeeperson at the March 17, 2026 primary, despite the fact that a committeeperson is not an elected official, and only a party representative.

75. The ISBE sitting in its capacity as the SOEB scheduled a "records examination" or review of signatures as defined in its Rules to be located at the ISBE's Springfield location, and scheduled 13 computer stations being operated simultaneously for June 11-12, 2026, which required Candidate Byron Sigcho Lopez to coordinate and arrange for at least 13 campaign volunteers to travel from Chicago to Springfield to partake in the review as "watchers" to observe the review process. Thirteen computer stations is the ISBE's maximum number of stations, and this amount is scheduled for statewide petitions, and a lesser number of stations have historically been scheduled for candidates in a political divisions or district less than the entire state.

76. The ISBE records examination on June 11-12, 2026 was also scheduled by ISBE Staff to proceed from 8:30AM – 8:30PM (with breaks for lunch and dinner)

even though the ISBE's regular business hours are from 8:30AM – 5:00 PM, and SOEB Rules require attorneys to be available "by telephone (including cell phone) during the day and at least until 7:00 p.m." The ISBE also deviated from the ISBE's past procedure for records examinations by hiring and paying the City of Springfield Police Dept. to provide armed municipal police officers to patrol inside of the room where the Sigcho Lopez records examination was proceeding, with the threat of arrest and removal for anyone who disobeyed staff instructions announced regularly during the review; on information and belief, the Springfield police officers were privately hired and paid by the ISBE, and were not employed by the City of Springfield on June 11-12, 2026.

77. Adding further difficulty to the records examination in Springfield, ISBE Staff also announced at the start of the records examination that restrooms in the ISBE facility were for employees only, and that Staff had pre-arranged for watchers to use of washrooms at the gas station located across the street from the ISBE's Springfield location, which Staff confirmed was pre-authorized by the gas station management; to help Candidate they would allow watchers to use the ISBE facility's side-door in the records examination review room, rather than exiting the building through the front door, but would not stop the records examination except for designated lunch and dinner break times. At some point later in the day, the ISBE revised its bathroom policy, and allowed watchers to use the ISBE restrooms.

78. At the completion of the records examination, the SOEB determined that Candidate Byron Sigcho Lopez had 9,594 signatures of petition signers that were registered voters in the 4th Congressional Dist. at the address written, and their

handwritten ink signatures matched the digital signature "clip" or image shown on the ISBE's computer monitors. See **Exhibit J.**

79. On July 21, 2026 each member of the SOEB, individually and in their official capacities, willfully and intentionally voted "Yes" to adopt the recommendation of the SOEB's hearing officer, and issued their 8-0 decision that Candidate Byron Sigcho Lopez's name should not be certified to the ballot because his ballot access petitions did not include at least 10,816 signatures of voters from the 4th Congressional Dist. See decision attached as **Exhibit G**.

80. Historically, only a handful of independent candidates in Illinois have been able to attain ballot access due to the severe and burdensome signature requirement for independent candidates, largely those who were not challenged by an objection; the few who were lucky not to draw an objetion does not overcome the facts recited herein that establish unequivocally that independent candidates ***have not regularly*** and ***consistently*** been able to reach the general election ballot. See **Exhibit K** and **L**.

81. The difficulty of reaching the 5% minimum signature requirement is enhanced due to an arbitrary maximum of 8%, in addition to other provisions of the Election Code, including only 90 days to circulate starting in February, each sheet requiring a notarial *jurat*, the "dual circulator" restriction that drastically reduces the number of eligible and experienced circulators, and the objector-biased electoral board objection process governed by electoral board Rules written for much smaller established party petitions.

82. Mayra Macias was another reasonably diligent Latina candidate that gathered signatures as an independent candidate for US Representative for the 4th

Congressional Dist. this year, and submitted 17,458 signatures. As reported to the FEC, her campaign committee received $306,144.40 to support her congressional campaign. A records examination to review petitions filed by candidate Macias was scheduled by the ISBE at its Chicago office on June 11-12, 15-18, 2026 with 5 computer stations operating simultaneously from 9:00AM – 12:00PM and from 1:00PM – 4:00PM. The ISBE did not hire armed state, county, or municipal police officers to patrol inside of the location where the Macias records examination was being undertaken.

83. At the conclusion of the Macias records examination, the SOEB determined that Macias had 10,330 signatures of petition signers that were registered voters in the 4th Congressional Dist. at the address written, and their handwritten ink signatures matched the digital signature "clip" or image shown on the ISBE's computer monitors.

84. On July 21, 2026 each member of the SOEB, individually and in their official capacities, willfully and intentionally voted "Yes" to adopt the recommendation of the SOEB's hearing officer that Macias did not have sufficient signatures to warrant ballot placement, and issued their 8-0 decision that Candidate Mayra Macias' name should not be certified to the ballot because her ballot access petitions did not include at least 10,816 signatures of voters from the 4th Congressional Dist.

85. One other candidate, Chris Getty, filed petitions as an independent candidate for US Representative for the 4th Congressional Dist. and his ballot access petitions were not challenged, and thus his signatures did not proceed through a records examination. Since this is a majority Latino district, Candidate

Getty's ballot access petitions were likely not challenged because of his Scottish or British name, that would not be a threat to Patty Garcia; Getty's petitions were subject only to the ISBE's 10% signature line apparent conformity review, which confirmed that Candidate Getty had filed a statement of candidacy and at least 1,082 unvalidated signature lines.

86. Only Plaintiff, Byron Sigcho Lopez, and Candidates Macias and Getty, filed to be independent candidates in the 4th Congressional Dist. which has the lowest independent signature requirement of 10,816 through application of 10 ILCS 5/10-3 (for non-redistricting elections); **other than these three** independent candidates, ***no other persons*** filed as independent candidates for US Representative in any of the other 16 districts in Illinois for the November 3, 2026 general election.

87. No candidate for US Representative in Illinois has ever overcome a general election signature requirement of 10,000 or more and survived an objection challenge, and since 1890, only 3 have done so in the country as confirmed by Richard Winger's Declaration, **Exhibit K**.

88. In 2026, a candidate with 9,594 signatures (as was the final count of validated signatures for Byron Sigcho Lopez), would have satisfied the signature requirement for an independent candidate for US Representative in 91.3% or 397 of the 435 US House Districts – that is, 9,594 signatures would have met the signature requirement in all districts in all states except Illinois, South Carolina, and Georgia. See **Exhibit K**.

89. In the period 1931 to the present, Illinois has never had more than 4 candidates on the November ballot for US Representative in a district except one race in 1996 with five candidates. See **Exhibit L**.

90. Illinois requires 3,000 signatures for partisan presidential primary candidates, and presidential primary ballots in Illinois are relatively crowded. In 2020 there were eleven candidates on the Democratic primary ballot, and in 2016 there were eleven candidates on the Republican primary ballot. There were also nine candidates in the 2008 Republican ballot, and nine in 2004 in the Democratic primary. The number of candidates on these ballots did not pose any election administration issues nor impact the integrity of the primary. See **Exhibit L**.

91. By application of a signature requirement of at least 5% of the votes at the last general election but not more than 8%, the only independent candidates for US Representative during the time 2010-2026 that made the general election ballot were the lucky and inconsequential candidates, who were not challenged by an opponent; serious independent candidates for US Representative that were challenged were removed from the ballot during this time.

92. During the period 2010 – 2026 there were 9 elections for US Representative in each of the 17 Congressional districts in Illinois, or 153 elections for US Representative. Four independent candidates were not objected to, and were able to make the ballot during the years when the signature requirement was 5,000 signatures, meaning there was an independent candidate in 3% of the post-redistricting congressional races over 9 elections; three candidates were not objected to and made the ballot during years with the 5% to 8% signature requirement, or 2% of these congressional races over 9 elections.

93. Independent candidates have not been able to overcome the Election Code's burdensome signature requirement for US Representative to reach the general election ballot with any regularity and consistency.

## C. Ballot access requirements for independent candidates in elections following redistricting.

94. District boundaries are changed through decennial redistricting after US Census data is updated, and since boundaries are changed, the State does not calculate the 5% minimum and 8% maximum signature requirement based upon the ballots cast in the district at the last general election for the election after redistricting.

95. For elections following the decennial redistricting, the Election Code 10 ILCS 5/10-3 imposes a requirement of 5,000 signatures for independent candidates, with no maximum restriction, as follows:

> [ * * * ] For the first election following a redistricting of congressional districts, nomination papers for an independent candidate for congressperson shall be signed by at least 5,000 qualified voters of the congressional district. For the first election following a redistricting of legislative districts, nomination papers for an independent candidate for State Senator in the General Assembly shall be signed by at least 3,000 qualified voters of the legislative district. For the first election following a redistricting of representative districts, nomination papers for an independent candidate for State Representative in the General Assembly shall be signed by at least 1,500 qualified voters of the representative district. [ * * * ]

96. No other state except Florida has two dramatically different signature requirement for elections following redistricting[7]. In Florida, for petitions in lieu of filing fee, Florida says in elections in years ending in "2" (that is, in elections following redistricting) the state calculates the number of signatures as 1% of the population of the average district, so the number of signatures is the same in every district and signatures can be collected anywhere in the state. Indiana uses the

---

7 The signature difference for established party candidates for US Representative between post-redistricting (election years ending in a "2") and the 0.5% no maximum signature number is nominal – 600 signatures are required for elections following redistricting, a difference of 100-200 signatures from the 0.5% requirement.

same signature calculation rule after redistricting, which is 2% of total votes cast in the district at the last election for the secretary of state.

97. All legitimate state interests are satisfied and met, including the showing of a modicum of support from voters, when independent candidates for US Representative submit at least 5,000 voter signatures from their congressional district seeking ballot access for elections immediately following redistricting.

98. History confirms that even with a 5,000 signature requirement, independent candidates have not been able to regularly and consistently reach the general election ballot.

99. For elections following redistricting, a reasonably diligent independent candidate could submit any number of signatures that could be obtained within 90 days, with no maximum signature restriction, provided that there was no "dual circulator" restriction that allowed hiring professional circulators.

100. The lack of a signature maximum limit at elections following redistricting confirms that the 8% maximum is arbitrary, has no relationship to any state concerns such as ballot overcrowding, voter confusion, frivolous candidates, or other election chaos.

101. There has never been ballot overcrowding, frivolous candidates, or voter confusion, nor any concerns about the integrity of the election at a general election in Illinois during elections following redistricting with a 5,000 signature requirement for independent candidates, alongside other provisions of the Election Code such as 90 days to gather signatures, with each sheet notarized, the "dual circulator" restriction that severely burdens independent candidates, and being subject to the objection challenge process (10 ILCS 5/10-8), which together

addresses all state interests in the orderly administration of the general election. See **Exhibit K**.

102. Illinois' 5,000 signature requirement with no maximum number, is still a higher signature requirement than the average and the median signature requirements in all other states. See **Exhibit K**.

**D. Other state ballot access requirements for US Representative.**

103. The US Census defines congressional districts based upon census population data as follows:

> Congressional districts are the 435 areas from which members are elected to the U.S. House of Representatives. After the apportionment of congressional seats among the states, which is based on decennial census population counts, each state with multiple seats is responsible for establishing congressional districts for the purpose of electing representatives. Each congressional district is to be as equal in population to all other congressional districts in a state as practicable. The boundaries and numbers shown for the congressional districts are those specified in the state laws or court orders establishing the districts within each state.

Source: https://www.census.gov/programs-surveys/geography/guidance/geo-areas/congressional-dist.html [last visited October 20, 2026]

104. On average each congressional district had a population of approximately 761,169 people based upon the 2020 US Census data; the largest are Delaware at-large (989,948) and Montana at-large (994,416) while the district with the fewest people is Rhode Island's 1st district with a population of 545,085 according to Wikipedia [last visited October 20, 2026] summary: https://en.wikipedia.org/wiki/List_of_United_States_congressional_districts

105. Nearly all other states yield to the US Constitution for the office of US Representative, and have lower ballot access requirements for independent candidates for US Representative than Illinois, and do just fine administering their

elections for US Representative with lower and less burdensome ballot access requirements.

106. Unaffiliated or independent candidates for US Representative in other states have lower signature requirements (see **Exhibit I**) including the following:

**Alaska** 3% of voters in district or 2,000 whichever is less;

**California** $1,740 fee or 2,000 signatures or partial fee plus signatures;

**Colorado** lesser of 2.5% votes in district at last election or 1,500 signature;

**Hawaii** 25 signatures and $75 filing fee;

**Idaho** 500 signatures in district and $300 filing fee;

**Indiana** 2% of votes cast in district at last election;

**Iowa** 1,726 signatures, at least 47 signatures in half the counties in the district;

**Kansas** 4% of voters in district, at least 25 and no more 5,000 and $1,740;

**Kentucky** 400 signatures and $500 filing fee;

**Louisiana** 250 signatures from anywhere in the state or $1,500 filing fee;

**Maine** 2,000 to 2,500 signatures;

**Massachusetts** 2,000 signatures;

**Michigan** 3,000 to 6,000 signatures;

**Minnesota** 1,000 signatures and $300 filing fee;

**Mississippi** 1,000 signatures anywhere or 200 in district and $500 filing fee;

**Missouri** 2% of votes from last election;

**Nebraska** 20% of registered voters in district of 2,000 whichever is less;

**Nevada** 1% of ballots cast in district at last election and $300 filing fee;

**New Hampshire** 1,500 signatures and $50;

**New Jersey** 250 signatures or 50 signatures after redistricting;

**New Mexico** 2% of ballots cast in district (D1: 5,678; D2: 3,903 or D3:4,619)

**New York** 5% of votes for governor at last election or 3,500 whichever less

**North Carolina** 1.5% of registered voters in district and $1,740

**North Dakota** 2% of resident population or 300 whichever is less

**Oregon** 1% of votes for president in district at last election

**Pennsylvania** 2% of the highest votes at last election in district and $150

**Rhode Island** 500 signatures

**South Dakota** 1% of votes for governor at last election or 3,502 signatures

**Tennessee** 25 signatures

**Texas** lesser of 500 or 5% of votes for governor in district at last election

**Utah** lesser of 300 or 5% of voters in the district

**Vermont** 500 signatures

**Virginia** 1,000 signatures

**Washington** $1,740 filing fee, or if unable to pay, gather 1,740 signatures

**West Virginia** 1% of votes in district at last election (D1: 2,072 and D2: 2,449)

**Wisconsin** at least 1,000 but not more than 2,000

**Wyoming** 2% of votes for same office in district at last election and $750

107. California has a large population and handles its ballot access requirements through a filing fee of 1% of the US Representative salary (or $1,740), but also allows candidates without the funds to pay the filing fee to gather and submit signatures, or a combination of partial fee and partial signatures.

108. Texas is a large state with both urban and rural congressional districts, and satisfies all state election integrity interests with a signature requirement of the lesser of 5% or 500 signatures. See Richard Winger Supplemental Declaration,

<u>**Exhibit L**</u>.

109. All legitimate state interests are satisfied and met, including the showing of a modicum of support from voters, preventing voter confusion, deterring frivolous candidates, preventing ballot overcrowding, and maintaining the integrity of elections, in each state that has a lower and less burdensome signature requirement than Illinois.

110. Georgia and Illinois are the only states that impose a signature requirement of more than 10,000 signatures for independent candidates for US Representative; South Carolina caps its signature requirement at 10,000.

111. Since each congressional district is similarly sized based upon US Census population data, the signature requirements for independent candidates from other states may be relied upon as legitimate, less restrictive, and feasible alternatives to Illinois' ballot access requirements for independent candidates.

112. Illinois' Election Code signature requirement for independent candidates for US Representative, amplified by the many other requirements and limitations governing independent ballot access petitions, is in a minority group of two states since 48 states require fewer signatures for independent candidate ballot access, without ballot chaos.

113. The Illinois Election Code, 10 ILCS 5/10-3, with its minimum of 5% of the total votes cast but not more than an arbitrary 8% poses a severe burden to ballot access for independent candidates.

E. <u>Dual Circulator Restriction in 10 ILCS 5/10-4</u>.

114. Article 10 of the Election Code at 10 ILCS 5/10-4 contains the following "dual circulator" provision that benefits established political parties, and severely burdens independent and new political party candidates, in part as follows:

> Provided, further, that no person shall circulate or certify petitions for candidates of more than one political party, or for an independent candidate or candidates in addition to one political party, to be voted upon at the next primary or general election, or for such candidates and parties with respect to the same political subdivision at the next consolidated election.

115. However, there is no provision in the Election Code for a voter (or person who is not registered to vote) to register or become a "member" of an established political party; the only time (and for the limited time duration in the voting booth) that a ***voter*** can affiliate with an established political party is at an established party primary by requesting an established party's primary nomination ballot, or by signing a statement of candidacy with oath for nomination as a candidate at a primary. A person who is ***not*** a voter cannot sign a statement of candidacy or a candidate's petition, nor request a party's ballot at a primary.

116. Although the "dual circulator" restriction prevents simultaneous cross-party circulation for a primary, the number of signatures that established party candidates need to submit is so low, combined with a well-established political infrastructure, this restriction has little impact upon established party candidates.

117. Independent and new political parties are disparately and severely burdened by the "dual circulator" prohibition in 10 ILCS 5/10-4, which prevents a person who ***previously*** circulated even one petition for a candidate seeking a political party's nomination at a primary from later circulating a petition for an independent or new political party candidate for the general election ballot; this

"dual circulator" provision was upheld by the decisions in *John W. Moore v. Bd. of Elec. Com'rs*, 794 F.2d 1254 (1986) and 845 F.2d 144 (1988) based upon an Election Code that differed from the Election Code as it is enacted today.

118. The US Supreme Court in *Meyer v. Grant*, 486 U.S. 414 (1988) subsequently confirmed that "[t]he First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people' and that "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

119. Unequivocally, the US Supreme Court confirmed that circulation of ballot access petitions necessarily constitutes "core political speech" for which First Amendment protection is at its zenith. *Meyer v. Grant*, 486 U.S. 414 (1988) and *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999).

120. The Election Code has also been revised since the *John W. Moore* decisions to prevent sore loser candidates, which was a motivating concern of the Court of Appeals, and the Court of Appeals did not have the benefit of the later decisions of the US Supreme Court in *Meyer v. Grant*, 486 U.S. 414 (1988) and *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999).

121. The "dual circulator" restriction is a severe burden upon independent and new party candidates because it locks in persons who are not required to be voters into a political party affiliation for non-voters that is not otherwise defined in the Election Code and restricts the content of their speech – essentially preventing persons who previously circulated an established party petition from exercising their First Amendment right to discuss publicly with petition signers an

independent or new political party candidate's message and engage in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Meyer v. Grant*, 486 U.S. 414 (1988).

122. The "dual circulator" restriction in 10 ILCS 5/10-4 is directly contrary to the reasoning and holding in *Meyer v. Grant*, 486 U.S. 414 (1988) because just as in *Meyer*, the "dual circulator" provision in 10 ILCS 5/10-4 similarly "restricts political expression in two ways: First, it limits the number of voices who will convey [a candidate's] message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that [a candidate] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion."

123. The "dual circulator" restriction severely burdens the signature requirement because independent and new party candidates are restricted in who is authorized to circulate their petition sheets, with the penalty being the loss of all signatures upon sheets that were circulated by someone who previously circulated a party nomination petition for a primary.

124. The "dual circulator" restriction poses a major obstacle to independent and new party candidates' ballot access both because of the huge number of signatures required, but also because virtually all experienced, regular, and professional circulators have already circulated for established party nominations. Independent and new party candidates have to enlist the help of persons who may not have experience circulating petitions, which is a less efficient method and risks errors in circulation. See **Exhibit J**.

125. The "dual circulator" restriction does not apply to non-partisan elections,

such as the election for Chicago mayor discussed in *Stone v. Bd. of Elections Comm'rs of City of Chicago*, 750 F.3d 678 (7th Cir. 2014), or the Chicago School Board elections that are being held in Chicago at the general election on November 3, 2026.

126. Candidate, Sigcho Lopez, was severely burdened in his petition gathering because two professional circulators that he hired were unable to complete the contracted petition gathering because they did not have circulators who had not previously circulated for an established party candidate, as confirmed by the Declaration of Byron Sigcho Lopez, attached as **Exhibit J**, and incorporated herein.

### F. Sore Loser & Other Changes after *John W. Moore* decisions.

127. By operation of 10 ILCS 5/10-4 in effect through 2001, a circulator was required to be a "registered voter of the political division, who has been a registered voter at all times he or she circulated the petition, for which the candidate or candidates shall be nominated."

128. Section 10-4, 10 ILCS 5/10-4, as amended by Public Act 92-0129 (effective July 20, 2001) removed the requirement for a circulator to be a registered voter.

129. Only a registered voter can participate in a primary election, and only a registered voter can request an established political party ballot (i.e. the only duration of time that a voter can declare a party affiliation is in the voting booth); there is no process in the Election Code for a person who is not registered to vote to either become a "member" of a political party, or to declare an affiliation for any established political party.

130. A sore loser provision was added to the Election Code in 10 ILCS 5/10-2 in 1983, as follows:

> [ * * * ] A candidate for whom a nomination paper has been filed as a partisan candidate at a primary election, and who is defeated for his or

> her nomination at the primary election, is ineligible for nomination as a candidate of a new political party for election in that general election.

131. The Court of Appeals acknowledged in a footnote that 10 ILCS 5/10-2 was not enacted until after the candidacy and litigation at issue in *Citizens for John W. Moore v. Bd. of Elec. Com'rs*, 794 F.2d 1254 (1986) at Fn.2.

132. Prior to 2007, independent candidates circulated and filed their general election ballot access petitions at same time as established party candidates circulated their primary nomination petitions; through P.A. 095-0699 (eff. Nov. 9, 2007) the earlier circulation and filing requirement for independent candidates was deleted, so that after Nov. 9, 2007, independent candidate circulation and filing was at the same ***later*** time as new political party candidates, 10 ILCS 5/10-6. See *Lee v. Keith*, 463 F. 3d 763 (7th Cir. 2006).

133. In 1982 there was no prohibition on a candidate who withdrew from, or lost an established party nomination at a primary from seeking election as an independent or a new political party candidate at the November general election, as was the situation in *John W. Moore v. Bd. of Elec. Com's*, 794 F. 2d 1254 (1986) and 845 F.2d 144 (1988). Public Act 097-0681 (eff. March 30, 2012) amended 10 ILCS 5/7-43 to incorporate a second sore loser provision that further restricted independent candidates as follows (with provisions added 3/30/2012 underlined):

> A person (i) who **filed** a statement of candidacy for a partisan office as a qualified primary voter of an established political party or (ii) who **voted** the ballot of an established political party at a general primary election **may not file** a statement of candidacy as a candidate of a different established political party or as an **independent** candidate for a partisan office to be filled at the general election immediately following the general primary for which the person filed the statement or voted the ballot. A person **may file** a statement of candidacy for a partisan office as a qualified primary voter of an established political party **regardless of any prior filing** of candidacy for a partisan office **or voting** the ballot of an established political party **at any prior election**.

134. 10 ILCS 5/10-2 and 10 ILCS 5/7-43 (as amended through P.A. 097-0681), addressed the sore loser concerns that were raised by the Court of Appeals in the *John W. Moore v. Bd. of Elec. Com'rs*, 794 F.2d 1254 (1986) and 845 F.2d 144 (1988) decisions.

135. Candidate Sigcho Lopez was severely burdened in his candidacy because of the "dual circulator" restriction, which prevented him from relying upon paid professional circulators that had been hired but could not deliver the contracted signatures; had his campaign not been restricted by the "dual circulator" bar, Candidate Sigcho Lopez would have received 10,000 to 15,000 more signatures from at least two professional circulators that would have added to his campaign team's and committeepeople and union supporter's signature gathering efforts.

136. A real and actual controversy exists between the parties.

137. Plaintiffs have no adequate remedy at law other than this action for declaratory and equitable relief.

138. Plaintiffs have suffered irreparable harm as a result of the denial of First and Fourteenth amendment rights in their capacities of candidate, voter, supporter, and/or circulator, and that harm will continue unless declared unlawful and enjoined by this honorable Court.

139. Plaintiff, Byron Sigcho Lopez has suffered actual damages, which includes the loss of funds expended for his campaign staff, printing petition sheets, office expenses, payments for petition circulators, legal fees for representation at the SOEB proceeding, and other actual damages.

## Causes of Action

### Count I
### First & Fourteenth Amendments to the United States Constitution

**(at least 5% but not more than 8% requirement in 10 ILCS 5/10-3 is facially unconstitutional)**

1-139. Plaintiffs reassert Paragraphs 1-139 as if fully stated herein.

140. The First and Fourteenth Amendments afford candidates vying for elected office, and their voting constituencies, the fundamental right to associate for political purposes and to participate in the electoral process. See *Clingman v. Beaver,* 544 U.S. 581, 586 (2005); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983); *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

141. The Election Code provisions governing independent and new party candidates serve to insulate the two-party system, as confirmed by historical record where few independent candidates have been able to regularly and consistently meet the signature requirements, and those that made the ballot were the lucky and inconsequential candidates who were not challenged so the total number of signatures submitted was never determined, other than through the Defendants' apparent conformity review which confirms only that such candidates submitted unvalidated lines of at least 10% of the number stated in the Election Code.

142. Legislation that imposes greater burdens upon independent candidates to protect or insulate the two-party system is not permitted, explained by the Supreme Court as follows:"[o]ur U.S. Supreme Court has observed that interest in political stability 'does not permit a State to completely insulate the two-party system from minor parties' or 'independent candidates' competition and influence." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 366-87, 117 S. Ct. 1364 (1977); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 187, 99 S.Ct. 983 (1979).

143. States may condition access to the general election ballot by a minor-party

or independent candidate upon a showing of a modicum of support among the potential voters for the office. See e.g., *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Williams v. Rhodes*, 393 U.S. 23 (1968).

144. The requirement for a modicum of voter support for US Representative is met through 0.5% of the votes for a party's candidate (rather than all ballots cast) at the last general election, or 697 signatures for Democratic party candidates and 371 for Republican party candidates.

145. The requirement for a modicum of voter support for US Representative, sufficient to satisfy the Defendants' interests and to certify a candidate to the ballot is met through Defendants' apparent conformity review, and confirmation by the ISBE of at least 70 signatures for Democratic party candidates and 37 for Republican party candidates, for US Representative.

146. The requirement for a modicum of voter support for US Representative, sufficient to satisfy the Defendants' interests and to certify a candidate to the ballot is met when an independent candidate for US Representative submits at least 5,000 signatures on elections following redistricting.

147. The provisions in 10 ILCS 5/10-4 that require an independent candidate petition to contain no less than 5% but not more than 8% of the ***total*** ballots cast at the last general election, gathered within 90 days, imposes a severe burden that restricts Plaintiffs' and their petition signers First and Fourteenth Amendment rights of the United States Constitution, particularly since the 8% maximum restriction is arbitrary and serves no legitimate state interest.

148. The provisions in 10 ILCS 5/10-3 requiring an independent candidate petition to contain no less than 5% but not more than 8% of the ballots cast at the

last general election fails to narrowly advance any legitimate state interest or regulatory purpose, particularly since the 8% maximum restriction is arbitrary and serves no legitimate state interest.

149. The provisions in 10 ILCS 5/10-3 requiring an independent candidate petition to contain no less than 5% but not more than 8% of the ballots cast at the last general election is not the least restrictive means for maintaining the integrity of the election, but rather, imposes as severe and unequal burden upon independent candidates, including Plaintiff, and such a requirement advances no legitimate and compelling state interest, particularly since the 8% maximum restriction is arbitrary and serves no legitimate state interest.

150. The provision in 10 ILCS 5/10-3 that define two different signature requirements of either 5,000 or at least 5% but not more than 8% has no legitimate state purpose, and serves only to insulate the two established party structure, particularly where the difference between 5,000 and 5% is more than double, with an 8% maximum that is arbitrary and restrictive.

151. The least restrictive method for advancing legitimate state interests to protect the integrity of the election would be either (a) ISBE's apparent conforming review which determines if there is 10% of the required signatures, or (b) a three or four times multiple of the established party signature requirement; or (c) 5,000 signatures after redistricting which is the requirement that meets all legitimate state interests, a matter of law because this is the enacted law.

152. Defendants have no legitimate state interest or compelling justification for requiring more than 5,000 signatures for independent candidates for US Representative. Defendants admit they have no facts to support their presumption

of any state interests. Such a presumptive argument however is rebutted by historical facts recited herein, that confirm independent candidates have not been able to regularly and consistently reach the general election ballot.

153. Illinois' ballot access requirements for independent candidates and new party candidates for US Representative violate rights guaranteed to the Plaintiffs – in their capacities as Candidate, voter, circulator, supporter, and/or petition signer – by the First and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. §1983.

154. The higher than necessary 5% signature requirement with an arbitrary 8% maximum separately and in conjunction with other requirements of the Election Code, both cause injury to and violate the rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

**COUNT II**
**First & Fourteenth Amendments to the United States Constitution**
**(at least 5% but not more than 8% requirement in 10 ILCS 5/10-3 is unconstitutional as applied)**

1-154. Plaintiffs reassert Paragraphs 1-154 as if fully stated herein.

155. The signature requirement of at least 5% but not more than 8% of the total votes cast in the district at the last general election, combined with the other ballot access requirements including 90 day circulation time, notarization for each sheet, "dual circulator" restriction, and electoral board objection process, is a severe and burdensome requirement to Candidate, Byron Sigcho Lopez's, ballot access rights.

156. As applied, the signature requirement of at least 5% but not more than 8% of the total votes cast in the district at the last general election, is a severe and burdensome requirement to Plaintiff Jose Guerra's, rights under the First Amendment to support and to see the candidate of his choice on the ballot, and to

be able to vote for the candidate of his choice.

157. As applied, the higher than necessary 5% signature requirement with an 8% maximum as applied, both cause injury to and violate rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

**COUNT III**
**Equal Protection First & Fourteenth Amendments**
**to the United States Constitution**

1-139. Plaintiffs reassert Paragraphs 1-139 as if fully stated herein.

140. Ballot access requirements that place more burdensome restrictions on certain types of candidates than on others implicate rights under the Equal Protection Clause as confirmed by the US Supreme Court in *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968); *Bullock v. Carter*, 405 U.S. 134 (1972); *Lubin v. Panish*, 415 U.S. 709 (1974); *Illinois Elections Bd. v. Socialist Workers Party*, 440 U. S. 173, 183 (1979),

141. The Election Code provisions governing ballot access by independent candidates insulate and protect the established party structure in Illinois, and freeze the statewide political status quo, as is confirmed by historical record that shows independent candidates are not able to regularly and consistently reach the general election ballot in the last century.

142. The many fold larger signature requirement governing independent and new political party candidates is neither necessary for the integrity of elections nor is it a minor difference from the signature requirement for established party candidates, particularly since the other provisions of the Election Code have not been expanded or adjusted for the many times larger signature requirement.

143. The maximum 8% allowed signatures for independent candidates is an arbitrary and severely restrictive requirement that discriminates against

independent candidates as compared to new political party candidates seeking the same office that are not resticted by a maximum signature limit.

144. The Election Code requires over 10,816 signatures for independent candidates for US Representative, yet the Election Code applies the same signature gathering procedures governing much smaller established party primary nomination papers – 90 days to gather signatures (but earlier February start), with each sheet requiring a notarial *jurat*, the "dual circulator" restriction, and the objector-biased objection process where a competing political interest can challenge and deny ballot access, and SOEB Rules that are the same accelerated schedule for established party candidates, without being adjusted to provide additional time, due process, and opportunities for Candidates to gather evidence and oppose the objectors' petition.

145. The impact of the dramatically larger signature requirement, yet restricted by the same provisions of the Election Code governing established party candidates and SOEB Rules written for established party candidate petitions results in an invidious and disparate discrimination against independent and new party candidates, in violation of the Equal Protection Clause of the US Constitution.

146. The 8% signature limit for independent candidates during years that do **not** end in the number "2" constitutes invidious and disparate discrimination, and a severe burden for independent candidates, in violation of the Equal Protection Clause of the US Constitution, as compared to new political party, established party candidates, and independent candidates at elections immediately following redistricting, who are all vying for the same elected office but do not face a maximum signature limit.

147. The considerable disparity in signature requirements for ballot access for independent candidates for US Representative exists as follows: (a) between established party candidates 0.5% and independent or new party candidates at 5%, and (b) 5,000 signatures for election with no maximum after redistricting and over 10,816 signatures for in-between elections based on 5% of total votes with an 8% maximum, (c) Defendants' 10% apparent conformity review (1,081 to 1,980) and over 10,816 signatures for in-between elections based on 5% of total votes in last general election in the district, and (d) between independent candidates that are restricted by an 8% maximum and established and new party candidates that do not face such a restriction. Such disparities in signature requirements and the 8% maximum restriction create a *prima facie* case of overt and invidious discrimination against independent candidates under the 5% but not more than 8% signature requirement, that violate the Equal Protection Clause of the US Constitution.

148. The Defendants have no legitimate state interest in enforcing a signature requirement of 5% to 8% of the total votes cast in the district at the last general election, when all legitimate state interests are satisfied through the lesser 5,000 signature requirement for elections following redistricting with no maximum, and also separately satisfied through the Defendant's 10% signature line apparent conformity review (low of 1,082 to high of 1,980 across the 17 districts).

149. The two different signature requirements of 5,000 for post-redistricting elections (years ending in the number "2") and the requirement of over 10,816 signatures but not more than 17,304 for in-between elections constitutes serves no "vital" government interest and history confirms that in practice the few candidates who were able to reach the ballot with 5,000 signatures post-redistricting would

have a 98% chance of being removed from the ballot at the subsequent election due to the dramatically higher signature requirement, which insulate the two party structure from competing viewpoints and candidates.

150. The two different signature requirements of 5,000 for post-redistricting elections (years ending in the number "2") and the requirement of over 10,816 signatures but not more than 17,304 for in-between elections unfairly and unnecessarily burdens new party and independent candidates' equally important interest in the continued availability of uniform and accessible political opportunity in violation of the right to Equal Protection,

151. The Election Code 10 ILCS 5/10-3 that requires independent candidates for US Representative to file at least 5% but not more than 8% of the total votes cast in the district at the last general election constitutes a violation of Plaintiffs' right to Equal Protection under the US Constitution, when 5,000 signatures with no maximum is enacted law and sufficient to meet all state interests in election integrity, and new party candidates for the same office also do not face a maximum limit on their signatures, confirming the 8% limit governing only independent candidates for US Represntative constitutes invidious discrmination.

**Count IV**
**Impermissible expansion of Qualifications Clause**

1-139. Plaintiffs reassert Paragraphs 1-139 as if fully stated herein.

140. The qualifications for the office of US Representative[8] are defined in the US Constitution, Article I, section 2, clause 2, as follows:

> No Person shall be a Representative who shall not have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of

8 See also, **Exhibit D**.

that State in which he shall be chosen.

141. The Tenth Amendment confirms that states have no authority to expand or impose additional qualifications to the office of US Representative:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

142. In *U.S. Term Limits*, the Supreme Court confirmed that states cannot add qualifications to federal candidacies by passing term limits. *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 115 S.Ct. 1842, 1847, 1852, 1868, 1870 (1995). See also *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944 (1969); *Trump v. Anderson*, 601 U.S. 100, 144 S.Ct. 662 (2024).

143. "Because federal officers 'owe their existence and functions to the united voice of the whole, not of a portion, of the people,' powers over their election and qualifications must be specifically 'delegated to, rather than reserved by, the States.'" *Trump v. Anderson,* 601 U.S. 100 (2024) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 803-804, 115 S.Ct. 1842 (1995))

144. Illinois' signature requirement for independent candidates for US Representative is so excessive and burdensome, and beyond any legitimate state interests, that the signature requirement of at least 5% but not more than 8% of the total votes in the district at the last general election is an additional "***super-modicum***" of support (or a super majority) qualification that is beyond those stated in the US Constitution.

145. All legitimate state interests are satisfied through a 5,000 signature requirement, which is adequate to satisfy the state's modicum of support requirement to deter frivolous candidates, avoid ballot overcrowding, and maintain

the integrity of the election – which the state admits are factually unsupported presumptions. This presumptive argument is rebutted by historical facts recited herein, which confirm that independent candidates have not been able to regularly and consistently reach the general election ballot.

146. Requiring more than double the 5,000 signature requirement that meets all state interests constitutes an additional qualification, namely, the more than double modicum of support requirement, which is not necessary for purposes of election administration.

147 The Election Code 10 ILCS 5/10-3 that requires independent candidates for US Representative to file at least 5% but not more than 8% of the total votes cast in the district at the last general election is an unconstitutional attempt to add qualifications for independent and new political party candidates for US Representative, and is unconstitutional because it violates the Tenth Amendment by imposing additional qualifications not stated in the US Constitution, Article I, section 2, clause 2.

**COUNT V**
**Cumulative effect of Illinois law creates an unconstitutional restriction of rights under the First & Fourteenth Amendments to the Constitution**

1-139. Plaintiffs reassert Paragraphs 1-139 as if fully stated herein.

140. All provisions of the Election Code should be considered for their combined effect upon ballot access. Independent candidates are limited 90 days to gather signatures just as established party candidates (but an earlier start in February), so independent candidates have to either hire circulators or enlist a considerably larger team of volunteers to gather 10 to 15 times or more signatures within 90 days; however, independent candidates, by virtue of being independent

of a political organization, and do not have the network of precinct captains, committeepersons, loyal supporters, and elected officials with their staffs, or the ability to run a "slate" petition with multiple candidates all gathering the same number of signatures as needed for one candidate.

141. Each sheet must contain an ink-signed notarial *jurat*, rather than a signature under penalty of perjury; each sheet being notarized creates a 10-15 times additional burden upon independent candidates who have to gather 10-15 times the number of signatures, where ink signed and notarized sheets require coordination of circulators and notaries.

142. The "dual circulator" restriction in 10 ILCS 5/10-4 locks in any person who circulated even one petition sheet for an established party candidate's nomination at a primary (March 17, 2026) as being a Democrat or Republican, and prevents such circulators from later changing their mind, and circulating for and exercising their First Amendment right to promote the positions of an independent candidate at the general election (Nov. 3, 2026); this restriction is a direct ***content-based*** restriction upon such circulators' right to First amendment speech.

143. Circulation of ballot access petitions necessarily constitutes "core political speech" for which First Amendment protection is at its zenith as confirmed by the US Supreme Court in *Meyer v. Grant*, 486 U.S. 414 (1988) and *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999).

144. The "dual circulator" restriction dramatically increases the difficulty of gathering the higher signature requirement for independent and new party candidates, and largely prevents independent and new party candidates from having access to professional petition circulators, who were all hired 6 months

prior for circulation of partisan nomination petitions. This restriction poses a major obstacle to independent and new party candidate ballot access.

145. After filing, independent and new party candidates face an objector-biased objection process where a competing political interest can challenge and deny ballot access to thousands of petition signers, by alleging signatures don't match voter card signatures, voters are not registered at the address or in the district, and other bases for striking petition signers, without notice or due process afforded to voters, or any additional time allotted to independent candidates to gather additional signatures, to show an even greater modicum of support.

146. The objection process before an electoral board, such as the SOEB, is governed by Rules written by the electoral board, and not otherwise defined in the Election Code. Electoral Board rules define an expedited schedule, with limited due process, though the electoral board process is the most important stage, akin to a trial court proceeding where all evidence, arguments, and claims must be made. The SOEB Rules prioritize speed to resolution, rather than accuracy of the result or respect for First amendment rights of candidates and petition signers that are being adjudicated.

147. The cumulative effect of at least 5% but not more than an arbitrary 8% signature maximum , in conjunction with other requirements of the Election Code, both cause injury to and violate rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

148. The higher signature requirement is unnecessary and unconstitutional as applied, because the cumulative effect of ballot access provisions in Article 10 of the Election Code are so robust that any legitimate state interests are already

satisfied when there is a 5,000 signature requirement for independent candidates for US Representative alongside the 90 day circulation time, notarization for each sheet, “dual circulator” restriction, objection challenge process, and harsh SOEB Rules that try to shoehorn the larger independent petitions into the same set of Rules the SOEB uses for fractionally smaller established party petitions.

149. The cumulative effect of Article 10 of the Election Code governing independent and new party candidates for US Representative poses a severe and invidious burden upon ballot access, and violates rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

**COUNT VI**
**“Dual Circulator” restriction in 10 ILCS 5/10-4 is facially unconstitutional**

1-139. Plaintiffs reassert Paragraphs 1-139 as if fully stated herein.

140. The “dual circulator” restriction in 10 ILCS 5/10-4 serves no election administration purpose, and there is no legitimate state interest in this provision. Defendants have no facts to support their presumption of any state interests. Such a presumptive argument however is rebutted by historical facts recited herein, that confirm independent candidates have not been able to regularly and consistently reach the general election ballot.

141. The Election Code at 10 ILCS 5/9-1.9 divides each election into two election cycles for candidates seeking elected office, the first of which ends the day of the primary election, and the second cycle commences on the day after the primary election through December 31 following the general election in November.

142. The “dual circulator” restriction locks in petition circulators, who do not have to be registered voters, into a political party affiliation that is not otherwise

defined in the Election Code, which then continues into the second part of the election after the primary, as if circulators cannot leave a political party or change their support if their candidate was not nominated at a primary.

143. The "dual circulator" restriction is inconsistent with the express qualifications stated in the Election Code 10 ILCS 5/10-4 for who can circulate petitions, as revised through P.A. 92-0129 (eff. July 20, 2001), in part as follows:

> [ * * * ] No signature shall be valid or be counted in considering the validity or sufficiency of such petition unless the requirements of this Section are complied with. At the bottom of each sheet of such petition shall be added a circulator's statement, signed by a person 18 years of age or older who is a citizen of the United States ~~registered voter of the political division, who has been a registered voter at all times he or she circulated the petition, for which the candidate or candidates shall be nominated~~; [* *]

144. The "dual circulator" restriction is actually a content-based restriction that specifically prohibits circulators from exercising their First amendment right to discuss and promote independent and new party candidates and their policies. The provision allows Democratic or Republican discussion, but shuts down and prohibits independent and new party policy discussions.

145. The "dual circulator" restriction results in entire sheets of otherwise valid voter signatures being disqualified through no fault of the petition signers, and without due process to the petition signers.

146. At all relevant times the Election Code, 10 ILCS 5/7-1, 10 ILCS 5/8-8, has protected established political party nominations at their primary by restricting Illinois voters who signed petitions from signing for a different political party as follows: "A '**qualified primary elector**' of a party may not sign petitions for or be a candidate in the primary of more than one party."

147. Persons who are not registered to vote in Illinois, and are not residents of

the State of Illinois, and thus are not eligible to be "**qualified primary electors**" of an established political party would nevertheless be ensnared by the "dual circulator" provision of 10 ILCS 5/10-4, and be identified as Illinois Democrats or Illinois Republicans by operation of the "dual circulator" provision, which thereafter bars them from engaging in "core political speech" otherwise protected by the First Amendment. These ensnared circulators, however, could not sign a petition, or request a primary ballot, despite being "branded" a Demorat or a Republican, through no choice or fault of their own, and for many, this is without their knowledge and consent.

148. There is no provision in the Election Code that allows a person (whether registered to vote or not, and regardless of state of domicile) to sign up to become an official or registered"member" of an established political party.

149. On information and belief, Illinois is the only state that prohibits petition circulators, including volunteer and professional petition circulators, based solely upon the prior Election Code-imposed "identity" as a Democrat or a Republican, that prevents promoting and circulating for independent or new political party candidates at the general election.

150. Because the circulation time for established political party candidate nomination papers occurs six or so months prior to the start of independent and new political party candidate circulation, established political party candidates have the first choice in each election cycle to enlist persons to circulate for their candidate nominations, with no restriction on prior circulators applicable to partisan circulators.

151. Most circulators, supporters, petition signers, and candidates are not aware

of the "dual circulator" restriction when they commence circulating nomination petitions for a candidate seeking a political party's nomination at a primary.

152. Plaintiff, Sigcho Lopez, was a reasonably diligent and adequately-funded candidate for US Representative for the 4th Congressional district, and was nonetheless severely burdened by the "dual circulator" restriction. Plaintiff contacted 3 or 4 professional circulators, and hired two, but they were unable to deliver signatures because they did not have qualified circulators that had not previously circulated for a candidate at the March 17, 2026 primary; similarly, union and committeeperson supporters that had experience circulating petitions were unable to do so for Plaintiff because they had previously circulated for the March 17, 2026 primary. See Sigcho Lopez Declaration, **Exhibit J**.

153. Candidate Sigcho Lopez would have been able to gather 10,000 to 15,000 signatures earlier in the 90 day petition gathering time through paid circulators, if the two circulators he hired were not restricted by the "dual circulator" provisions.

154. Patty Garcia's objectors asserted before the SOEB that Candidate Sigcho Lopez should nonetheless lose entire sheets of petition signers because some of his sheets were circulated by persons who previously circulated for a committeeperson nomination at the March 17, 2026 primary – committeeperson is an elected office, but rather an internal representative of an established political party, which is a private non-governmental entity.

155. Neither the Defendants, nor any election authority in the State, maintain a list, database or other source of the names and addresses of persons who have circulated nomination petitions for established political party candidates seeking a political party's nomination at a primary, so that would-be independent candidates

could check to see if a circulator had previously circulated petitions for a primary.

156. Independent and new political party candidates thus have no process, means, or notice available to them to check and/or verify if a person has previously circulated petitions for an established political party in relation to a candidate's nomination at a primary to avoid the draconian impact of the "dual circulator" restriction in 10 ILCS 5/10-4, and/or prevent being sabotaged by circulators that lie about their history in order to get paid, and then sell out the candidate.

157. The "dual circulator" provision of 10 ILCS 5/10-4 is ripe for abuse and opportunistic use by established political parties, who have in the past, and could in the future, dispatch their operatives who previously circulated for an established party candidate as saboteurs to gather petitions for an independent or new political party candidate, and create reliance upon those signatures that will then draw an objection, but without ability to avoid such entrapment. The objection process is a serious obstacle which drains financial and time resources before an electoral board, and generates an "objection pending" designation that creates a reputational stigma that effectively stops all fundraising, and stays organizational endorsements and forum opportunities.

158. The "dual circulator" restriction abridges the exercise of independent and new party candidates' constitutional right to hire professional petition circulators as confirmed by the Supreme Court in *Meyer v. Grant*, 486 U.S. 414 (1988), and the additional speech protections extended by *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), *Citizens United v. FEC*, 558 U.S. 310 (2010) and and *Chiles v. Salazar*, 607 U.S. ___ (2026).

159. After *Meyer*, *Buckley*, and *Citizens United*, and many substantive changes to

the Election Code, the facts discussed in the *John W. Moore* decisions are incapable of repetition, and the reasoning supporting those decisions is no longer accurate.

160. The "dual circulator" restriction in 10 ILCS 5/10-4 impermissibly and unduly burdens and restricts the content of speech, namely, it prevents persons who may not even be registered voters from exercising their First amendment rights by specifically barring the content of independent and new party candidate positions and dialogue promoting independent candidates, in violation of the First and Fourteenth amendments.

161. Based upon the Supreme Court's balancing test articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), particularly in light of the Supreme Court's holdings in *Meyer v. Grant*, 486 U.S. 414 (1988), *Citizens United v. Fed. Elec. Com'n*, 558 U.S. 310 (2010), and *Chiles v. Salazar*, 607 U.S. ___ (2026), the "dual circulator" provision should be reviewed under strict scrutiny because it restricts the content of speech.

162. Since the "dual circulator" provision of 10 ILCS 5/10-4 serves no legitimate need or purpose of the Defendants, nor any election authority, and has no relationship to the administration of elections, it not narrowly tailored and thus unconstitutionally restricts Plaintiffs' First and Fourteenth Amendment rights.

**COUNT VII**
**"Dual Circulator" restriction in 10 ILCS 5/10-4 is unconstitutional as applied**

1-139. Plaintiffs reassert Paragraphs 1-139 as if fully stated herein.

140-162. Plaintiffs reassert Paragraphs 140-162 of Count VI as if fully stated herein.

163. As applied to Plaintiffs and independent candidates, the "dual circulator" provision in 10 ILCS 5/10-4 is an unconstitutional restriction upon their First and Fourteenth amendment rights to voting and ballot access with no relation to

election administration.

## Preservation of Evidence

163. Plaintiffs request that Defendants secure and preserve all original ballot access petitions submitted by Candidate, Byron Sigcho Lopez, and all email, filings, spreadsheets, notes, transcripts, and other documents in the possession of Defendants related to the SOEB proceeding *Rivera, et al. v. Byron Sigcho Lopez*, No. 26 SOEB GE 508.

164. Notice is provided to the Attorney General as attorney for the Defendants that Plaintiffs seek a decision regarding the constitutionality of Illinois law.

## Prayer For Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter findings and an order as follows:

A. Finding that 10 ILCS 5/10-3 poses a severe burden to independent candidates and the Defendants have no compelling state interest in enforcing the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than an arbitrary 8% of the total votes cast in the district at the last election;

B. Finding that all legitimate state interests in the signature requirement in 10 ILCS 5/10-3 governing independent candidates for US Representative are met through the Defendants' 10% apparent conformity review (1,082 to 1,980 signature lines) and/or through a 5,000 signature requirement;

C. Declaring that the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than an arbitrary 8% of the total votes cast in the district at the last election to

be an unconstitutional denial of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution;

D. Declaring that the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than an arbitrary 8% of the total votes cast in the district at the last election to be an unconstitutional denial of Plaintiffs' rights of Equal Protection under the US Constitution;

E. Declaring that the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than an arbitrary 8% of the total votes cast in the district at the last election or over 10,816 signatures to be an unconstitutional and an impermissible additional qualification to the qualifications for US Rep. defined in US Constitution;

F. Declaring that the "dual circulator" restriction in 10 ILCS 5/10-4 impermissibly restricts the content of independent candidate speech and is facially unconstitutional, or in the alternative, is unconstitutional as applied to independent and new party candidates;

G. Entering a permanent injunction order against Defendants enjoining the Defendants from enforcing the provision in 10 ILCS 5/10-3 that requires independent candidates for US Representative to submit signatures equal to at least 5% but not more than an arbitrary 8% of the total votes cast in the district at the last election;

H. Entering a permanent injunction order against Defendants enjoining the Defendants from enforcing the "dual circulator" provision in 10 ILCS 5/10-4;

I. Awarding litigation costs and reasonable attorney fees pursuant to 42 U.S.C.

§1988; and,

J. Retaining jurisdiction over this action to enforce this honorable court's orders, and grant any further equitable relief which may in the discretion of this Court to be just and appropriate.

Respectfully submitted:

By: /s/ Andrew Finko
One of Plaintiffs' attorneys

Andrew Finko
20 N. Clark St.
Suite 3300
Chicago, IL 60602
P (773) 480-0616
Finkolaw@Fastmail.FM

**Verification pursuant to 28 U.S.C. § 1746**

The undersigned, BYRON SIGCHO LOPEZ declares on personal knowledge and verifies under penalty of perjury under the laws of the United States of America that the facts contained in the foregoing Verified Amended Complaint are true and correct to the best of his knowledge and belief.

By: ______________________________
Byron Sigcho Lopez

**Verification pursuant to 28 U.S.C. § 1746**

The undersigned, JOSE GUERRA, declares on personal knowledge and verifies under penalty of perjury under the laws of the United States of America that the facts contained in the foregoing Verified Amended Complaint are true and correct to the best of his knowledge and belief.

By: ______________________
Jose Guerra

# EXHIBIT A

GALLUP®

JANUARY 12, 2026

# New High of 45% in U.S. Identify as Political Independents

More independents lean Democratic than Republican, giving Democrats edge in party affiliation for first time since 2021



BY **JEFFREY M. JONES**

WASHINGTON, D.C. — A record-high 45% of U.S. adults identified as political independents in 2025, surpassing the 43% measured in 2014, 2023 and 2024. Meanwhile, equal shares of U.S. adults — 27% each — identified as either Democrats or Republicans.

In most years since Gallup began regularly conducting its polls by telephone in 1988, independents have been the largest political group. However, the independent percentage has increased markedly in the past 15 years, typically registering 40% or higher, a level not reached prior to 2011.

**U.S. Political Party Identification, 1988-2025**

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*




Based on annual averages of Gallup telephone interview data

Get the data • Download image

The 2025 findings are based on interviews with more than 13,000 U.S. adults throughout the year. In each survey, Gallup asks U.S. adults whether they identify politically as a Republican, a Democrat or an independent.

The recent increase in independent identification is partly attributable to younger generations of Americans (millennials and Generation X) continuing to identify as independents at relatively high rates as they have gotten older. In contrast, older

generations of Americans have been less likely to identify as independents over time. Generation Z, like previous generations before them when they were young, identify disproportionately as political independents.

In 2025, majorities of Gen Z adults and millennials identified as political independents, as did more than four in 10 Gen X adults. One-third or less of baby boomers and Silent Generation adults were politically independent.

**Party Identification by Birth Cohort, 2025**

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*
*As of today, do you lean more to the Democratic Party or the Republican Party?*

| | Republican % | Independent % | Democrat % |
|---|---|---|---|
| Generation Z (born 1997-2007) | 17 | 56 | 27 |
| Millennials (born 1981-1996) | 21 | 54 | 24 |
| Generation X (born 1965-1980) | 31 | 42 | 25 |
| Baby boomers (born 1946-1964) | 34 | 33 | 32 |
| Silent Generation (born before 1946) | 37 | 30 | 32 |

Based on annual averages of Gallup telephone interview data

"No opinion" responses are not shown.

Get the data • Download image

GALLUP

The higher rate of political independence also results from younger adults today being more likely than young adults in the past to identify as independents. The 56% of Gen Z adults identifying as independents today compares with 47% of millennials in 2012 and 40% of Gen X adults in 1992.

## Democratic-Leaning Independents Give Democrats Edge

Gallup has regularly asked political independents since 1991 whether they lean more toward the Republican or Democratic Party.

Last year, more political independents said they lean toward the Democratic Party than the Republican Party, with the 45% of political independents breaking down into 20% Democratic leaners, 15% Republican leaners and 10% non-leaners. That is a shift from 2024, representing a three-point decline in Republican leaners and a three-point increase in Democratic leaners.

Between 2024 and 2025, identification with both the Republican and Democratic parties fell by one percentage point.

### Changes in U.S. Adults' Party Identification and Leanings, 2024-2025

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*
*As of today, do you lean more to the Democratic Party or the Republican Party?*

| | 2024 % | 2025 % | Change (pct. pts.) |
|---|---|---|---|
| Republican identifiers | 28 | 27 | -1 |
| Republican-leaning independents | 18 | 15 | -3 |
| Non-leaning independents | 8 | 10 | 2 |
| Democratic-leaning independents | 17 | 20 | 3 |
| Democratic identifiers | 28 | 27 | -1 |

Based on annual averages of Gallup telephone interview data

Get the data • Download image

GALLUP

Taking into account Americans' party identification and political leanings, an average of 47% identified as Democrats or said they were independents who lean toward the Democratic Party, while 42% identified as Republicans or leaned Republican. This breaks a three-year stretch in which Republicans held an edge in party affiliation.

Party preferences in 2025 essentially reverted back to what they were during Donald Trump's first term as president, when Democrats held leads averaging five points. Democrats — who usually hold an edge — have had larger advantages than now in

1992 and 1993, 1996 through 1999, and 2006 through 2009.

### U.S. Political Party Identification and Leaning, 1991-2025

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*
*As of today, do you lean more to the Democratic Party or the Republican Party?*




Based on annual averages of Gallup telephone interview data

Get the data • Download image

GALLUP

The shift in the annual average leaned party preferences, moving from a one-point Republican advantage in 2024 to a five-point Democratic advantage in 2025, somewhat obscures the true extent of movement in party affiliation that has occurred over the past 16 months. In the fourth quarter of 2024, which spanned the last month of the presidential election campaign and most of the Trump presidential transition, Republicans held a four-point lead in party affiliation. By the first quarter of 2025, that advantage had disappeared and the parties were on equal footing. By the second quarter, Democrats had gained an edge of three points, 46% to 43%, which expanded to seven points in the third quarter and eight points in the fourth quarter.

**Recent Quarterly Averages of U.S. Adults' Party Identification and Leaning**

*In politics, as of today, do you consider yourself a Republican, a Democrat or an independent?*
*As of today, do you lean more to the Democratic Party or the Republican Party?*




Based on quarterly averages of Gallup telephone interview data

U.S. adults with no party identification or leaning are not shown.

Get the data • Download image

GALLUP

## Conservative Lead in Ideology Narrowest Yet

In addition to asking Americans for their party identification and leanings, Gallup asks respondents in each survey to describe their political views using a scale ranging from very liberal to very conservative. As usual, more Americans in 2025 described their views as "very conservative" or "conservative" (35%) than as "very liberal" or "liberal" (28%), with 33% identifying as "moderate." However, the seven-point conservative advantage over liberals in 2025 is the smallest Gallup has measured in annual averages dating back to 1992. It is only the third time the conservative lead has been less than 10 points.

## U.S. Political Ideology Identification, 1992-2025

*How would you describe your political views — very conservative, conservative, moderate, liberal or very liberal?*




Based on annual averages of Gallup telephone interview data

Get the data • Download image

GALLUP

Over time, more Americans have identified as liberal (up from 17% in 1992) and fewer as moderate (down from 43%), with conservative identification more steady.

Changes in ideological identification are mainly apparent among Democrats — 59% now identify as liberal, up from 33% in 2005 and 25% in 1994. Increased liberal identification in recent years is seen among most subgroups of Democrats.

Republicans' and independents' ideological identification has changed less over time, although more Republicans identify as conservative today (77%) than in 1994 (58%). Meanwhile, slightly less than half of independents, 47%, continue to identify as moderates, with the remainder tilting more toward conservative than liberal identification.

Case: 1:26-cv-09156 Document #: 41 Filed: 10/21/26 Page 68 of 137 PageID #:592

## Trends in Ideological Identification, by Political Party

*How would you describe your political views — very conservative, conservative, moderate, liberal or very liberal?*




Based on annual aggregates of Gallup telephone interview data

GALLUP

## Bottom Line

The political landscape in the U.S. changed greatly in the first year of Trump's second term as president. A record-high percentage of U.S. adults said they identify with neither major party, and a shift in independents' political leanings caused the Republican Party advantage that aided Trump's reelection to dissipate almost as soon as he took office. Over the course of the year, the Democratic Party regained and expanded its advantage in party leanings, a trend that was borne out in the party's strong performance in 2025 special elections compared to similar races in the more Republican-favorable 2024 election cycle.

Importantly, these party shifts do not indicate that Americans are warming to the Democratic Party. In fact, favorable ratings of the Democratic Party are no better than those of the Republican Party, and are among the worst Gallup has recorded for the Democratic Party historically.

Rather, as in 2022 through 2024, these recent political shifts appear to be a consequence of one party's association with an unpopular incumbent president (the Democrats with Biden and now Republicans with Trump). Negative evaluations of the president's performance appear to persuade a subset of Americans, primarily political independents who have weaker attachments to either party, to side with the opposition party.

This dynamic has led to frequent changes in the party power structure in Washington in recent federal election cycles, with the incumbent president's party losing control of the presidency or one house of Congress in each of the past six presidential or midterm elections.

*Stay up to date with the latest insights by following @Gallup on X and on Instagram.*

*Learn more about how the Gallup Poll Social Series works.*

SURVEY METHODS

RELEASE DATE: January 12, 2026

SOURCE: Gallup https://news.gallup.com/poll/700499/new-high-identify-political-independents.aspx

CONTACT: Gallup World Headquarters, 901 F Street, Washington, D.C., 20001, U.S.A

+1 202.715.3030

Copyright © 2026 Gallup, Inc. All rights reserved.

Gallup uses cookies to ensure the best website experience. Please select the cookies you want. You can change this setting anytime, but doing so may impair functionality on our websites. Privacy Statement

Accept All Manage Preferences

# Cookie Settings

Gallup uses cookies to ensure the best website experience. Please select the cookies you want. You can change this setting anytime, but doing so may impair functionality on our websites. Privacy Statement

Essential
We use essential cookies to provide our visitors basic functions through our websites. Without these cookies, our websites will not work properly.

☐
Analytics
We use statistics cookies to collect information anonymously. This information helps us understand how our visitors use our websites.

☐
Marketing
Marketing cookies help Gallup improve the ads we display on third-party websites and allow third parties to gather web-usage information required to determine ad performance.

---

Accept All Save Preferences

# EXHIBIT B

GALLUP®

AUGUST 18, 2022

# Millennials, Gen X Clinging to Independent Party ID




BY **JEFFREY M. JONES**

## Story Highlights

- More millennials identifying as independent as they get older
- Generation X maintaining higher levels of independent identification
- Republican identification much higher among older generations

WASHINGTON, D.C. -- Historically, Americans have had weak attachments to the two major U.S. political parties in young adulthood, but as they get older, they usually became more likely to identify as a Republican or a Democrat. That historical pattern, evident in the Silent and baby boom generations, appears to be changing. Generation X and millennials, who are now middle aged or approaching it, have maintained or even expanded their identification as political independents in recent decades.

Currently, 44% of Generation X identifies as political independents, which is unchanged from three decades ago, when the first part of the generation was entering adulthood. The majority of millennials, 52%, are independent, and that percentage has increased by five percentage points in each of the past two decades.

Meanwhile, Gallup data show far lower, and declining, proportions of independents among the Silent Generation (now 26%) and baby boomers (now 33%), consistent with the historical pattern.

Members of Generation Z who have reached adulthood match millennials in the percentage of political independents, at 52%.

The data also reveal that each younger generation has had a greater proportion of independents throughout their lives than the prior generation did, even at similar stages in their life. For example, the 44% of Generation X (now aged 42 to 57) that currently identifies as independent is 10 points higher than the 34% of baby boomers who said they were independents in 2002 (when they were aged 38 to 56).

These emerging generational patterns of party identification help explain why independent identification has reached levels in the past decade never seen before in Gallup polling. Since 2011, 40% or more of U.S. adults have identified as political

independents in nearly every year. Before that year, that level had never been reached.

## Independent Identification Varies Inversely With Republican Identification

Whereas younger generations tend to be more politically independent than older generations, older Americans are much more likely to identify as Republicans. In fact, Republican identification is most common among the oldest generation of Americans -- the Silent Generation, at 39% -- and is less common at each lower rung on the generational ladder, down to 17% among Generation Z.

Democratic Party identification is more uniform across the five generational groupings, ranging between 27% and 35%.

### Party Identification, by Generation, 2022 to Date

In politics, as of today, do you consider yourself a Republican, a Democrat, or an independent?

| | % Republican | % Independent | % Democrat |
|---|---|---|---|
| Silent Generation (born 1928-1945) | 39 | 26 | 35 |
| Baby boomers (born 1946-1964) | 35 | 33 | 32 |
| Generation X (born 1965-1980) | 30 | 44 | 27 |
| Millennials (born 1981-1996) | 21 | 52 | 27 |
| Generation Z (born 1997-2012) | 17 | 52 | 31 |

January-July 2022

Get the data • Download image

GALLUP

These results are based on aggregated data from 2022 Gallup surveys to date, encompassing more than 6,000 interviews with U.S. adults and at least 500 in each generation. The results for 2022 are similar to those for 2021, which are based on even larger samples.

Gallup also analyzed its 1992, 2002 and 2012 data to show how party identification has changed among the generations over time. The most notable changes in recent decades are that the Silent Generation has become increasingly Republican and less independent, while independent identification among Generation X and millennials has held steady or increased, compared with when the groups first entered adulthood.

The following sections show the trends in party identification for each generation over the past 30 years. There are no trend data for Generation Z because no one in that generation had reached adulthood until 2015.

## Silent Generation

Members of the Silent Generation were born between 1928 and 1945 and, therefore, are primarily between the ages of 77 and 94 today. The group has been less likely to identify as independents than other generations over the past 30 years and is even less likely to do so today.

Since 1992, the percentage of Silent Generation members who identify as political independents has decreased from 35% to 26%, which has been accompanied by an equal increase in Republican identification.

Over the past 30 years, the proportion of Silent Generation people who identify as Democrats has been relatively stable.

### Trend in Party Identification Among U.S. Adults in the Silent Generation, 1992-2022

The Silent Generation is defined as those born between 1928 and 1945.




Members of the Silent Generation were aged 47 to 64 in 1992; 57 to 74 in 2002; 67 to 84 in 2012; and are 77 to 94 now.

Get the data • Download image

GALLUP

## Baby-Boom Generation

The pattern in party identification among baby boomers, born between 1946 and 1964 and aged 58 to 76 today, is largely similar to that for the Silent Generation. Fewer baby boomers today (33%) than in 1992 (40%) identify as political independents, with most of that change offset by an increase in Republican identification, from 29% to 35%. The 32% of baby boomers who identify as Democrats is largely unchanged over the past 30 years.

Baby boomers' party preferences have been evenly split over the past three decades.

**Trend in Party Identification Among U.S. Adults in the Baby Boom Generation, 1992-2022**

The baby boom generation is defined as those born between 1946 and 1964.




Members of the baby boom generation were aged 28 to 46 in 1992; 38 to 56 in 2002; 48 to 66 in 2012; and are 58 to 76 now.

Get the data • Download image GALLUP

## Generation X

Generation X, whose members were born between 1965 and 1980 and are aged 42 to 57 today, has a higher proportion of independents than preceding generations and, unlike those generations, that percentage has not shrunk over time.

In 1992, when only about half of Gen X had reached adulthood, 44% identified as independents. Ten years later, when all generation members were at least 22 years old, a slightly smaller percentage, 39%, said they were independent. But in both 2012 and 2022, the proportion of Generation X members who are independent has returned to the mid-40% range.

The adult members of Generation X in 1992 were more likely to identify as Republicans than Democrats, 32% to 24%. This group came of age when Republicans held the White House for 12 years between 1981 and 1992. Over time, and as more of Generation X reached adulthood, Republicans and Democrats have claimed roughly equal proportions of the generation, including 30% of the former and 27% of the latter this year.

**Trend in Party Identification Among U.S. Adults in Generation X, 1992-2022**

Generation X is defined as those born between 1965 and 1980.




Adult members of Generation X were aged 18 to 27 in 1992; 22 to 37 in 2002; 32 to 47 in 2012; and are 42 to 57 now.

Get the data • Download image

GALLUP

## Millennial Generation

Millennials, born between 1981 and 1996 and aged 26 to 41 today, have become increasingly independent since 2002, when the oldest members of the generation were first turning 18. That year, 42% of adult millennials were independent. Ten years later, when all but the youngest millennials were adults, 47% identified as independent. Now, a 52% majority of the group does.

Millennials have been more likely to identify as Democrats than Republicans over the past 20 years, but fewer align with either party than did 10 and 20 years ago.

**Trend in Party Identification Among U.S. Adults in the Millennial Generation, 2002-2022**

The millennial generation is defined as those born between 1981 and 1996.




Adult members of the millennial generation were aged 18 to 21 in 2002; 18 to 31 in 2012; and are 26 to 41 now.

Get the data • Download image GALLUP

## Bottom Line

Younger generations of U.S. adults are much more likely than older generations to identify as independents and, to this point, Generation X and millennials have become no less likely to do so as they have gotten older, in contrast to the generations that preceded them.

The youngest adults, those in Generation Z, are as likely as millennials to think of themselves as independents. In fact, like millennials, more describe themselves this way than identify with either political party.

These population trends appear at odds with the political parties' actions, as they have seemingly tried to appeal more to their own bases than to the larger group of unaffiliated voters. This disconnect may explain low levels of trust in government and poor views of both parties in general. While Republican messaging in recent decades may have increased the party's support among older generations of Americans in recent decades, it may have cost the party support among younger generations, with only about one in five adults younger than 41 identifying as Republican.

The trends to date for Generation X and millennials do not preclude their showing declining political independence as they continue to age. However, even if those generations become less likely to identify as independents in the future, they will still likely have higher proportions of independents than members of their preceding generations had at similar points in their lives.

*To stay up to date with the latest Gallup News insights and updates, follow us on Twitter.*

*Learn more about how the Gallup Poll Social Series works.*

SURVEY METHODS

RELEASE DATE: August 18, 2022

SOURCE: Gallup https://news.gallup.com/poll/397241/millennials-gen-clinging-independent-party.aspx

CONTACT: Gallup World Headquarters, 901 F Street, Washington, D.C., 20001, U.S.A
+1 202.715.3030

Copyright © 2026 Gallup, Inc. All rights reserved.

Gallup uses cookies to ensure the best website experience. Please select the cookies you want. You can change this setting anytime, but doing so may impair functionality on our websites. Privacy Statement

Accept All Manage Preferences



# Cookie Settings

Gallup uses cookies to ensure the best website experience. Please select the cookies you want. You can change this setting anytime, but doing so may impair functionality on our websites. Privacy Statement

Essential

We use essential cookies to provide our visitors basic functions through our websites. Without these cookies, our websites will not work properly.

Analytics

We use statistics cookies to collect information anonymously. This information helps us understand how our visitors use our websites.

Marketing

Marketing cookies help Gallup improve the ads we display on third-party websites and allow third parties to gather web-usage information required to determine ad performance.

Accept All Save Preferences

# EXHIBIT C



State of Illinois

# 2026 CANDIDATE'S GUIDE

Issued by the
Illinois State Board of Elections

*Amended on 2/17/2026*

# AMENDMENTS

| Date | Revised Page Number | Change Made |
|---|---|---|
| 7/2/2025 | N/A | Original Issue Date |
| 7/7/2025 | 32 | Added State Senate districts not on the 2026 election ballot unless a vacancy in office occurs |
| 7/7/2025 | 34 | Maximum signature requirement added to Independent column and removed from New Party column |
| 7/7/2025 | 42 | Subcircuits SBE Form P-16A added |
| 7/7/2025 | 71 | Districts elected to 2-year terms and 4-year terms corrected |
| 7/10/2025 | 59 | Signature requirements corrected |
| 7/10/2025 | 35 | Minimum signature requirement for District 36 Independent and New Party corrected |
| 7/10/2025 | 36 | Maximum signature requirement District 86 updated |
| 7/10/2025 | 28 | Maximum signature requirement for District 4 Independent updated |
| 7/31/2025 | 53 | Updated State Central Committeepersons Gender Declaration Form link |
| 8/5/2025 | 70 | Updated term begins date |
| 2/17/2026 | 71 | Form P-7C updated to include 2026 signature requirements |

# PREFACE

## THE 2026 CANDIDATE'S GUIDE

This Candidate's Guide has been prepared to provide information for candidates seeking office in 2026. Information is provided regarding nomination procedures and the objection process. A signature requirements section is included with each specific office in this guide. Answers to some of the more frequently asked questions about nominating petitions and procedures can be found on page 75.

All citations contained in this guide refer to the Illinois Election Code (10 ILCS 5/1-1 *et seq.*, as amended) or as otherwise indicated. This guide may be amended to include new legislation and court decisions as they arise. Please visit the Illinois State Board of Elections' website (www.elections.il.gov) for any updates

**Legal information contained in this guide is not binding and should not be construed as legal advice or sufficient argument in response to an objection to any candidate's nominating papers. The State Board of Elections recommends that all prospective candidates consult with competent legal counsel when preparing their nomination papers.**

Statutory deadlines for filing objections and for withdrawing from all but one incompatible office will depend on the filing period. Specific deadline dates can be found in the SBE Election and Campaign Finance Calendar for 2026 located on the publications page under "Election Guides." The calendar, this guide, and filing date announcements can be found on the State Board of Elections' website.

Additional information may be obtained by contacting your election authority or the State Board of Elections.

## APPARENT CONFORMITY

The State Board of Elections conducts an "apparent conformity" review of all nominating petitions filed therewith. The review will take place after a petition is filed and will be limited to determining the following:

(1) whether a signed Statement of Candidacy has been filed, and (2) whether the filed nominating sheets contain gross signatures equal to or exceeding 10% of the minimum number of signatures required for the office sought.

All candidates whose petitions fail the apparent conformity review will be notified in writing and given the opportunity to appear before the State Board of Elections at its first meeting after the petition filing deadline to show good cause why the petition should not be rejected on the basis of non-conformity.

Please note, SBE employees are not available during filing periods to notarize documents.

## OTHER PUBLICATIONS

The State Board of Elections also produces additional guides that can be helpful when preparing to run for office. The Election and Campaign Finance Calendar lists more specific dates and deadlines to follow, and the County Officials book and Federal and State Officers book, located on the publications page under "Directory of Officials," have relevant contact information for elected officials. On our website under the Campaign Disclosure tab, you can find information regarding campaign disclosure and tutorials on the financial filing process.

## CONTACT INFORMATION

Illinois State Board of Elections – Springfield Office
2329 South MacArthur Boulevard
Springfield, Illinois 62704
Phone: (217) 782-4141
Fax: (217) 782-5959

Illinois State Board of Elections – Chicago Office
69 West Washington Street, Pedway LL-08
Chicago, Illinois 60602
Phone: (312) 814-6440
Fax: (312) 814-6485

webmaster@elections.il.gov

www.elections.il.gov

# EXHIBIT D

# UNITED STATES REPRESENTATIVE

## NOMINATION PAPERS

**Petitions:** Established Party (SBE Form P-11); Independent (SBE Form P-3); New Party (SBE Form P-8)
**Statement of Candidacy:** Established Party (SBE Form P-1); Independent (SBE Form P-1B); New Party (SBE Form P-1D)
**Loyalty Oath (optional):** All candidates (SBE Form P-1C)
**Statement of Economic Interests**: Not required for federal offices.

## SIGNATURE REQUIREMENTS

**Established Party:** Not less than .5% (.005) of the qualified primary electors of their party in the congressional district. (10 ILCS 5/7-10(b))
**Independent:** Not less than 5% nor more than 8% (or 50 more than the minimum, whichever is greater) of the total number of persons who voted at the last regular general election within the congressional district. (10 ILCS 5/10-3)
**New Party:** Not less than 5% of the total number of persons who voted at the last regular general election within the congressional district. There is no maximum signature requirement. (10 ILCS 5/10-2)

## FILING INFORMATION

**Established Party:** Not more than 141 nor less than 134 days prior to the General Primary. (10 ILCS 5/7-12)
**Independent & New Party:** Not more than 169 nor less than 162 days prior to the General Election. (10 ILCS 5/10-6)

QUALIFICATIONS:

- 25 years of age
- United States citizen for seven years
- Inhabitant of Illinois at the time of the election
- Registered voter

(United States Constitution, Article 1, Section 2; 10 ILCS 5/7-10, 10-5)

FILING PERIODS:

**Established Party:**
October 27 – November 3, 2025

**Independent and New Party:**
May 18 – May 26, 2026

TERM:

**Term of office:** Two years (United States Constitution, Article 1, Section 2)

**Term begins:** Noon, January 3, 2027 (United States Constitution, Amendment XX, Section 2)

All candidates will file with the Illinois State Board of Elections, 2329 S. MacArthur Blvd., Springfield, IL 62704, either by mail or in person. Nomination papers received via other delivery methods (such as UPS or FedEx) will not be included in a ballot placement lottery.

**Campaign Contributions:** All candidates file with the Federal Election Commission (FEC), 1050 First Street NE, Washington D.C., 20463 (20002 for other delivery services outside U.S. Postal Service). If you have specific questions, you may call them at (800) 424-9530.

**NOTE:** Federal filing requirements are subject to change by the FEC. We advise that you contact the FEC for the latest information on filing requirements.

## SIGNATURE CALCULATIONS

| District | Democrat | Republican | Independent | New Party |
|---|---|---|---|---|
| 1 | 1071 | 546 | 16,652 – 26,641 | 16,652 |
| 2 | 979 | 471 | 15,065 – 24,103 | 15,065 |
| 3 | 875 | 445 | 13,664 – 21,861 | 13,664 |
| 4 | 697 | 371 | 10,816 – 17,304 | 10,816 |
| 5 | 1271 | 577 | 19,176 – 30,680 | 19,176 |
| 6 | 984 | 852 | 18,959 – 30,333 | 18,959 |
| 7 | 1164 | 232 | 14,161 – 22,656 | 14,161 |
| 8 | 865 | 707 | 15,721 – 25,152 | 15,721 |
| 9 | 1173 | 540 | 17,852 – 28,562 | 17,852 |
| 10 | 995 | 656 | 16,814 – 26,902 | 16,814 |
| 11 | 1000 | 799 | 18,465 – 29,543 | 18,465 |
| 12 | 520 | 1362 | 18,840 – 30,143 | 18,840 |
| 13 | 957 | 727 | 16,885 – 27,015 | 16,885 |
| 14 | 918 | 780 | 17,056 – 27,288 | 17,056 |
| 15 | 583 | 1545 | 19,273 – 30,835 | 19,273 |
| 16 | 738 | 1555 | 19,800 – 31,679 | 19,800 |
| 17 | 852 | 744 | 16,035 – 25,654 | 16,035 |

# EXHIBIT E

| District | Republican votes cast | signature requirement | Democratic votes cast | signature requirement | Total Ballots Cast | New Party signature requirement | Minimum Independent signature requirement | Maximum Independent signature requirement |
|---|---|---|---|---|---|---|---|---|
| | | 0.5% | | 0.5% | | 5% | 5% | 8% |
| 1st Congressional | 109,192 | 546 | 214,172 | 1071 | 333,022 | 16,652 | 16,652 | 26,641 |
| 2nd Congressional | 94,004 | 471 | 195,777 | 979 | 301,292 | 15,065 | 15,065 | 24,103 |
| 3rd Congressional | 88,940 | 445 | 174,825 | 875 | 273,274 | 13,664 | 13,664 | 21,861 |
| 4th Congressional | 74,153 | 371 | 139,343 | 697 | 216,305 | 10,816 | 10,816 | 17,304 |
| 5th Congressional | 115,269 | 577 | 254,174 | 1271 | 383,509 | 19,176 | 19,176 | 30,680 |
| 6th Congressional | 170,358 | 852 | 196,647 | 984 | 379,169 | 18,959 | 18,959 | 30,333 |
| 7th Congressional | 46,368 | 232 | 232,778 | 1164 | 283,202 | 14,161 | 14,161 | 22,656 |
| 8th Congressional | 141,339 | 707 | 172,920 | 865 | 314,401 | 15,721 | 15,721 | 25,152 |
| 9th Congressional | 107,933 | 540 | 234,483 | 1173 | 357,028 | 17,852 | 17,852 | 28,562 |
| 10th Congressional | 131,025 | 656 | 198,873 | 995 | 336,278 | 16,814 | 16,814 | 26,902 |
| 11th Congressional | 159,630 | 799 | 199,825 | 1000 | 369,290 | 18,465 | 18,465 | 29,543 |
| 12th Congressional | 272,254 | 1362 | 103,926 | 520 | 376,794 | 18,840 | 18,840 | 30,143 |
| 13th Congressional | 145,329 | 727 | 191,339 | 957 | 337,693 | 16,885 | 16,885 | 27,015 |
| 14th Congressional | 155,887 | 780 | 183,446 | 918 | 341,103 | 17,056 | 17,056 | 27,288 |
| 15th Congressional | 308,825 | 1545 | 116,519 | 583 | 385,446 | 19,273 | 19,273 | 30,835 |
| 16th Congressional | 310,925 | 1555 | 147,403 | 738 | 395,995 | 19,800 | 19,800 | 31,679 |
| 17th Congressional | 148,677 | 744 | 170,261 | 852 | 320,681 | 16,035 | 16,035 | 25,654 |
| **Statewide Total Signatures** | | **12,909** | | **15,642** | | **285,234** | **285,234** | **456,351** |

| | Dem[1] | Rep[2] | Indep / New Party Min. 5%[3] | Indep / New Party Min. 5,000[4] |
|---|---|---|---|---|
| 1 | 1,071 | 546 | 16,652 | 5,000 |
| 2 | 979 | 471 | 15,065 | 5,000 |
| 3 | 875 | 445 | 13,664 | 5,000 |
| 4 | 697 | 371 | 10,816 | 5,000 |
| 5 | 1,271 | 577 | 19,176 | 5,000 |
| 6 | 984 | 852 | 18,959 | 5,000 |
| 7 | 1,164 | 232 | 14,161 | 5,000 |
| 8 | 865 | 707 | 15,721 | 5,000 |
| 9 | 1,173 | 540 | 17,852 | 5,000 |
| 10 | 995 | 656 | 16,814 | 5,000 |
| 11 | 1,000 | 799 | 18,465 | 5,000 |
| 12 | 520 | 1,362 | 18,840 | 5,000 |
| 13 | 957 | 727 | 16,885 | 5,000 |
| 14 | 918 | 780 | 17,056 | 5,000 |
| 15 | 583 | 1,545 | 19,273 | 5,000 |
| 16 | 738 | 1,555 | 19,800 | 5,000 |
| 17 | 852 | 744 | 16,035 | 5,000 |
| **Total Voter Signatures for ALL Districts** | **15,642** | **12,909** | **285,234** | **85,000** |

1 10 ILCS 5/7-10(b) "the candidate's petition for nomination must contain at least the number of signatures equal to 0.5% of the qualified primary electors of his or her party in his or her congressional district." [signatures are not limited by a maximum percent]

10 ILCS 5/7-10(k) "For political subdivisions, the number of primary electors shall be determined by taking the total vote cast for the candidate for that political party who received the highest number of votes in the political subdivision at the last regular election at which an officer was regularly scheduled to be elected from that subdivision."

2 Same as for Democratic Party, fn. 1.

3 10 ILCS 5/10-3 "by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area." [signatures above the 8% maximum number are not counted]

4 10 ILCS 5/10-3 "For the first election following a redistricting of congressional districts, nomination papers for an independent candidate for **congressperson** shall be signed by at least **5,000** qualified voters of the congressional district. For the first election following a redistricting of legislative districts, nomination papers for an independent candidate for State Senator in the General Assembly shall be signed by at least 3,000 qualified voters of the legislative district. For the first election following a redistricting of representative districts, nomination papers for an independent candidate for State Representative in the General Assembly shall be signed by at least 1,500 qualified voters of the representative district."

# EXHIBIT F

Case: 1:26-cv-09156 Document #: 41 Filed: 10/21/26 Page 97 of 137 PageID #:621

**NEWS > POLITICS**

# House admonishes Rep. Jesús 'Chuy' García over ballot maneuver as most Democrats defend Chicago congressman




By **DANIEL C. VOCK** | dcvock@gmail.com | For the Chicago Tribune and **DAN PETRELLA** | dpetrella@chicagotribune.com | Chicago Tribune
PUBLISHED: November 18, 2025 at 5:48 PM CST

Getting your **Trinity Audio** player ready...

WASHINGTON — Twenty-three congressional Democrats — including two fellow members from Illinois — joined with Republicans on Tuesday in favor of a resolution admonishing U.S. Rep. Jesús "Chuy" García for using old-school tactics to clear the way for his own House successor.

Opt-Out Signal Honored

U.S. Reps. Bill Foster of Naperville and Eric Sorensen of Moline were the only Illinois Democrats to join Republicans in voting 236-183 for the resolution that chastises García for his move two weeks ago in which he suddenly dropped out of his reelection race and cleared the way for his then-chief of staff, Patty García, to succeed him. The resolution was introduced by a Democrat from the state of Washington who argued the move deprived voters in Illinois' heavily Democratic 4th Congressional District of a meaningful choice in the Democratic primary for his House seat next year.

While the resolution will have no practical impact on the congressman's remaining time in office or on Patty García's efforts to take the seat, its passage is the latest slap at the outgoing congressman for his insider political maneuvering and could cast a cloud over Patty García, who is no relation to the congressman, should she win the office next year.

Chuy García originally filed for reelection but later changed his mind. Instead of making a public announcement right away, the congressman helped Patty García, who has since resigned as chief of staff, collect the necessary signatures to appear on the ballot, which were submitted at the last minute.

Rep. Marie Gluesenkamp Perez, an iconoclastic Democrat from Washington state, led the effort to reprimand the prominent Chicago lawmaker. During a debate Monday night, she insisted the vote was not about García's long record of public service, but about how he decided to leave public life.

"The consequences of subverting an election and choosing your successor are a slide toward a very ugly future for our country," Gluesenkamp Perez said. "We know about it. That conveys on us a responsibility, not just when it's politically convenient to condemn someone, but when it's in your own family. ... Whether it hurts you or not, you have to have confidence that Americans will make the choice for themselves."

García defended his last-minute decision, saying he had a change of heart after considering his own health, his wife's multiple sclerosis and their recent decision to adopt one of their grandchildren after the death of his daughter.

Opt-Out Signal Honored

"I wasn't expecting to stand here to debate my retirement," he told his colleagues, "but before any of us are members of Congress, we are husbands, we are grandfathers, we're sons, we're mothers, we're sisters. We're regular people. But life reminds us that our jobs come second to the people waiting for us at home."

Most members of the Democratic caucus, including House Minority Leader Hakeem Jeffries and the Congressional Hispanic Caucus, rallied around García. Many Democrats objected to having to deal with an intraparty dispute as soon as they returned from a nearly two-month House recess to end a government shutdown.

U.S. Rep. Sydney Kamlager-Dove, a California Democrat, called the motion "character assassination."

She said House Democrats shouldn't be fighting each other at a time when the Trump administration cut food stamps during a government shutdown, was ordering military strikes on boats in international waters without congressional approval and was presiding over the rolling back of health care subsidies. House Democrats were also pushing for legislation requiring the Justice Department release documents related to its investigation of the late convicted sex offender Jeffrey Epstein, she noted, a measure that eventually passed the House overwhelmingly.

"Those are issues that are far more pressing and critical to Americans," she said. "I was home in my district this weekend. Not one person asked me about Chuy García. Not one person."

U.S. Rep. Jan Schakowsky, a Democrat who represents parts of the North Side of Chicago and many north suburbs, chafed at the idea that a lawmaker from outside the area was coming after García, who had a long career in Chicago politics.

"For someone who doesn't know about the city of Chicago and the role that (García) has played, to find some outside idea that he has somehow cheated the city of Chicago, or the people of the city of Chicago: Are you kidding?" Schakowsky said. "There has not been one single person that has stood up in Chicago and said that there should be some sort of punishment for our great friend."

Opt-Out Signal Honored

Patty García declined to comment Tuesday on the resolution through a spokeswoman. But she defended the ballot maneuver in an interview with the Tribune last week at a restaurant in Chicago's Little Village neighborhood.

Given the timing of the congressman's decision, there was little time to consider making a public announcement to would-be primary opponents, his former chief of staff said.

"I'll be honest, I mean, on that Friday, there's so many trains having to run," she said.

Before declaring her own candidacy, she had to resign from her federal position and "make sure that my congressional team is in good hands," she said. At the same time, she was working with district staff and allies to help constituents whose families had been affected by federal immigration enforcement actions, she said.

"The immediate reaction was: 'Are we going to be OK not having you help the team, right?' … I've been kind of (the) lead on these rapid response (efforts) with our team members," García said.

On top of that, the political organization also had to quickly put together plans to gather the necessary signatures to secure her spot on the ballot, she said, an effort that used 75 volunteers to collect about 2,500 signatures in just a couple of days.

A spot on the 4th Congressional District primary ballot required only 697 valid voter signatures for the March primary election, but candidates typically collect several times that amount to ensure they can withstand any legal challenges to their petitions. The period for filing objections closed Nov. 10, without anyone challenging her petitions.

Like her former boss, García said their political organization thought other candidates already were circulating petitions to challenge the congressman, given that he faced a primary challenge two years ago, although she acknowledged she wasn't aware of any specific candidates.

And while she will be uncontested in the primary, García noted she'll still face at least one Republican opponent in November, along with possible independent candidates.

Opt-Out Signal Honored

Progressive Ald. Byron Sigcho-Lopez, 25th, has said he is considering a bid, and Mayra Macías, formerly of the group Latino Victory Project, is said to be exploring a run. The related Latino Victory Fund has endorsed Gluesenkamp Perez in her reelection campaign.

“There’s still a misconception of like, ‘Well, the race is done. You’re it,’” García said. “And the reality is, it isn’t. I have an endorsement from the congressman, and it’s that, it’s an endorsement, and I still have to run a campaign.”

Prior to joining the congressman’s staff in 2019, Patty García worked for groups including the National Association of Latino Elected and Appointed Officials Educational Fund. She earned a doctorate in educational policy studies from the University of Illinois Urbana-Champaign in 2011.

*Petrella reported from Chicago.*

## MORE FROM OUR NEWSROOM



**Letters: The Obama Presidential Center tower is a monument to the former...**

Saturday, June 20



**ICE arrests shift to courthouses and immigration check-ins as enforcement...**

Friday, June 19




**Boyfriend charged with murder in fatal stabbing of Calumet City woman, 27, in...**

Friday, June 19

Opt-Out Signal Honored



**Editorial: Attorney Dan**

# H. Res. 878

## *In the House of Representatives, U. S.,*

*November 18, 2025.*

Whereas, on October 27, 2025, Representative Chuy García of Illinois filed nominating petitions to be on the Democratic primary ballot in March 2026;

Whereas, on November 5, 2025, on the last day of filing, Representative García's Chief of Staff, Patty García, submitted her own paperwork to enter the Democratic primary;

Whereas, on November 6, after the filing deadline, Representative García confirmed that he would not be seeking another term in 2026 and would be withdrawing his nominating petitions;

Whereas Representative García's Chief of Staff was the only Democrat who filed to run in the primary at the direction of Representative García, undermining the process of a free and fair election; and

Whereas Representative García's actions are beneath the dignity of his office and incompatible with the spirit of the United States Constitution: Now, therefore, be it

*Resolved,* That the House of Representatives disapproves of the behavior of the Representative from Illinois Mr. García.

Attest:

*Clerk.*

# EXHIBIT G

STATE OF ILLINOIS )
) ss
COUNTY OF COOK )

**BEFORE THE STATE BOARD OF ELECTIONS SITTING AS THE STATE OFFICERS ELECTORAL BOARD**
**FOR THE HEARING AND PASSING UPON OF OBJECTIONS**
**TO NOMINATION PAPERS OF NEW PARTY AND INDEPENDENT CANDIDATES**
**FOR THE NOVEMBER 3, 2026, GENERAL ELECTION**

| | | |
|---|---|---|
| IN THE MATTER OF OBJECTIONS BY | ) | |
| | ) | |
| Jeremy Rivera, Rene A. Munoz, and Sandra Mendez, | ) | |
| Objectors, | ) | |
| v. | ) | **No. 26 SOEB GE 508** |
| | ) | |
| Byron Sigcho Lopez, | ) | |
| Candidate. | ) | |

**DECISION**

The State Board of Elections, sitting as the duly constituted State Officers Electoral Board, and having convened on July 21, 2026, at 69 W. Washington, Chicago, Illinois, and via videoconference at 2329 S. MacArthur Blvd., Springfield, Illinois, and having heard and considered the objections filed in the above-titled matter, hereby determines and finds that:

1. The State Board of Elections has been duly and legally constituted as the State Officers Electoral Board pursuant to Sections 10-9 and 10-10 of the Election Code (10 ILCS 5/10-9 and 5/10-10) for the purpose of hearing and passing upon the objections filed in this matter and as such, has jurisdiction in this matter.

2. On June 2, 2026, Jeremy Rivera, Rene A. Munoz, and Sandra Mendez timely filed an objection to the nomination papers of Byron Sigcho Lopez, Independent candidate for the office of Representative in Congress for the 4th Congressional District.

3. A call for the hearing on said objection was duly issued and was served upon the Members of the Board, the Objectors, and the Candidate by registered mail as provided by statute unless waived.

4. On June 9, 2026, the State Officers Electoral Board voted to adopt the Rules of Procedure, and a hearing officer was assigned to consider arguments and evidence in this matter.

5. From June 11, 2026, through June 12, 2026, a records examination was conducted by the staff of the State Board of Elections. Candidate collected a total of 17,227 signatures. There were 10,257 line objections reviewed by State Board of Elections staff. Of those lines reviewed, 7,633 of the objections were sustained, and 2,642 were overruled. At the conclusion of the records examination, Candidate had 9,594 apparently valid signatures, which is 1,222 under the statutory minimum of 10,816 per Section 10-3 of the Election Code.

6. On June 11, 2026, Candidate filed a Motion to Dismiss. On June 15, 2026, Objectors filed a Response to Candidate's Motion to Dismiss. On July 1, 2026, Candidate filed a Memo of Law. On July 2, 2026, Objectors filed a Response to Candidate's Memorandum of Law.

7. On June 11, 2026, Candidate requested an extension of the Rule 9 Motion Period. The Hearing Officer granted the parties an extension of the Rule 9 Motion Period to June 24, 2026, to submit evidence.

8. On June 15, 2026, in their Response to Candidate's Motion to Dismiss, Objectors withdrew paragraph 16 of the Objection, that petition sheets 756, 998, and 1,786 contain insufficient notarizations or dates.

9. On June 25, 2026, the assigned Hearing Officer resigned. As set forth in Rule 5(c), the General Counsel assigned a replacement Hearing Officer to consider arguments and evidence in this matter.

10. On July 6, 2026, a hearing was held before the new Hearing Officer. During the hearing, Parties had the opportunity to proffer evidence, testimony, and argument before the Hearing Officer.

11. The Board's appointed Hearing Officer issued a recommended decision in this matter after reviewing all matters in the record, including arguments and/or evidence tendered by the parties.

12. Upon consideration of this matter, the Board adopts the findings of fact, conclusions of law, and recommendations of the Hearing Officer and the General Counsel and finds that:

A. Candidate's Motion to Dismiss is denied as:

a. Objectors withdrew the circulator and notary objections in Paragraph 16 of the objection petition.

b. Candidate failed to identify any facial deficiency in Paragraph 11's allegation that signatures are not genuine.

c. Objector sufficiently pled a violation of Section 10-4's dual circulator prohibition, which the Board, as an administrative agency, must apply as written. *See Goodman v. Ward*, 241 Ill.2d 398, 411 (2011).

B. The Board does not have jurisdiction to consider Candidate's constitutional challenges to the Election Code. *See Goodman*, 241 Ill.2d at 411.

C. Candidate's petition sheets contained 9,594 apparently valid signatures after the conduct of a record examination evaluating Objectors' individual signature objections as found in Paragraphs 9-14, which is 1,222 fewer than the statutory minimum of 10,816 required for Independent candidates seeking placement on the ballot as Representative in Congress for the 4th Congressional District of Illinois.

D. Due to Candidate's insufficient signatures, it is unnecessary to rule upon the remainder of Objectors' petition.

IT IS HEREBY ORDERED that Candidate's Motion to Dismiss DENIED, and the objection of Jeremy Rivera, Rene A. Munoz, and Sandra Mendez to the nomination papers of Byron Sigcho Lopez, Independent candidate for nomination to the office of Representative in Congress for the 4th Congressional District, is SUSTAINED based on the findings contained in Paragraph 12 above, and the name of the Candidate Byron Sigcho Lopez SHALL NOT be certified for the November 3, 2026, General Election ballot by the Illinois State Board of Elections.

DATED: 07/21/2026

Laura K. Donahue, Chair

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 21, 2026, the foregoing order was served upon the Objector(s) or their attorney(s) by:

☐ Placing a pre-paid certified mail envelope in a U.S. mailbox addressed to:

Ed Mullen
1505 W. Morse Ave.
Chicago, IL 60626

☐ Hand delivery at:
- ☐ 2329 S. MacArthur Blvd., Springfield, IL 62704
- ☐ 69 W. Washington St, Chicago, IL 60602

And on July 21, 2026, served upon the Candidate(s) or their attorney(s) by:

☐ Placing a pre-paid certified mail envelope in a U.S. mailbox addressed to:

Andrew Finko
875 N. Michigan Avenue
Suite 3100
Chicago, IL 60611

☐ Hand delivery at:
- ☐ 2329 S. MacArthur Blvd., Springfield, IL 62704
- ☐ 69 W. Washington St, Chicago, IL 60602

Sean Sarcu
Legal Counsel II
Illinois State Board of Elections

# EXHIBIT H

Some states have changed or may be changing their congressional districts for the 2026 elections. This map based on 2024 congressional districts is still the *correct map* for determining who *currently* represents you in Congress. But you may be in a different district when you vote in November.



# EXHIBIT I

**Signature requirements for independent (or unaffiliated) US Representative candidates with code citations**

**Arkansas** requires "not less than three percent (3%) of the qualified electors in the county, township, or district in which the person is seeking office, but in no event shall more than two thousand (2,000) signatures be required for a district, county, or township office." Arkansas Code Title 7. Elections § 7-7-103.

**California** has the same requirement for partisan and independent candidates as follows: either payment of a $1,740 filing fee, or 2,000 signatures; partial signatures may be submitted to cover all or part of the filing fee. Calif. Election Code §§8062(a)(1), (2), 8103, 8106(a).

**Colorado** requires the lesser of 2.5% of votes cast in the same district for US Representative at the last election, or 1,500 signatures. C.R.S. 1-4-802(1)(c).

**Georgia** requires a number of voters equal to 5 percent of the total number of registered voters eligible to vote in the last election for the filling of the office the candidate is seeking and the signers of such petition shall be registered and eligible to vote in the election at which such candidate seeks to be elected plus payment of a qualifying fee of $5,220. O.C.G.A § 21-2-170(b); O.C.G.A. § 21-2-131(a)(2)

**Hawaii** treats requires at least 25 signatures and a $75 filing fee for non-partisan candidates to compete on the primary, and advanced to general election is non-partisan candidate receives over 10% of the votes or receives votes equal or greater than the lowest voted partisan candidate. 2025 HRS § 12-5; HRS §12-41(b).

**Idaho** requires 500 qualified voters in the district plus a filing fee of $300. Idaho Code, § 34-708.

**Illinois** requires signatures of at least 5% but not more than 8% of the total votes cast in the district at the last general election, gathered in 90 days. 10 ILCS 5/10-4

**Indiana** requires signatures from 2% of total votes cast in the district at the last election for the secretary of state. Indiana Code IC 3-8-6-3.

**Iowa** requires at least 1,726 signatures, including at least 47 signatures from half of the counties in the district. Iowas Code §43.20, §45.1.

**Kansas** requires signatures from 4% of the registered voters in the district, but not less than 25 signatures nor more than 5,000 plus a filing fee of $1,740. KSA 25-303(d).

**Kentucky** requires 400 signatures plus a filing fee of $500. Kentucky Revised Statutes, 118.315(2).

**Louisiana** requires 250 signatures from anywhere in the state, or payment of a qualifying fee of $1,500. LA HB842 signed by Governor – Act 7 (5/14/2026).

**Maine** requires at least 2,000 signatures but not more than 2,500 signatures from the district. Maine Revised Statutes, 21-A §354(5)(D).

**Massachusetts** requires 2,000 signatures from the district. Mass. Gen. Laws, Title VIII, ch. 53, § 44.

**Michigan** requires at least 3,000 signatures but not more than 6,000 signatures collected within 180 days. MCL 168.544f; MCL 168.590b(3).

**Minnesota** requires 1,000 signatures plus a filing fee of $300. Minnesota Statutes section 204B.08 subd.3(b).

**Mississippi** requires either 1,000 signatures from voters anywhere in the state or 200 signatures of voters in the district plus a qualifying fee of $500. Miss. Code Ann. §23-15-297; §23-15-853.

**Missouri** requires at least 2% of the total number of voters who voted at the last election for candidates for the office being sought or is equal to 10,000 voters, whichever is less. Section 115.321.4, RSMo.

**Montana** requires 6,742 signatures for Dist. #1 and 7,274 signatures for Dist. #2 (with no time restriction on gathering signatures). MCA 13-10-502.

**Nebraska** requires signatures from 20% of registered voters in the district who voted for president in 2024, or 2,000, whichever is less. Neb. Rev. Stat. §32-618.

**Nevada** has a signature requirement equal to 1% of the ballots cast in the district at the last general election plus a filing fee of $300. NRS 293.200; NRS 293.193.

**New Hampshire** requires signatures from 1,500 voters in the district plus a filing fee of $50. NH RSA 655:42(II).

**New Jersey** requires 250 signatures; or 50 signatures for elections after redistricting N.J.S.A. 19:13-5.

**New Mexico** requires 2% of the ballots cast in the district at the last election, (Dist. 1 is 5,678 signatures, Dist. 2 is 3,903 signatures, Dist. 3 is 4,619 signatures. New Mexico Code section 1-8-51.

**New York** requires signatures of at least 5% of votes cast for governor in the last election or 3,500, whichever is less. NY Election Law section §6-142(2).

**North Carolina** requires 1.5% of the total number of registered voters in that district as of January 1 of the election year plus $1,740 filing fee. N.C.G.S. § 163-122(a)(2); N.C.G.S. § 163-122(e); § 163-107.

**North Dakota** requires signatures of at least two percent of the resident population of the district as determined by the most recent federal decennial census, but in no case may more than three hundred signatures be required; circulation is 150 days. ND Century Code § 16.1-12-02; § 16.1-12-02.3.

**Ohio** requires 25 signatures if the number of votes in the congressional district at the last election for governor was less than 5,000, or a number equal to 5% of the vote

whichever is less; if more than 5,000 votes cast then required signatures is 1% of the vote. Filing fee is $85. Ohio R.C. 3513.257.

**Oklahoma** requires signatures of at least 2% of the number of registered voters in the district, plus a filing fee of $1,000. 26 OK Stat § 5-112.

**Oregon** requires signatures equal to 1% of the number of votes cast in the district for president. ORS 249.740.

**Pennsylvania** requires 2% of the largest vote cast in the district in the last election plus a filing fee of $150. 25 P.S. § 2911(b), § 2913(B.1)(2).

**Rhode Island** requires the same 500 signatures from partisan and independent candidates. RI Gen. Laws § 17-14-7.

**South Carolina** requires at least 5% of the active, registered voters in the geographical area the office represents, based on the total number of registered voters in the geographical area 120 days prior to the election, but in no event more than 10,000 signatures. SC Code of Laws § 7-11-70.

**South Dakota** requires signatures of at least 1% of the total vote for Governor in 2022, or 3,502 signatures. SD Codified Laws § 12-7-1.

**Tennessee** requires at least 25 signatures of voters in the district. Tenn. Code Ann. § 2-16-204.

**Texas** requires signatures of at least 5% of all votes cast for governor in the district in the last election, or 500, whichever is less. Texas Elec. Code Title 9, § 142.007.

**Utah** requires signatures of at least 300 signatures or 5% of the voters in the district, whichever is less. Utah Code § 20A-9-502.

**Vermont** requires at least 500 signatures. 17 V.S.A. §2402.

**Virginia** requires at least 1,000 signatures. § 24.2-506(A)(2).

**Washington** state allows ballot access through payment of a filing fee of $1,740 or for candidates who do not have the filing fee, they may submit a petition with at least 1,740 signatures. RCW 29A.24.091.

**West Virginia** requires signatures of at least 1% of the votes in the district at the last election, or 2,272 signatures for Dist. 1 and 2,449 signatures for Dist. 2. W. VA. Code § 3-5-23 and § 3-5-24.

**Wisconsin** has the same signature requirement of 1,000 but not more than 2,000 signatures for partisan and independent candidates. Wis.Stat. §8.20(1), 8.15(6).

**Wyoming** requires not less than two percent (2%) of the total number of votes cast for the office in that particular district in the last general election circulated during the same calendar year as election, plus a filing fee of $750. Wyoming Statutes 22-5-304(c); 22-5-305.

# EXHIBIT J

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BYRON SIGCHO LOPEZ,<br>JOSE GUERRA,<br><br>Plaintiff,<br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, and its members, in their official capacities, LAURA K. DONAHUE, Chair, RICK S. TERVEN, SR., Vice Chair, JENNIFER M. BALLARD CROFT, CRISTINA D. CRAY, TONYA L. GENOVESE, CATHERINE S. McCRORY, JACK VRETT, and CASSANDRA B. WATSON,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 26-cv-9156<br><br>Hon. Franklin U. Valderrama |

**<u>Declaration of Byron Sigcho Lopez</u>**

The undersigned Byron Sigcho Lopez, under penalties of perjury, affirms and certifies the following facts based upon his personal knowledge, and if called to testify under oath, would testify to the following facts.

1. I am is a US Citizen, a registered voter and long-time resident of the 4th Congressional District of Illinois,

2. In 2019 I ran for and was elected Alderperson for the 25th Ward in Chicago, and in 2023 I was re-elected as Chicago's 25th Ward Alderperson. I have experience in how to organize a campaign, how to fund raise for a political campaign, how to gather signatures, and how to file petitions to gain a place on the election ballot for non-partisan elected office.

3. In 2025, I relied upon Rep. Chuy Garcia public representations that he was seeking re-election, and based upon this information, I did not seek the Democratic party's nomination for US Rep for the 4th Congressional Dist.

4. Had Rep. Garcia announced that he would not be seeking re-election I would have sought the Democratic party's nomination for US Rep. for the 4th Congressional Dist. at the March 17, 2026 primary, particularly since Rep. Chuy Garcia was not doing all he could for the residents of the 4th Congressional Dist. for some time, and I heard criticism of Rep. Chuy Garcia more often and more vocally in 2025.

5. I was denied the opportunity for a meaningful Democratic primary nomination for US Representative for the 4th Congressional Dist. That is, due to the coordination between Rep. Chuy Garcia and his chief of staff, Patty Garcia to misdirect the public during the 90 day petition gathering time, and use Rep. Chuy Garcia's standing and support in the Democratic party to deter and discourage other candidates from filing nomination papers for US Representative at the Democratic party primary. The coordination and timing of the filing of nomination papers where Rep. Chuy Garcia filed on the first day in the first hour, and Patty Garcia filed on the last day of petition filing in the last hour prevented me and other candidates from being able to file Democratic party nomination papers.

6. Due to the timing of Rep. Chuy Garcia's publicly announced withdrawal from the Democratic party's nomination process, I decided to campaign as an independent candidate for US Representative for the 4th Congressional Dist. In early 2026 I organized my federal political campaign, raised money, hired staff and consultants, and embarked upon the process to gather signatures as an independent candidate.

7. My US Representative campaign started gathering signatures on February 25, 2026, which was the first day of the 90 day time period, and continued working to gather signatures through the 89th day allowed for gathering signatures. On May 26, 2026, which was the 90th day for signature gathering and last day to file ballot access petitions, I drove with campaign staff and supporters from Chicago to the State Board of Elections' Springfield office to file my ballot access petitions, since the State Board did not allow candidate petitions to be filed at its Chicago office.

8. My campaign team ultimately gathered almost 20,000 signatures, largely through volunteers and paid individual circulators. After we removed some signatures from the petition because we were over the maximum number, we filed very close to the maximum number of signatures the Election Code allowed for an independent candidate for US Representative for the 4th Congressional District at the November 3, 2026 general election. If there was no maximum number restriction, we would have filed between 19,000 and 20,000 signatures.

9. To supplement petition gathering efforts of campaign volunteers and paid individual circulators, my campaign hired professional circulator Willie Burton, who had experience working for US Rep. Danny Davis, State Rep. LaShawn Ford, and Ald. Walter Burnett. Willie Burton was hired early in petitioning specifically to gather up to 10,000 petition signatures on my petitions for US Representative in 2026, which Mr. Burton agreed to provide. However, after about two weeks, Mr. Burton provided about 20 sheets with voter signatures that his circulators had obtained, due in large part to the fact that most of Mr. Burton's circulators were not eligible to circulate for my independent candidacy because they had previously circulated nomination petitions for Democratic candidates for the March 17, 2026 primary. Circulation was also more difficult this year, due to fear and apprehension within the community resulting from ICE activity.

10. My campaign staff and I relied upon Willie Burton to provide about half the signatures, we intended to gather. Willie Burton's inability to gather the promised signatures created a major petition gathering issue for the campaign mid-way through the 90 day circulation time. The campaign contacted two or three other professional circulators, including John Preston who agreed to provide up to 5,000 signatures, but none had circulators available who had not previously circulated petitions for Democratic or Republican candidates seeking nomination at the March 17, 2026 primary. John Preston refunded the partial payment from my campaign because he was unable to gather the promised signatures.

11. As a result of being unable to hire professional/experience paid circulators, my campaign increased the number of individuals who were hired to circulate petitions, many of whom had not previously circulated petitions. Individual circulators required additional time and coordination by campaign staff.

12. I did not recall this year if I circulated petition sheets in the fall 2025 for a Democratic candidate for the March 17, 2026 primary, it could have been one or two or so sheets, but I don't remember if they were turned in or not, so I was very reluctant to circulate my own petition sheets for US Representative, and risk losing all signatures on those sheets. There were more than few volunteers and supporters that did not recall if they circulated and/or turned in petition sheets for a Democratic candidate in 2025, and could not affirmatively say if they were eligible to circulate my independent US Representative candidate petitions.

13. There were Democratic party committeepeople and many union members who supported my US Representative campaign, and directly offered to help gather signatures. However, nearly every union member and committeeperson that offered to help was unable to do so, because they had circulated petition sheets for a Democratic party candidate at the March 17, 2026 primary. Based upon my past experience circulating petitions and familiarity with this group's ability to gather petition signatures in prior elections, I believe this group of volunteers could have gathered about 5,000 signatures for me from the 4th Congressional Dist.

14. Overall my campaign had about 320 petition circulators, consisting of volunteers and individual paid circulators.

15. My independent US Representative campaign was well-supported, and supporters contributed about $180,000 toward my independent candidacy in 2026. A large amount of campaign funds were for direct paid circulators to gather signatures, along with funding for staff and consultants running our field and volunteer operations. We had the money to pay Willie Burton to gather 10,000 signatures, and to pay other professional circulators, if they were not restricted on who could circulate for independent candidates.

16. This year was much harder to gather signatures than in my prior years circulating in the same geographic areas, due to community-wide trauma and fear after ICE raids targeted many areas within the 4th Congressional Dist. The 4th Congressional Dist. has a majority Latino population, and was one of the hardest

targeted areas in Cook County. Non-citizens and citizens were equally afraid of being surrounded, physically assaulted, arrested, and removed to a detention facility. There was a very real and palpable fear in the Latino community that started last year and continued this year during the petition gathering.

17. My campaign tried door-to-door canvassing for signatures, going to addresses with known registered voters, but a large percentage of those door-to-door residents were highly reluctant to open their doors to people they did not personally know. Door-to-door was not yielding signatures, and my campaign changed our petition gathering efforts to focus on public venues and/or on the street. However, street circulation resulted in a lower validity rate since many signers did not recall where they were registered to vote, or if they resided in the 4th Congressional Dist., and/or how their signature looked when they signed their voter cards.

18. Another complication of petition circulation the streets was the irregular shape of the 4th Congressional Dist., and increased the risk that petition signers would not be residents of the 4th Congressional Dist. My campaign staff and I noticed that many people did not know the congressional district that they lived in, or even if their voter registration was up-to-date at their current address, or was still listed at a prior address.

19. The illogical, and meandering boundaries of the 4th Congressional Dist. that included parts of Cook County and DuPage County, created additional challenges when gathering signatures at public venues and/or on the street because voters could sign – voters largely did not know their congressional district, and petition circulators could not check voter addresses on the street to see if they were in the 4th Congressional Dist.

20. After we filed my independent US Representative petitions they were challenged by supporters of Democratic candidate Patty Garcia. The State Board of Elections reviewed the signatures at its Springfield office, and determined based upon its calculation that I had 9,594 validated signatures. See attached report from State Board of Elections.

21. My campaign staff were able to validate hundreds of additional signatures through checking voter registration records and obtaining affidavits. However, because of the expedited electoral board proceeding we were not able to finish validating other signatures, and we were not allowed additional time to gather more signatures if there was a need for showing more support for my candidacy.

22. Pursuant to 28 U.S.C. Sec. 1746(2) I hereby declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

Byron Sigcho Lopez

Illinois State Board of Elections
State Officers Electoral Board


6/12/2026
9:18:36PM

# OBJECTION SUMMARY REPORT

## 26SOEBGE508 / Rivera, Munoz, Mendez v. Sigcho Lopez

OBJECTOR(S)

Jeremy Rivera
6037 S. Albany Ave.
Chicago, IL 60629

Rene A. Munoz
4843 S. Keeler Ave.
Chicago, IL 60622

Sandra Mendez
3116 S. Komensky Ave.
Chicago, IL 60623

CANDIDATE(S)

Byron Sigcho Lopez
1901 W. 21st St.
Chicago, IL 60608

INDEPENDENT
4TH CONGRESS

OBJECTION TOTALS

| | | | | | |
|---|---|---|---|---|---|
| Petition pages | 1,891 | | Examined | 10,257 | |
| Lines with signatures | 17,227 | | Valid | 2,624 | 25.6% |
| Lines with objections | 10,257 | 59.5% | Invalid | 7,633 | 74.4% |
| Unchallenged lines | 6,970 | 40.5% | Pending | 0 | 0% |

| | | |
|---|---|---|
| Pages with objections | 0 | 0% |
| Pending | 0 | |
| Overruled | 0 | |
| Sustained | 0 | |
| Signatures subtracted | 0 | |

| | | | |
|---|---|---|---|
| Required signatures | 10,816 | Over/Under required signatures | -1222 |

9,594 valid

# EXHIBIT K

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BYRON SIGCHO LOPEZ,<br>JOSE GUERRA,<br><br>Plaintiff,<br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, and its members, in their official capacities, LAURA K. DONAHUE, Chair, RICK S. TERVEN, SR., Vice Chair, JENNIFER M. BALLARD CROFT, CRISTINA D. CRAY, TONYA L. GENOVESE, CATHERINE S. McCRORY, JACK VRETT, and CASSANDRA B. WATSON,<br><br>Defendants. | ) | No. 26-cv-9156<br><br>Hon. Franklin U. Valderrama |

**Declaration of Richard Winger**

The undersigned, Richard Winger, affirms and declares under penalty of perjury the following facts based upon his personal knowledge, expertise in ballot access requirements in the US, and experience.

1. I am over 18 years of age, and a resident of the State of California. I provide the statements in this Declaration based upon my own personal knowledge and research that I have conducted for decades studying ballot access laws throughout the United States, and if called to testify would testify under oath to the contents of this Declaration.

2. I graduated from the University of California at Berkely in 1966 with a B.A. degree in political science. Since 1985 I have been the editor and publisher (and recently co-editor with Bill Redpath) of Ballot Access News, a non-partisan newsletter and website ( https://ballot-access.org/ ) that reports on developments in ballot access laws throughout the nation, and developments in the law which affect

political parties.

3. I have researched the ballot access laws of all 50 sates from the year 1888 to present. I have become well-versed in how the ballot access laws of each state have worked historically and how those laws compare with the laws of Illinois.

4. As stated in my attached curriculum vitae I have offered expert testimony and testified in ballot access cases in over half the states.

5. In 1891 Illinois enacted a 2% signature requirement for independent and new or minor party candidates (commonly referred to as "third parties") to get on the ballot.

6. There was a US Senate election in 1926 and 1930 (although no gubernatorial election). In 1926 there were 12 candidates, and in 1930 there were nine.

7. In 1927 Illinois enacted Senate Bill 585, enabling "third parties" to get on the ballot by party convention or caucus meeting.

8. In 1931 Illinois repealed the provision it enacted in 1927 through SB 585 applicable to "third parties" and also increased the signature requirement for "third party" and independent candidates to 5% of the total votes from the last election. This change was enacted primarily to keep Communist candidates off the ballot, as many Communist affiliated candidates used the 1927 law to get on the ballot.

9. Illinois is the only state which allows candidates who file less than the required number of signatures to get on the ballot if no one filed an objector's petition against such a candidate. The Illinois Election Code does not define or authorize an "apparent conformity" review, but the Illinois State Board of Elections

has adopted such a procedure in recent elections, in which it checks for a statement of candidacy and at least 10% of the required signatures, which would then allow a candidate to get on the ballot, even with less than the required number of signatures, if no objection is filed.

10. When I use the phrase "overcome a signature requirement" for Illinois, I am referring to a candidate who has overcome an objector's petition and has appeared on the general election ballot.

11. No candidate for US House in Illinois has ever overcome a general election signature requirement of 10,000 or more, and since 1890, only 3 have done so in the country (Wendell Fant in North Carolina in 2010; Frazier Reams in Ohio in 1954; Jack Gargan in Florida in 1998).

12. Only one candidate for US House has ever overcome a signature requirement of 5% of votes cast at the last election in Illinois, and that was H. Douglas Lassiter in the 15th Congressional District in 1974, when there was no restriction upon the duration of time a candidate could gather signatures.

13. From 1890 to 2024, there would have been over 25,000 regularly-scheduled US House races – there are 435 districts with two year House terms.

14. Only 5 candidates, out of all the US House races since 1890 have been able to overcome a general election requirement of 10,000 or more: Wendell Fant in North Carolina in 2010; Frazier Reams in Ohio in 1954; Jack Gargan in Florida in 1998; Cindy Sheehan in California in 2008 (10,198); and Steve Kelly in Montana in 1994 (10,186).

15. Only three states require 10,000 or more signatures for independent US House candidates to get on the general election ballot: Illinois (5% to 8% of total

votes in the district at last election), South Carolina (5% of reg. voters or 10,000) and Georgia (5% of registered voters). North Carolina lowered its signature requirement from 4% of the registered voters to 1.5% of the registered voters.

16. In 2026, a candidate with 9,594 signatures (as was the final count of validated signatures for Byron Sigcho Lopez), would have satisfied the signature requirement for an independent candidate for US Representative in **91.3**% or 397 of the 435 US House Districts – that is, 9,594 signatures would have met the signature requirement in all districts in all states **except** Illinois, South Carolina, and Georgia.

17. It is my opinion that a reasonably diligent candidate for US House in Illinois could not be expected to be able to meet a signature requirement of 10,816 or more signatures within 90 days to gain a place on the Illinois ballot. When Jack Gargan got his signatures in Florida in 1998, he had a petitioning period that ran from January 1 of the election year to July 15 of the election year. And when Wendell Fant got his signatures he had from November 2008 until May 2010 to collect them. And when Frazier Reams got his in 1954 he was free to start as early as he wished. I base this opinion upon my years of study of elections and ballot access laws, and the historical fact that no one ever met a requirement of 10,816 in such a short petitioning window as the 90-day Illinois window.

18. Illinois also severely restricts independent candidates also by applying the same 90 day allotted circulation time for independent candidates, as is applies to established party candidates with a fraction of the signature requirement.

19. Illinois has a reduced signature requirement of at least 5,000 signatures, with no maximum restriction, for independent US House candidates seeking ballot placement at elections following redistricting, for the same office of

US Representative that is elected at all other election years. Even with a reduced 5,000 signature requirement and the 90 day time to gather signatures, Illinois elections for US Representative have not been overcrowded or burdened by an excessive number of independent candidates.

20. Illinois' 5,000 signature requirement with no maximum number, is still a higher signature requirement than the average and the median signature requirements in all other states.

21. Since the Election Code was amended in 1931, there has not been ballot overcrowding in Illinois elections for US Representative, and there has never been an election with too many independent or new political party candidates on any ballot in Illinois that has impacted election administration. I base this opinion upon my historical review of elections in Illinois.

22. Pursuant to 28 U.S.C. Sec. 1746(2) I hereby declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

Richard Winger

Richard Winger

**Richard Winger Curriculae Vitae**

3201 Baker Street
San Francisco, California 94123
Updated July 26, 2026

EDUCATION

BA, Political Science, University of California, Berkeley, 1966
Graduate study, Political Science, UCLA, 1966-67

EMPLOYMENT

*Ballot Access News*, Editor 1985-Present
Editor of newsletter covering legal, legislative and political developments of interest to minor parties and independent candidates. Researcher of ballot access laws of all 50 states from years 1888-present; well versed in how ballot access laws of each state work historically and how they compare to each other. Responsible for reading all statutes, regulations, legal opinions, and state attorney general opinions on rights of political parties and the publications of minor parties.

On the Editorial Board of *Election Law Journal*, published by Mary Ann Liebert, Inc., Larchmont, N.Y., since 2001.

PUBLICATIONS

Wrote a chapter or two in each of these books:

*Libertarianism: John Hospers, the Libertarian Party's 50th Anniversary, and Beyond*, Jameson Books, 2021, editors C. Ronald Kimberling and Stan Oliver. My chapter is "The Libertarian Party has Been the Nation's Leading Force for More Lenient Ballot Access Laws."

*The Best Candidate: The Law of Presidential Nomination in Polarized Times*, Cambridge University Press, 2020, editors Eugene D. Mazo and Michael R. Dimino. My chapter is "The Nomination of Presidential Candidates by Minor Parties."

*America Votes! A Guide to Modern Election Law and Voting Rights*, 2nd edition, 2012, published by the American Bar Association's Section of State and Local Government Law, editor Benjamin E. Griffith. My chapter is "Significant Ballot Access Issues."

*Others, Vol. 2, Third Parties During The Populist Period*, by Darcy G. Richardson (2007: iUniverse, Inc., New York). Wrote the book's Appendix, "Early Ballot Access Laws for New and Minor Parties."

*Democracy's Moment*
edited by Ronald Hayduk and Kevin Mattson (2002: Rowman & Littlefield, Lanham, Md.). My chapter is, "More Choice Please! Why U.S. Ballot Access Laws are Discriminatory and How Independent Parties and Candidaes Challenge Them."

*The Encyclopedia of Third Parties in America*
edited by Immanuel Ness and James Ciment (2000: M.E. Sharpe, Inc., Armonk, N.Y.). My article is "History of U.S. Ballot Access Law for New and Minor Parties."

*Multiparty Politics in America*
edited by Paul S. Herrnson (1997: Rowman & Littlefield, Lanham, Md.). My chapter is "Institutional Obstacles to a Multi-Party System.

*The New Populist Reader*
edited by Karl Trautman (1997: Praeger, Westport, Ct.)

*Libertarianism, John Hospers, the Libertarian Party's 50th Anniversary, and Beyond*, edited by C. Ronald Kimberling and Stan Oliver. My chapter is, "The Libertarian Party Has Been the Nation's Leading Force for More Lenient Ballot Access Laws."

Additional articles published in these periodicals:
*Seton Hall Journal of Legislation & Public Policy*, vol. 48, book 1, 2023
*Fordham Law Review*, Vol. 90, #2, November 2021
*University of Arkansas Little Rock Law Review*, Vol. 29, #4, summer 2007
*Wall Street Journal*, October 26, 1984 and also November 2, 1988.
*The Long Term View*, Mass. Sch. of Law, vol. 2 #2 (spring 1994)
*American Review of Politics*, U. of Akron, vol. 16, Winter 1995
*California Journal*, July 1977
*Election Law Journal* (two articles), Vol. 1 #2 (2002) and Vol. 5 #2 (2006)
*Cleveland State Law Review*, Vol. 45 #1 (1997)
*Chronicles Magazine*, November 1994
*Price Costco Connection*, Dec. 1995
*Fordham Urban Law Journal*, Vol. 32 #3 (May 2005)
*Fordham Law Review*, Vol. 85 #3 (December 2016)
*Oklahoma Politics*, Vol. 8 (October 1999)
*Harvard Law Record*, internet, April 25, 2016

Also, I wrote "Election Law Decisions" in all issues of the newsletter of the American Political Science Association's Section on Representation and Electoral Systems, 2005-2014. The publication appeared twice each year.

I wrote articles for "Voice for Democracy", the newsletter of Californians for Electoral Reform, in these issues: Spring 2012, February 2014, August 2014, November 2014, and February 2015.

NATIONAL INTERVIEWS on Minor Parties, Independents, Ballots and Ballot Access

*NBC* | *National Public Radio*
*ABC* | *Pacifica Radio*
*CNN* | *MSNBC*
*C-SPAN*

CASES: TESTIMONY or AFFIDAVITS (political party or candidate prevailing, or case pending)

**Alabama**: Hall v Bennett, U.S. Dist. Ct., 212 F.Supp.3d 1148 (m.d. 2016).
**Alaska**: Libertarian Party v Coghill, state superior court, 3rd dist., 3AN-92-08181, 1992: court enjoined petition deadline for minor party presidential petitions.
**Arizona:** Campbell v Hull, 73 F Supp 2d 1081 (1999). Az. Libt. Party v Hull, superior ct., Maricopa Co. 96-13996, 1996: deadline for submitting presidential elector

candidates too early. Nader v Brewer, 531 F 3d 1028 (9th cir., 2008). De La Fuente v Hobbs, 19-16868 (pending in 9th circuit): signature requirement for independent candidates.

**Arkansas**: Citizens to Establish a Reform Party v Priest, 970 F Supp 690 (E.D. Ark. 1996). Green Party of Ark. v Priest, 159 F.Supp.2d (E.D. Ark. 2001). Green Party of Ark. v Daniels, U.S. District Court, 448 F.Supp 2d 1056 (E.D.Ark. 2006). Moore v Martin, 854 F 3d 1021. Libertarian Party of Arkansas v Thurston, e.d., 4:19cv-214 (2019): signature requirement for new parties.

**California:** California Democratic Party v Jones, 530 US 567 (2000). California Justice Committee v Bowen, 2012 WL 5057625 (C.D.Cal.): deadline for new party qualification too early.

**Colorado**: Ptak v Meyer, 94-N-2250, U.S. Dist. Ct., 1994. Signature requirement for independent legislative candidates.

**Florida**: Libt. Party of Fla. v Mortham, 4:96cv258-RH, n.d. 1996: Libertarian vice-presidential candidate put on ballot even though he was not on the petition. Reform Party v Black, 885 So.2d 303 (Fla. 2004).

**Georgia**: Bergland v Harris, 767 F 2d 1551 (11th cir., 1985). Remanded case back to U.S. District Court; before District Court acted, legislature substantially eased law, so case became moot. Green Party of Georgia v Kemp, 171 F Supp 3d 1340 (n.d. 2016), affirmed, 674 F.Appx. 974 (11th cir., 2017). Libertarian Party of Georgia v Raffensperger, n.d., 1:17cv-4660: number of signatures for U.S. House.

**Hawaii**: Libt. Party of Hi. v Waihee, cv 86-439, U.S. Dist. Ct., 1986: petition deadline for new parties.

**Illinois**: Nader v Ill. State Bd. of Elections, 00-cv-4401, U.S. Dist. Ct., N.D., 2000: petition deadline enjoined. Lee v Ill. State Bd. of Elections, 463 F.3d 763 (7th cir. 2006). Jones v McGuffage, 921 F Supp 2d 888 (N.D.. Il, 2013). Libertarian Party of Illinois v Scholz, 164 F Supp 3d 1023 (n.d. 2016), affirmed 872 F.3d 518 (7th cir., 2017). Gill v Scholz, central dist., 3:16cv-3221: case pending in 7th circuit on 5% petition requirement for independent candidates for U.S. House; U.S. District Court put candidate on ballot, but 7th circuit stayed that action. Jones v McGuffage, n.d., 1:12cv-9997: number of signatures in special U.S. House elections; judge reduced number of signatures.

**Iowa**: Oviatt v Baxter, s.d., 4:92-10513, U.S. Dist. Ct., 1992: signature requirement for U.S. House candidates. Libertarian Party of Iowa v Pate, s.d., 4:19cv-241. Petition deadline.

**Kansas**: Merritt v Graves, 87-4264-R, U.S. Dist. Ct., 1988: independent petition deadline, requirement that independent petitions not be circulated outside of circulator's home precinct, and requirement that voters could only register in qualified parties. This case should not be confused with another by the same name decided in December, 1988.

**Kentucky**: Libt. Pty. of Ky. v Ehrler, 776 F Supp 1200 (E.D. 1991). Sweeney v Crigler, e.d., 2:19cv-46 (2019): deadline for declaration of candidacy.

**Louisiana**: Carpenter v Landry, m.d., 3:26cv-791.

**Maine**: Libertarian Party of Me v Dunlap, 2:16cv-2: deadline for new party.

**Maryland**: Dixon v Md. State Adm. Bd. of Elec. Laws, 878 F 2d 776 (1989, 4th cir.). Green Party v Bd. of Elections, 832 A 2d 214 (Md. 2003).

**Michigan:** Graveline v Johnson, 336 F.Supp.3d 801 (e.d. 2018), affirmed, 747 F Appx 408 (6th circuit 2018). Number of signatures for independent candidates.

**Montana**: Kelly v Johnson, U.S. Dist. Ct. 08-25 (2012): independent candidate petition deadline. Breck v Stapleton, 259 F.Supp.3d 1126 (2017). Montana Green Party v

Stapleton, 9th circuit, 20-35340. Unequal distribution requirement for petitions for party status.

**Nebraska**: Bernbeck v Gale, 4:18cv-3073 (2018). Number of signatures for independent candidates.

**Nevada**: Libt Pty. of Nev. v Swackhamer, 638 F Supp 565 (1986); Fulani v Lau, cv-N-92-535, U.S. Dist. Ct., 1992: minor party and independent petition deadline.

**New Jersey**: Council of Alternative Political Parties v Hooks, 999 F Supp 607 (1998); Council of Alternative Political Parties v State Div. of Elections, 781 A 2d 1041 (N.J.Super. A.D. 2001).

**New York**: Molinari v Powers, 82 F Supp 57 (E.D.N.Y. 2000). Schulz w Williams, 44 F 3d 48 (2nd cir., 1994). Green Party of N.Y. v N.Y. State Bd. of Elections, 389 F.3d 411 (2nd cir., 2004).

**North Carolina**: Obie v N.C. Bd. of Elections, 762 F Supp 119 (E.D. 1991). DeLaney v Bartlett, 370 F.Supp.2d 373 (M.D. 2004). Edwards v Berger, Wake County Superior Court, 18-cvs-9749 (2018): state could not give party labels to some candidates, but not all candidates, for the same office.

**Ohio**: Libertarian Party of Ohio v Blackwell, 462 F.3d 579 (6th cir. 2006). Libertarian Party of Ohio v Husted, U.S. Dist. Ct., middle district, 2:13cv-935 (2014): state could not create a new petition in September of odd year before election and expect it to be used in following year.

**Oklahoma**: Atherton v Ward, 22 F Supp 2d 1265 (W.D. Ok. 1998). De La Fuente v Ziriax, had been pending in 10th circuit, 17-6010, then legislature eased requirement for independent presidential candidates so case became moot.

**Pennsylvania**: Patriot Party of Pa. v Mitchell, 826 F Supp 926 (E.D. 1993).

**South Dakota**: Nader v Hazeltine, 110 F Supp 2d 1201 (2000). Libertarian Party of South Dakota v Krebs, 2018, 4:15cv-4111.

**Tennessee**: Libt Party v Goins, U.S. Dist. Ct., 793 F Supp 1064 (M.D. 2010). Green Party of Tennessee v Hargett, 7 F.Supp.3d 772 (m.d. 2014), aff'm, 791 F.3d 684 (6th cir. 2015): this is the case that struck down the law on how a party remains on the ballot, and should not be confused with the case of the same name on the requirements for a party getting on the ballot.

**Texas**: Pilcher v Rains, 853 F 2d 334 (5th cir., 1988). Collier v Nelson, w.d., 1:26cv-1574.

**Virginia**: Libt. Pty of Va. v Quinn, 3:01-cv-468, U.S. Dist. Ct., E.D. (2001): court ordered state to print "Libertarian" party label on ballot next to names of candidates.

**West Virginia**: State ex rel Browne v Hechler, 476 SE 2d 559 (Supreme Court 1996). Nader v Hechler, 112 F.Supp.2d 575 (S.D.W.V., 2000). McClure v Manchin, 301 F Supp 2d 564 (2003).

CASES: TESTIMONY or AFFIDAVITS (political party or candidate not prevailing)

**Alabama**: Swanson v Bennett, 490 F.3d 894 (11th cit. 2007). Stein v Chapman, 774 F.3d 689 (11th cir., 2014). De La Fuente v Merrill, m.d., 2:16cv-755: whether sore loser law applies to presidential primaries.

**Arizona**: Indp. Amer. Party v Hull, civ 96-1240, U.S. Dist. Ct., 1996: petition deadline for new parties. Browne v Bayless, 46 P 3d 416 (2002). Arizona Libertarian Party v Hobbs, 925 F.3d.1085 (2019).

**Arkansas**: Langguth v McKuen, LR-C-92-466, U.S. Dist. Ct., E.D., 1992: petition deadline for independent candidates. Christian Populist Party v Sec. of

State, 650 F Supp 1205 (E.D. 1987). Green Party of Ark. V Martin, 649 F.3d 675 (8th cir. 2011).
**California**: Socialist Workers Party v Eu, 591 F 2d 1252 (9th cir., 1978). Independent Party v Padilla, 184 F.Supp.3d 791 (Cal.,e.d. 2016). De La Fuente v Padilla, 930 F.3d 1101 (9th cir. 2019).
**D.C.**: Libertarian Party v D.C. Bd. of Elections, 682 F.3d 72 (D.C. Cir. 2012).
**Florida**: Fulani v Smith, 92-4629, Leon Co. Circuit Court, 1992: deadline for write-in filing. Libertarian Party of Fla. v State of Fla., 710 F 2d 790 (11th cir., 1983). U.S. Taxpayers Party v Smith, 871 F.Supp. 426 (n.d. Fla. 1993).
**Georgia**: Libertarian Party of Ga. v Cleland, U.S. Dist. Ct., n.d., 1:94-cv-1503-CC, U.S. Dist. Ct., N.D. (1994): number of signatures. Amendola v Miller, U.S. Dist. Ct, n.d., 1:96cv-2103 (1997): number of signatures. Esco v Secretary of State, E-53493, Fulton Co. Superior Court, 1998: number of signatures. Cartwright v Barnes, 304 F 3d 1138 (11th cir., 2002): number of signatures. Coffield v Kemp, 599 F.3d 1276 (2010): number of signatures.
**Idaho**: Nader v Cenarrusa, cv 00-503, U.S. Dist. Ct., 2000: number of signatures.
**Illinois**: Libt Party v Rednour, 108 F 3d 768 (7th cir., 1997). Nader v Keith, 385 F.3d 729 (7th cir. 2006). Summers v Smart, 65 F.Supp. 3d 556 (n.d. Ill. 2014).
**Kansas**: Hagelin for President Committee v Graves, 804 F Supp 1377 (1992).
**Maine**: Maine Green Party v Diamond, 95-318, U.S. Dist. Ct., 1995: definition of qualified party. Maine Green Party v Secretary of State, 96-cv-261, U.S. Dist. Ct., 1996: definition of political party.
**Maryland**: Ahmad v Raynor, R-88-869, U.S. Dist. Ct., 1988: number of signatures. Creager v State Adm. Bd. of Election Laws, AW-96-2612, U.S. Dist. Ct., 1996: number of signatures.
**Missouri**: Manifold v Blunt, 863 F 2d 1368 (8th cir. 1988).
**New Hampshire**: Werme v Gov. of N.H., 84 F 3d 479 (1st cir., 1996).
**New Mexico**: Parker v Duran, 180 F Supp 3d 851 (2014).
**North Carolina**: Nader v Bartlett, 00-2040, 4th cir., 2000: number of signatures.
**North Dakota**: Libertarian Party of N.D. v Jaeger, 659 F 3d 689 (2011).
**Ohio**: Schrader v Blackwell, 241 F 2d 783 (6th cir., 2001). State ex rel Fockler v Husted, State Supreme Court, 2016-1863: rules for primary ballot access. Libertarian Party of Ohio v Ohio Secretary of State, state appeals court, 10th dist., 16APE-07-496: definition of political party.
**Oklahoma**: Rainbow Coalition v Okla. State Elec. Bd., 844 F 2d 740 (1988). Nader v Ward, 00-1340, U.S. Dist. Ct., 1996: number of signatures. Clingman v Beaver, 544 U.S.581.
**Oregon**: Libt Party v Roberts, 737 P 2d 137 (Ore. Ct. of Appeals, 1987).
**Tennessee:** Green Party of Tennessee v Hargett, 882 F.Supp.2d 959 (m.d. 2012) and 953 F.Supp.2d 816 (m.d. 2013) (not to be confused with the case of the same name on how a party remains on the ballot). The final decisions are not reported and are 2016 US Dist Lexis 109161 (2016) and Sixth Circuit case 16-6299 (2017).
**Texas**: Texas Indp. Party v Kirk, 84 F 3d 178 (5th cir., 1996). Nat. Comm. of U.S. Taxpayers Party v Garza, 924 F Supp 71 (W.D. 1996). Kennedy v Cascos, 214 F.Supp.3d 559 (w.d. Tex, 2016).
**Virginia**: Wood v Meadows, 207 F 3d 708 (4th cir., 2000).
**Washington**: Washington State Republican Party v Washington State Grange, 876 F.3d 794 (2012).
**West Virginia**: Fishbeck v Hechler, 85 F 3d 162 (4th cir., 1996).

**Wyoming**: Spiegel v State of Wyoming, 96-cv-1028, U.S. Dist. Ct., 1996: petition deadline.

QUALIFIED EXPERT WITNESS

**Fishbeck v Hechler**, 85 F 3d 162 (4th cir. 1996, West Virginia case)
**Council of Alternative Political Parties v Hooks**, 999 F Supp 607 (1998, N.J.)
**Citizens to Establish Reform Party v Priest**, 970 F Supp 690 (E.D. Ark, 1996)
**Atherton v Ward**, 22 F Supp 2d 1265 (W.D.Ok. 1998)
**Calif. Democratic Party v Jones**, 530 US 567 (2000)
**Swanson v Bennett**, not reported, U.S. Dist. Ct., m.d.Ala. (02-T-644-N)
**Clingman v Beaver,** 544 U.S. 581.
**Green Pty v N.Y. Bd. Elec.**, 267 F Supp 2d 342 (EDNY 2003), 389 F.3d 411 (2nd 2004)
**Lawrence v Blackwell**, 430 F.3d 368 (6th cir. 2005)
**Hall v Merrill,** 212 F.Supp.3d 1148 (Alabama m.d. 2016)
**Graveline v Johnson,** 336 F.Supp.3d 801 (e.d. Mi. 2018), aff'm 747 F Appx 408 (6th cir. 2018)
**Green Party of Tennessee v Hargett,** 882 F.Supp.2d 959 (m.d. Tn. 2012); also 953 F.Supp.2d 816 (same)
**De La Fuente v Padilla,** 930 F.3d 1101 (9th cir. 2019)
**De La Fuente v State of Arizona**, 2:16cv-2419 (2019)

CASES IN WHICH DECISION MENTIONED MY EVIDENCE AND EITHER STRUCK DOWN OR ENJOINED THE LAW

**Hall v Merrill**, 212 F.Supp.3d 1148 (m.d. Ala. 2016), footnote 10. Eleventh Circuit later ruled that case was moot when it was decided and therefore vacated the decision, 902 F.3d 1294.
**Citizens to Establish a Reform Party in Arkansas v Priest,** 970 F.Supp.690 (e.d. 1996) at 695.
**Green Party of Arkansas v Priest**, 159 F.Supp.2d 1140 (e.d. 2001). Decision cites my evidence at p. 1143 but doesn't name me.
**Green Party of Arkansas v Daniels,** 445 F.Supp.2d 1056 (e.d. 2006) at 1059ff
**Libertarian Party of Arkansas v Thurston,** e.d. 4:19cv-214 (July 3, 2019)
**California Justice Committee v Bowen**, 2012 WL 5057625 (Oct. 18, 2012)
**Green Party of Georgia v Kemp,** 171 F.Supp.3d 1340 (n.d. 2016); aff'm, 674 F Appx 974 (11th cir. 2017)
**Gill v Scholz**, U.S. Dist. Ct., n.d. Ill. 16cv-3221. Court enjoined law and put candidate on ballot. Then the 7th circuit issued a one-sentence order removing the candidate from the ballot but not explaining why. Then another U.S. District Court Judge upheld law. Case is pending in the 7th circuit.
**Jones v McGuffage**, 921 F.Supp.2d 888 (2017) at 893.
**Lee v Keith,** 463 F.3d 763 (7th cir. 2006) at 766 (decision uses my evidence but does not name me)
**Libertarian Party of Illinois v Illinois State Bd. of Elections**, 164 F.Supp.3d 1023 (n.d. 2016). See footnote four.
**Graveline v Johnson**, 336 F.Supp.3d 801, aff'm 747 F Appx 408 (6th cir. 2018)
**Breck v Stapleton,** 6:18cv-87 (2017).

**Green Party of N.Y. v N.Y. State Board of Elections**, 389 F.3d 411 (2004) at 421
**Libertarian Party of Ohio v Blackwell**, 462 F.3d 579 (6th cir. 2006) at 589
**Libertarian Party of Ohio v Husted**, 2014 WL 11515569 (s.d. Oh. Jan. 7, 2014)(opinion misspells my surname as "Wagner")
**Libertarian Party of South Dakota v Krebs**, 290 F.Supp.3d 902 (2018)
**Libertarian Party of Tennessee v Goins**, 793 F.Supp.2d 1064 (m.d. 2010) at 1068
**Green Party of Tennessee v Hargett**, 882 F.Supp.2d 959 (m.d. 2012) at 976ff; on remand, 953 F.Supp.2d 816 (m.d. 2013) under heading "Parties' Expert Proof)

LIST OF ALL CASES IN LAST FOUR YEARS IN WHICH I TESTIFIED AT TRIAL OR AT DEPOSITION

**Green Party of Georgia v Kemp** (deposition 2015)
**Green Party of Tennessee v Hargett** (trial 2016)
**Libertarian Party of Illinois v Illinois State Election Board** (deposition 2017)
**De La Fuente v Padilla** (deposition 2017, California)
**Kennedy v Cascos** (court hearing 2016, Texas)
**Libertarian Party of South Dakota v Krebs** (trial 2018)
**Libertarian Party of Georgia v Raffensperger** (deposition 2019)
**Montana Green Party v Stapleton** (deposition 2019)
**Sweeney v Crigler** (deposition 2019)

SPEAKING ENGAGEMENTS: Colleges and Scholarly Meetings

Panel of New York City Bar Association, 1994. Ballot access.
Amer. Political Science Assn., nat. conventions of August 1995 and August 1996. Papers.
Capital University School, law school class, Columbus, Ohio, 1996. Guest lecturer.
Cal. State U., course in political science, Hayward, 1993 and 1996. Guest lecturer.
San Francisco City College, course in political science, 1996 and 1997. Guest lecturer.
Providence College, R.I., Oct. 1997, seminar on ballot access.
Harvard U., JFK School of Gov't, Oct. 18, 1995, guest lecturer, ballot access.
Voting Integrity Project national conference, Apr. 1, 2000, speaker on ballot access.
Center for Voting & Democracy nat. conference, Nov. 30, 2003, speaker on ballot access.
Robert Dole Institute of Politics, U. of Kansas, one of 5 panel members, Oct. 25, 2007.

# EXHIBIT L

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BYRON SIGCHO LOPEZ,<br>JOSE GUERRA,<br><br>Plaintiff,<br>v.<br><br>LAURA K. DONAHUE, Chair, RICK S. TERVEN, SR., Vice Chair, JENNIFER M. BALLARD CROFT, CRISTINA D. CRAY, TONYA L. GENOVESE, CATHERINE S. McCRORY, JACK VRETT, and CASSANDRA B. WATSON,<br><br>Defendants. | ) | No. 26-cv-9156<br><br>Hon. Franklin U. Valderrama |

**Supplemental Declaration of Richard Winger**

The undersigned, Richard Winger, affirms and declares under penalty of perjury the following facts based upon his personal knowledge, expertise in ballot access requirements in the US, and experience.

1. I am over 18 years of age, and a resident of the State of California. I provide the statements in this Declaration based upon my own personal knowledge and research that I have conducted for decades studying ballot access laws throughout the United States, and if called to testify would testify under oath to the contents of this Declaration.

2. I graduated from the University of California at Berkely in 1966 with a B.A. degree in political science. Since 1985 I have been the editor and publisher (and recently co-editor with Bill Redpath) of Ballot Access News, a non-partisan newsletter and website ( https://ballot-access.org/ ) that reports on developments in ballot access laws throughout the nation, and developments in the law which affect political parties.

3. I have researched the ballot access laws of all 50 states from the year 1888 to present. I have become well-versed in how the ballot access laws of each state have worked historically and how those laws compare with the laws of Illinois, and as stated in my curriculum vitae attached to my first Declaration in this case, I have offered expert testimony and testified in ballot access cases in over half the states.

5. This Supplemental Declaration expands upon and adds additional information and opinions to supplement my first Declaration in this case.

6. For petitions in lieu of filing fee, Florida says in elections in years ending in "2" (that is, in elections following redistricting) the state calculates the number of signatures as 1% of the population of the average district, so the number of signatures is the same in every district and signatures can be collected anywhere in the state.

7. Other than Florida, I don't know of any other state except Illinois that has special (or different) signature calculation rules for years ending in "2". Indiana uses the same signature calculation rule after redistricting, which is 2% of total votes cast in the district at the last election for the secretary of state.

8. The election code in Texas addressed by *American Party of Texas v. White*, 415 U.S. 767 (1974) reviewed the Texas requirement for the lesser of 500 signatures or 5% which was the law since 1963. I attended the oral argument for the US Supreme Court decision in this case, and the Supreme Court allowed one independent candidate to address the Court, and he testified that it was still very difficult to obtain 500 signatures. The US Supreme Court did not uphold a 3% or 5% signature requirement, but rather, upheld a 500 signature requirement in Texas.

9. In the period 1931 to the present, Illinois has never had more than 4 candidates on the November ballot for US House in a district (there were some at-large elections in the 1930's and 1940's but they are irrelevant to any 5% petition) except one race in 1996 with five candidates. I have books for every election from the Congress, called "Statistics of Congressional Election for [date of election]" going back to 1920, and these books confirm this.

10. Illinois requires 3,000 signatures for presidential primary candidates, and presidential primary ballots in Illinois are relatively crowded. In 2020 there were eleven candidates on the Democratic primary ballot, and in 2016 there were eleven candidates on the Republican primary ballot. There were also nine candidates in the 2008 Republican ballot, and nine in 2004 in the Dem. Primary. I am not aware of any election administration issues that arose as a result of having this many candidate names printed on these ballots.

11. There is only one other state, Georgia, that requires a candidate for US House to submit over 10,000 signatures. South Carolina caps the signature requirement at exactly 10,000 signatures.

12. Both Illinois and Georgia are anticipated to continue to require considerably more than 10,000 signatures because this mid-term election is expected to have a large voter turnout, much like presidential election years.

Pursuant to 28 U.S.C. Sec. 1746(2) I hereby declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

/s/ Richard Winger